ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF JASPER | OF THE FOURTEENTH JUDICIAL CIRCUIT |
| A.M.L., J.J.L., E.R.L., by and through their Next of Friend, John Doe, R.D.M., by and through his Next of Friend, Jane Snow, J.J.G., and S.T.S., | **SUMMONS** |
| Plaintiffs, | |
| v. | |
| Wright Directions, LLC, Renee Sutton, LPC, Nicki Nichols, LPC, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, Sandra Roberts, Tyrone B. Beckett, First Zion Missionary Baptist Church, South Carolina Department of Social Services, SCDSS Case Worker #1, SCDSS Case Worker #2, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #1, SCDSS Case Worker Supervisor #2, Magnelia Washington Cottrell, Charles Brown, Franklin County Childrens Services, FCCS Case Worker #1, FCCS Case Worker #2, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #1, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, Joe Haynes, Beaufort County School Board Member #1, Beaufort County School District Administrator #1, Beaufort County School District Administrator #2, Seaside Pediatrics of Bluffton, P.C., Maureen Berrigan, M.D., Palmetto Pediatrics of the Low Country, LLC, Lance Lowe, M.D., | |
| Defendants. | |

TO: DEFENDANTS ABOVE-NAMED

YOU ARE HEREBY SUMMONED and required to answer the Complaint in this matter, a copy of which is herewith served upon you, and to serve a copy of your Answer to the said Complaint on the subscribers at their office, 507 Walnut Street, Camden, South Carolina 29020, Post Office Box 610, Camden, South Carolina, 29020, within thirty (30) days after the service hereof, exclusive of the day of such service, and if you fail to answer the Complaint within the time aforesaid, judgment by default will be rendered against you for the relief demanded in the Complaint.

The Camden Law Firm, PA

<u>s/Robert J. Butcher</u>
Deborah J. Butcher
S.C. Bar No. 74029
Fed. Bar No. 10731
Robert J. Butcher
S.C. Bar No. 74722
Fed. Bar No. 9767
The Foster Care Abuse Law Firm, PA
507 Walnut Street
Camden, South Carolina 29020
P.O. Box 610
Camden, South Carolina 29021
Telephone:      (803) 432-7599
Facsimile:      (803) 432-7499
rbutcher@camdensc-law.com
dbutcher@camdensc-law.com

Attorneys for Plaintiffs

Camden, S.C.
May 9, 2022

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF JASPER | OF THE FOURTEENTH JUDICIAL CIRCUIT |
| A.M.L., J.J.L., E.R.L., by and through their Next of Friend, John Doe, R.D.M., by and through his Next of Friend, Jane Snow, J.J.G., and S.T.S., | |
| Plaintiffs, | |
| v. | **COMPLAINT**<br>*(JURY TRIAL DEMANDED)* |
| Wright Directions, LLC, Renee Sutton, LPC, Nikki Nichols, LPC, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, Sandra Roberts, Tyrone B. Beckett, First Zion Missionary Baptist Church, South Carolina Department of Social Services, SCDSS Case Worker #1, SCDSS Case Worker #2, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #1, SCDSS Case Worker Supervisor #2, Magnelia Washington Cottrell, Charles Brown, Franklin County Childrens Services, FCCS Case Worker #1, FCCS Case Worker #2, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #1, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, Joe Haynes, Beaufort County School Board Member #1, Beaufort County School District Administrator #1, Beaufort County School District Administrator #2, Seaside Pediatrics of Bluffton, P.C., Maureen Berrigan, M.D., Palmetto Pediatrics of the Low Country, LLC, Lance Lowe, M.D., | |
| Defendants. | |

The Plaintiffs, complaining of the Defendants, would respectfully show this Court the following:

## I.     The Parties.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

**A. Plaintiffs.**

1.      Plaintiff **A.M.L.** was born in Ohio in 2004. A.M.L. is currently a citizen and resident of the County of Dorchester in the State of South Carolina.

2.      Plaintiff **J.J.L.** was born in Ohio in 2005. J.J.L. is currently a citizen and resident of the County of Dorchester in the State of South Carolina.

3.      Plaintiff **E.R.L.** was born in Ohio in 2011. E.R.L. is currently a citizen and resident of the County of Dorchester in the State of South Carolina.

4.      As A.M.L., J.J.L., and E.R.L. are minor children, this action is brought on her behalf by their next of Friend, **John Doe**. John Doe is the adoptive father of A.M.L., J.J.L., and E.R.L. and a citizen and resident of the County of Dorchester in the State of South Carolina. John Doe is also bringing necessaries claims for the medical and extraordinary care that will be necessary due to the starving, torture, and harm perpetrated of the girls.

5.      Plaintiff **R.D.M.** was born in Ohio in 2006. R.D.M. is currently a citizen and resident of the County of Charleston in the State of South Carolina.

6.      As R.D.M. is a minor child, this action is brought on his behalf by his next of Friend, **Jane Snow**. Jane Snow is the adoptive mother of R.D.M. and a citizen and resident of the County of Charleston in the State of South Carolina. Jane Snow is also bringing necessaries claims for the medical and extraordinary care that will be necessary due to the starving, torture, and harm perpetrated of R.D.M.

7.      Plaintiff **J.J.G.** was born in Ohio in 2003. J.J.G. is currently a citizen and resident of the County of Berkeley in the State of South Carolina.

8.      Plaintiff **S.T.S.** was born in South Carolina in 2003. S.T.S. is currently a citizen and resident of the County of Beaufort in the State of South Carolina.

9.     Plaintiffs J.J.G. and S.T.S. proceed under pseudonyms to protect the anonymity of their four minor siblings. In addition, the family of their abusers have threatened to harm some of the Plaintiffs.

**B.  First Zion Missionary Baptist Church Defendants.**

10.     Defendant Tyrone B. Beckett was the pastor of First Zion Missionary Baptist Church and he resides at 3055 Steep Bottom Road, Estill, South Carolina in the County of Hampton in the State of South Carolina.

11.     Defendant **First Zion Missionary Baptist Church** is a nonprofit corporation located in the County of Beaufort in the State of South Carolina. Clifford Bush, III, Esq. is the Registered Agent and he is located at 10 Robertson Street, Bluffton, South Carolina 29910.

**C.  Wright Directions Family Services Defendants.**

12.     The Wright Directions Family Services Defendants are also referred to as WDFS Defendants.

13.     Defendant **Wright Directions, LLC**, **(WDFS)** is a limited liability company whose registered agent is Corporation Service Company and is 508 West Meeting Street, West Columbia, South Carolina a. WDFS is located in the County of Jasper in the State of South Carolina.

14.     WDFS owns, operates, manages, and oversees family services clinics and provides the counselors, employees, and care for many children in the low country of South Carolina.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

15. WDFS was responsible for ensuring operations at their Family Services Clinics provided safe and competent care to their minor patients, including those who were being, or had been, starved, tortured, and abused like A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.

16. WDFS had the right or power to direct and control the way its employees and/or agents provided care and operate the business of delivering medical and non-medical care for a fee through its facilities.

17. WDFS had the right or power to direct and control the way its employees and/or agents hire, retain, supervise, and train staff under its employment or agency.

18. WDFS had non-delegable duties to provide staff with adequate knowledge and training to be able to provide necessary and reasonable medical and non-medical care to patients at its facilities and clinics.

19. WDFS had medical and/or non-medical staff who are its agents, servants, and employees, and all acts or omissions complained of herein, performed by said agents, servants, and employees occurred during the course and scope of such agency and/or employment and are therefore imputed to the Defendant.

20. The negligent, grossly negligent, reckless, willful or wanton acts, omissions, and liability of Defendant WDFS includes that of their agents, principals, employees, and/or servants, both directly and vicariously, pursuant to principals of non-delegable duty, corporate liability, apparent authority, agency, ostensible agency, and/or *respondeat superior*.

21. Defendant **Nicki Nichols, LPC**, is a citizen and resident of the County of Jasper in the State of South Carolina. She is a licensed professional counselor and she provided psychological and family services to the Plaintiff children. Nicki Nichols was an employee of WDFS.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

22.     Defendant **Renee Sutton, LPC,** is a citizen and resident of the County of Beaufort in the State of South Carolina. She is a licensed professional counselor and she provided psychological and family services to the Plaintiff children. Renee Sutton was an employee of WDFS.

23.     Defendants **WDFS Employee #1, WDFS Employee #2, WDFS Employee #3,** and **WDFS Employee #4** are unknown employees of Wright Directions, LLC. It is believed they are citizens and residents of the Counties of Jasper or Beaufort in the State of South Carolina.

24.     Defendant **Jawanda McNair** is a citizen and resident of the County of New Hanover in the State of North Carolina. She was the quality assurance manager at WDFS and was responsible for approving all billing, to include fraudulent billing which was sent electronically to Medicaid and defrauded the Children of psychological services and family services and Medicaid of money. Jawanda McNair was an officer of WDFS.

25.     Defendant **Gregg Wright** is a citizen and resident of the County of Jasper in the State of South Carolina. He was the Chief Executive Officer at WDFS and was responsible for approving all billing, to include fraudulent billing which was sent electronically to Medicaid and defrauded the Children of psychological services and family services and Medicaid of money.

26.     Defendant **Sandra Roberts** is a citizen and resident of the County of Jasper in the State of South Carolina. She was responsible for electronically sending fraudulent billing to Medicaid and defrauded the Children of psychological services and family services and Medicaid of money.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

**D.  South Carolina Department of Social Services Defendants.**

27.    Defendant *South Carolina Department of Social Services* **("SCDSS")** is an agency of the State of South Carolina created by the General Assembly of the State of South Carolina. SCDSS is responsible for ensuring that the children in its custody are safe and are receiving adequate care and treatment in accordance with applicable legal standards. S.C. Code Ann. § 43-1-10 (1993); S.C. Code Ann. § 63-7-10(A)(5). It is also responsible for investigating allegations of child abuse and neglect in South Carolina.

28.    Defendants **SCDSS Case Worker #1, SCDSS Case Worker #2, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #1,** and **SCDSS Case Worker Supervisor #2,** are unknown employees of the South Carolina Department of Social Services. It is believed they are citizens and residents of the Counties of Jasper or Beaufort in the State of South Carolina.

29.    Defendant **Magnelia Washington Cottrell** is a citizen and resident of the County of Beaufort in the State of South Carolina. From March 11, 2010 through June 6, 2010, she was employed by the South Carolina Department of Social Services. Magnelia Washington Cottrell is sued in her individual capacity.

30.    Defendant **Charles Brown** is a is a is a citizen and resident of the County of Beaufort in the State of South Carolina. From March 11, 2010 through June 6, 2010, she was employed by the South Carolina Department of Social Services. Charles Brown is sued in his individual capacity.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

### E.  Franklin County Childrens Services Defendants.

31.    Defendant **Franklin County Childrens Services** is a "public children services agency" and has assumed the powers and duties of the children services function for Franklin County, Ohio. Ohio Rev. Code §§5153.01 & 5153.02. See also, Ohio Rev. Code § 307.981. In 2015 Franklin County Children Services had 4,225 children in its custody, among them, A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G.[1] Franklin County Children Services is sued pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

32.    Defendants **FCCS Case Worker #1, FCCS Case Worker #2, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #1, FCCS Case Worker Supervisor #2** are unknown employees of Defendant Franklin County Childrens Services. It is believed they are citizens and residents of the County of Franklin in the State of Ohio.

### F.  Adoption Advocacy Defendants.

33.    **Adoption Advocacy, Inc.** is a private adoption agency registered with the Secretary of State for State of South Carolina as a nonprofit corporation. The corporation's registered agent is June S. Bond and her address is 1712 Waterway Court, Spartanburg, South Carolina 29301. Adoption Advocacy, Inc. is located in the County of Spartanburg, State of South Carolina.

34.    **June Bond** is an employee of Adoption Advocacy, Inc., a citizen and resident of the County of Spartanburg in the State of South Carolina, and was responsible for the

---

[1] FCA Bates No, 011193, 004737, 007729, 008230.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

investigation, placement, and monitoring of the placement, supervision, and safety of A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G.

35.    **Joseph Haynes** is an employee of Adoption Advocacy, Inc., a citizen and resident of the County of Spartanburg in the State of South Carolina, and was responsible for the investigation, placement, and monitoring of the placement, supervision, and safety of A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G.

**G. Beaufort County School District Defendants.**

36.    **Beaufort County School District Administrator #1, Beaufort County School District Administrator #2** are unknown employees of the Beaufort County School District. It is believed they are citizens and residents of the County of Beaufort in the State of South Carolina.

37.    Defendant **Beaufort County School Board Member #1** was an elected member of the Beaufort County School Board. Beaufort County School Board Member #1 is a citizen and resident of the County of Beaufort, State of South Carolina.

**H. Seaside Pediatrics Defendants.**

38.    Defendant **Seaside Pediatrics of Bluffton, P.C.** is a professional corporation located in the County of Beaufort in the State of South Carolina. Its registered agent is Maureen M. Berrigan and she is located at 37 Offshore Road, Hilton Head Island, South Carolina 29928.

39.    Seaside Pediatrics of Bluffton, P.C., owns, operates, manages, and oversees a pediatric clinic and provides the physicians, employees, and care for many children in the low country of South Carolina.

40.     Defendant **Maureen M. Berrigan, M.D.** is a citizen and resident of the County of Beaufort in the State of South Carolina. At all times relevant to the allegations herein, Dr. Berrigan was a physician licensed and practicing pediatric medicine in the State of South Carolina. At all times Dr. Berrigan treated A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., she was acting in the course and scope of her employment and/or agency with Seaside.

41.     Seaside Pediatrics of Bluffton, P.C., was singularly responsible for ensuring operations at its pediatric clinic and to provide safe and competent care to its minor patients, including those who were being, or had been, starved, tortured, and abused like A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.

42.     At all relevant times, Seaside Pediatrics of Bluffton, P.C., held itself out as a modern competent medical facility that included trained and skilled physicians.

43.     Seaside Pediatrics of Bluffton, P.C., had the right or power to direct and control the way its employees and/or agents provided care and operate the business of delivering medical and non-medical care for a fee through its facilities.

44.     Seaside Pediatrics of Bluffton, P.C., had the right or power to direct and control the way its employees and/or agents hire, retain, supervise, and train staff under its employment or agency.

45.     Seaside Pediatrics of Bluffton, P.C., had non-delegable duties to provide staff with adequate knowledge and training to be able to provide necessary and reasonable medical and non-medical care to patients at its facilities and clinics.

46.     Seaside Pediatrics of Bluffton, P.C., had medical and/or non-medical staff who are its agents, servants, and employees, and all acts or omissions complained of herein,

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

performed by said agents, servants, and employees occurred during the course and scope of such agency and/or employment and are therefore imputed to the Defendant.

## I. Palmetto Pediatrics Defendants.

47.    Defendant **Palmetto Pediatrics of the Low Country, LLC**, is a limited liability company located in the County of Beaufort in the State of South Carolina. Its registered agent is Lance S. Lowe, M.D. and he is located at 18 Wellington Drive, Bluffton, South Carolina 29910.

48.    Palmetto Pediatrics of the Low Country, LLC, owns, operates, manages, and oversees a pediatric clinic and provides the physicians, employees, and care for many children in the low country of South Carolina.

49.    **Lance S. Lowe, M.D.** is a citizen and resident of the County of Beaufort in the State of South Carolina. At all times relevant to the allegations herein, Lowe was a physician licensed and practicing pediatric medicine in the State of South Carolina. At all times Dr. Lowe treated A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., he was acting in the course and scope of his employment and/or agency with Palmetto Pediatrics of the Low Country, LLC.

50.    Palmetto Pediatrics of the Low Country, LLC, was singularly responsible for ensuring operations at its pediatric clinic and to provide safe and competent care to its minor patients, including those who were being, or had been, starved, tortured, and abused like A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.

51.    At all relevant times, Palmetto Pediatrics of the Low Country, LLC, held itself out as a modern competent medical facility that included trained and skilled physicians.

52.     Palmetto Pediatrics of the Low Country, LLC, had the right or power to direct and control the way its employees and/or agents provided care and operate the business of delivering medical and non-medical care for a fee through its facilities.

53.     Palmetto Pediatrics of the Low Country, LLC, had the right or power to direct and control the way its employees and/or agents hire, retain, supervise, and train staff under its employment or agency.

54.     Palmetto Pediatrics of the Low Country, LLC, had non-delegable duties to provide staff with adequate knowledge and training to be able to provide necessary and reasonable medical and non-medical care to patients at its facilities and clinics.

55.     Palmetto Pediatrics of the Low Country, LLC, had medical and/or non-medical staff who are its agents, servants, and employees, and all acts or omissions complained of herein, performed by said agents, servants, and employees occurred during the course and scope of such agency and/or employment and are therefore imputed to the Defendant.

**J.  Generally.**

56.     The above-named Defendants are jointly and severally liable for all damages alleged herein since their negligent, grossly negligent, reckless, and wanton acts and omissions, singularly or in combination, are the contributing proximate cause(s) of Plaintiffs' and Minor Children's damages and injuries.

**II.     Jurisdiction and Venue.**

57.     Plaintiffs incorporate paragraphs 1-56 as if incorporated herein verbatim.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

58.    This Court has subject matter jurisdiction over this action pursuant to 42 U.S.C. §1983, *Martinez v. California*, 444 U.S. 277 (1980), 18 U.S.C. §1964(c), and S.C. Code Ann. § 15-78-100(b) and has personal jurisdiction over the parties.

59.    Venue lies in County of Jasper, State of South Carolina pursuant to S.C. Code Ann. §§ 15-7-30 and 15-78-100(b) as the first named Defendant is a citizen and resident of County of Jasper in the State of South Carolina.

### III.    Damage Allegations.

60.    Plaintiffs incorporate paragraphs 1-59 as if incorporated herein verbatim.

61.    The WDFS Defendants, Seaside Pediatrics Defendants, and Palmetto Pediatrics Defendants are private entities or persons subject, in part, to the Non-Economic Damages Act of 2005.

62.    Plaintiffs identified multiple breaches of the standards of care by Defendants (and their agents and/or employees) – some of which are known, and some which are currently unknown.

63.    The Non-Economic Damages Act of 2005 limits the Plaintiffs' single occurrence non-economic damages.

64.    Each claimant is limited to a total of 3 caps for simple medical negligence causes of action.

65.    Plaintiffs are also alleging non-economic (general negligence) and economic damages not subject to the limitations contained in the Non-Economic Damages Act of 2005.

66.    In addition, Plaintiffs are alleging the WDFS Defendants, Seaside Pediatrics Defendants, and Palmetto Pediatrics Defendants (and their physicians, nurses, service providers,

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

agents, and/or employees) committed reckless and grossly negligent acts which breached the standards of medical and non-medical care which are also not subject to limitations contained in the Non-Economic Damages Act of 2005.

67.    S.C. Code Ann. §15-32-220(E) states that "the limitations for noneconomic damages rendered against any health care provider or health care institution do not apply if the jury or court determines that the defendant was grossly negligent, willful, wanton, or reckless, and such conduct was the proximate cause of the claimant's noneconomic damages, or if the defendant has engaged in fraud or misrepresentation related to the claim, or if the defendant altered or destroyed medical records with the purpose of avoiding a claim or liability to the claimant."

68.    Thus, if Defendants engaged in any grossly negligent or reckless care or misrepresented any care related to the claim, there would be no caps on damages.

69.    As a result, there are certain negligent, grossly negligent, reckless, willful, and wanton actions (and/or inactions) (pursuant to S.C. Code Ann. §15-32-220(E)) for which an unlimited amount of damages is recoverable.

### IV.    Non-Medical Malpractice Causes of Action.

70.    Plaintiffs incorporate paragraphs 1-69 as if incorporated herein verbatim

71.    Some of the causes of actions against the WDFS Defendants, Seaside Pediatrics Defendants, and Palmetto Pediatrics Defendants are grounded under a non-medical malpractice standard.

72.    "[N]ot every action taken by a medical professional in a hospital or doctor's office necessarily implicates medical malpractice and, consequently, the requirements of [S.C.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

Code Ann.] Section 15-79-125." *Dawkins v. Union Hosp. Dist.*, 408 S.C. 171, 178, 758 S.E.2d 501, 504 (2014).

73.     "However, at all times, the medical professional must 'exercise ordinary and reasonable care to ensure that no unnecessary harm [befalls] the patient.'" *Id.*, at 178, 758 S.E.2d at 504 (further citations omitted).

74.     "The statutory definition of medical malpractice found in section 15-79-110(6) does not impact medical providers' ordinary obligation to reasonably care for patients with respect to nonmedical, administrative, ministerial, or routine care." *Id.*

## A. Administrative Actions are not medical negligence.

75.     Upon information and belief, the WDFS Defendants, Seaside Pediatrics Defendants, and Palmetto Pediatrics Defendants were overseen and/or governed by a board of directors who formulated policies, procedures, and strategy at the time of any care to A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.

76.     The board members of the WDFS Defendants, Seaside Pediatrics Defendants, and Palmetto Pediatrics Defendants created policies, procedures, rules and/or regulations for each specific facility (if more than one).

77.     In order for these committees and the policies, procedures, rules, and regulations these committees formulate to be effective, they have to create proper structure.

78.     To create the proper structure, the entity must have a clear purpose with sustainable goals and objectives.

79.     The creation of these policies and procedures, rules and regulations of safety committees is a core purpose of the care system for minor children.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

80.     These actions are administrative in nature.

81.     In order to create a safe system for patients, the defendants must utilize different modalities to make themselves aware of potential danger to minor children.

82.     The awareness of potential danger is based on historical data, experience, literature and information within the industry.

83.     The awareness of known danger or potential danger is NOT medical practice or medical judgment.

84.     The awareness of danger to minor children and ways to mitigate or eliminate them is in the purview of the administrative arm of the WDFS Defendants, Seaside Pediatrics Defendants, and Palmetto Pediatrics Defendants.

85.     Once aware of hazards and/or using national or regional paradigms, the WDFS Defendants, Seaside Pediatrics Defendants, and Palmetto Pediatrics Defendants can then create policies, procedures, rules, and regulations that are intended to be efficacious.

86.     Most of these policies, procedures, rules, and regulations have been tested, or have been proven to be useful in creating a safer facility.

87.     Most of these safety policies, procedures, rules, and regulations involve common sense objectives and solutions.

88.     The actions or inactions of employees and/or agents of the Defendants regarding policies, procedures, rules and regulations are not medical care.

89.     They are mostly administrative in nature and involve the goal of safety for the patient or minor child.

90.     The creation of these types of policies, procedures, rules, and regulations do not require the practice of medicine while formulating such written objectives.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

91.    It does require common sense.

92.    If any Defendant has deficient policies, procedures, rules and/or regulations by the failure of a staff-oriented committee to recognize, enact and/or implement such strategies, there is a NO cap for the actions or inactions of any administrative committee.

93.    Medical malpractice covers all sorts of procedures and medical judgment calls which physicians and nurses must make when treating patients with ailments or injuries.

94.    However, "not every injury sustained by a patient in a hospital results from medical malpractice." *Dawkins v. Union Hosp. Dist.*, 408 S.C. 171, 177, 758 S.E.2d 501, 504 (2014).

95.    *Dawkins* stands for the proposition that doctors, nurses, and medical professionals acting in their professional capacity and their professional setting can commit errors grounded in ordinary negligence, administrative negligence, or ministerial action negligence rather than medical malpractice.

96.    The allegations in this complaint are grounded in both medical and non-medical malpractice tort principles.

97.    Even if a doctor, nurse, or counselor is discharging their duty regarding the minor child in this case, the breach of the duties which resulted in injury came about due to both medical and non-medical actions that may have been contributed to or caused by administrative actions or inactions.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

**B. Failure to create a culture of safety is not medical negligence.**

98.     The responsibilities of WDFS Defendants, Seaside Pediatrics Defendants, and Palmetto Pediatrics Defendants includes creating a culture of safety for their minor patients and/or clients.

99.     In a culture of safety, people are not merely encouraged to work toward change; they take action when it is needed. Inaction in the face of safety problems is taboo, and eventually the pressure comes from all directions — from peers as well as leaders.

100.     There is no room in a culture of safety for those who uselessly point fingers or say, "Safety is not my responsibility, so I'll file a report and wash my hands of it."

101.     Part of the creation of a culture of safety at any of the Defendant's facilities is to investigate when bad things happen.

102.     This can occur when a medical provider or employee suspects a minor child is being abused.

103.     Minor Children deserve protection from abusers in their midst.

104.     Part of the safety net for children who live with or are the children of an abuser rely on physicians and family service providers to investigate and/or determine if a child is being abused.

105.     This type of vigilance takes many forms.

106.     A child is an innocent.

107.     They cannot protect themselves from abusive and torturing parents.

108.     It requires member of the child's medical and family Services support community to protect them.

109.     This requires entities and people like the defendants to do a competent job.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

110.    If they ignore or fail to respond to obvious symptoms of starving, torture and abuse, they are willfully ignorant.

111.    Pediatrics and family services are specifically delineated industries where abuse and neglect of children is a known phenomenon, and awareness of such does not require expert medical knowledge.

112.    Unfortunately, if the physician and/or family medical services provider fails in their protection for a minor child, the minor can suffer for years.

113.    This includes starvation, horrible physical base, torture and mental and emotional abuse.

114.    Children deserve protection.

115.    If a physician or family services providers fails to understand why a child is starved, tortured or abused, they are creating a culture that allows such events to re-occur.

116.    If a physician or family services provider does not act on explicit and common-sense evidence of starvation, torture and abuse, they are contributing to a culture of gross negligence and recklessness.

117.    The failure of a physician or family services provider to respond properly to starvation, torture and abuse of minor children and/or patients, leads to more starvation, torture and abuse events of minor children.

118.    A reasonable physician and or medical services corporation has a duty and obligation to determine what happened when a child is showing signs of starvation, torture or abuse and act accordingly.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

119.    Failure by the WDFS Defendants, Seaside Pediatrics Defendants, and Palmetto Pediatrics Defendants to ensure integrity in the process of protecting a minor child is a breach of the industry standard and leads to increased danger to all minor children and/or patients.

120.    Failure to protect a child after obvious signs of starvation, torture and abuse is NOT medical negligence.

## V.    Child Services Agencies.

121.    Plaintiffs incorporate paragraphs 1-120 as if incorporated herein verbatim.

122.    Child welfare agencies are "responsible for ensuring that children who have been found to be victims of abuse or neglect are protected from further harm. Whether the child is placed in out-of-home care or maintained in the home, the child welfare agency's first concern must be to ensure the safety of the child." U.S. Department of Health and Human Services Administration of Children and Families, Children's Bureau, *Child Welfare Outcomes Report 2016 Report to Congress*, *16.

123.    A "foster home" means a private residence in which children are received apart from their parents, guardian, or legal custodian, by an individual reimbursed for providing the children nonsecure care, supervision, or training twenty-four hours a day. "Foster home" does not include care provided for a child in the home of a person other than the child's parent, guardian, or legal custodian while the parent, guardian, or legal custodian is temporarily away. Family foster homes and specialized foster homes are types of foster homes. Ohio Rev. Code §5103.02(D).

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

124.    The operation of a foster home is a governmental function that falls within the grant of public immunity afforded by the Ohio Tort Claims Act. *Johnson v. Calhoun*, 2008 Ohio 549, *9 (Ohio Court of Appeals 9th District 2008).

## A.  Franklin County Children Services.

125.    Franklin County Children Services is a "public children services agency" and has assumed the powers and duties of the children services function for Franklin County, Ohio. Ohio Rev. Code §§5153.01 & 5153.02. See also, Ohio Rev. Code § 307.981. In 2015 Franklin County Children Services had 4,225 children in its custody, among them, A.M.L., J.J.L., R.D.M., and J.J.G. These children were placed in foster care, congregate care, residential treatment facilities, and kinship care. Ohio law limits children services "…with respect to the care of children, needing or likely to need public care or services, shall be vested in a single agency of county government…" This includes:

(1) Make an investigation concerning any child alleged to be an abused, neglected, or dependent child;
(2) Enter into agreements with the parent, guardian, or other person having legal custody of any child, or with the department of job and family services, department of mental health and addiction services, department of developmental disabilities, other department, any certified organization within or outside the county, or any agency or institution outside the state, having legal custody of any child, with respect to the custody, care, or placement of any child, or with respect to any matter, in the interests of the child, provided the permanent custody of a child shall not be transferred by a parent to the public children services agency without the consent of the juvenile court;
(3) Accept custody of children committed to the public children services agency by a court exercising juvenile jurisdiction;
(4) Provide such care as the public children services agency considers to be in the best interests of any child adjudicated to be an abused, neglected, or dependent child the agency finds to be in need of public care or service;
(7) Provide temporary emergency care for any child considered by the public children services agency to be in need of such care, without agreement or commitment;
(8) Find certified foster homes, within or outside the county, for the care of children, including handicapped children from other counties attending special schools in the county;

…

(12) Cooperate with, make its services available to, and act as the agent of persons, courts, the department of job and family services, the department of health, and other organizations within and outside the state, in matters relating to the welfare of children…;

(14) Administer funds provided under Title IV-E of the "Social Security Act," 94 Stat. 501 (1980), 42 U.S.C.A. 671, as amended, in accordance with rules adopted under section 5101.141 of the Revised Code;

(15) In addition to administering Title IV-E adoption assistance funds, enter into agreements to make adoption assistance payments under section 5153.163 of the Revised Code;

(16) Implement a system of safety and risk assessment, in accordance with rules adopted by the director of job and family services, to assist the public children services agency in determining the risk of abuse or neglect to a child;

…

(19) Make reasonable efforts to place the child in a timely manner in accordance with the permanency plan…and to complete whatever steps are necessary to finalize the permanent placement of the child;

Ohio Rev. Code §5153.16.

126.    The provision of foster care and adoption services is highly regulated in the state of Ohio by each public children services agency and the Ohio Department of Job and Family Services. See Title 51, Chapters 5101, 5103, 5153; Title 21, Chapter 2151; Title 31, Chapter 3107 of the Ohio Revised Code and Title 5101:2, Chapters 5101-2-1, 5101-2-7, 5101-2-9, 5101-2-13, 5101-2-14, 5101-2-34, 5101-2-36 through 5101-2-40, 5101-2-42, 5101-2-44, 5101-2-47 through 5101-2-49, 5101-2-51, 5101-2-52, 5101-2-57. The placement of children outside the state of Ohio is also highly regulated and requires assessment, investigation, and monitoring of the child and the out-of-state home. See Title 51, Chapter 5103, Sections 5103.20 through 5103.28.

127.    Standardized policies and procedures are promulgated by the Ohio Department of Job and Family Services and adopted by each county public children services agency, to include Franklin County Children Services. See https://emanuals.jfs.ohio.gov/FamChild/, last accessed May 3, 2021.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

128.    Franklin County Children Services "…provides case management, protective and supportive services, as well as purchased services from community agencies within a case plan agreed to by the family and Children Services casework staff."[2]

129.    Because A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G. were wards of the state of Ohio, foster children in the custody of Franklin County Children Services, and their parents' rights had been terminated, the Agency was required to protect the health and safety of A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G. while in the Agency's care.

130.    Franklin County Children Services retained a non-delegable constitutional duty to ensure that children in Franklin County Children Services custody were safe and receiving adequate care. Meador v. Cabinet for Human Resources, 902 F.2d 474, 476 (6th Cir. 1990) (We hold that due process extends the right to be free from the infliction of unnecessary harm to children in state-regulated foster homes.). See also, Doe ex rel. Johnson v. S.C. Dep't of Soc. Svcs., 597 F.3d 163, 175 (4th Cir. 2010).

131.    Franklin County Children Services entrusted Adoption Advocacy, Inc., and its employees with implementing the concomitant constitutional duty to ensure A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G. were placed in a home that was safe and receiving adequate treatment on a day-to-day basis.

132.    Franklin County Children Services entrusted Adoption Advocacy, Inc. and Family Caseworker to assess, investigate, and monitor the adoptive placement from the time A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G. were placed in the adoptive placement until the adoption was completed.

---

[2] FCA Bates No. 011193.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

133.     Ohio law required Adoption Advocacy to complete a "multiple children assessment" when Franklin County Children Services and Adoption Advocacy placed A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G. in the Mitchell home to "…evaluate the ability of the person seeking to adopt in meeting the needs of the minor or foster child to be adopted and continuing to meet the needs of the children residing in the home." Ohio Rev. Code Ann. §3107.032.

134.     Franklin County Children Services contracted with Adoption Advocacy, Inc. to investigate, place, and monitor the health and safety of A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G. while they were in a foster care placement with Yulanda Mitchell and Herbert Bernard Mitchell, Sr. These services, when performed for a child who is a ward of the state, are state actions under color of law.

135.     Franklin County Children Services is a signatory and administrator for the Interstate Compact on the Placement of Children. Ohio Rev. Code §§ 5103.20 through 2103.237; Ohio Admin. Code §§5101:2-52-02 through 5101:2-52-10.

136.     As a signatory of the Interstate Compact on the Placement of Children, Franklin County Children Services retained jurisdiction over A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G. from the time they were placed in South Carolina until the day they were adopted. S.C. Code Ann. §63-9-2200(5)(a); Ohio Rev. Code §5103.20(IV).

137.     Based upon the legislative definition of "foster home", the Ohio Court of Appeals had determined that the operation of a foster home is a governmental function. Johnson v. Calhoun, 2008 Ohio 549, *8-11, 2008 Ohio App. LEXIS 470 (Ct. App. Ohio February 13, 2008); Ohio Rev. Code §5103.02(D); Ohio Admin Code §5101:2-1-01(B)(130).

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

**B.  South Carolina Department of Social Services.**

138.    SCDSS is an agency of the State of South Carolina created by the General Assembly of the State of South Carolina. SCDSS is responsible for ensuring that the children in its custody are safe and are receiving adequate care and treatment in accordance with applicable legal standards. S.C. Code Ann. § 43-1-10 (1993); S.C. Code Ann. § 63-7-10(A)(5). SCDSS is also responsible for investigating allegations of abuse and neglect of South Carolina's children.

139.    All intervention by the State has as its primary goal the welfare and safety of the child. S.C. Code Ann. § 63-7-10(A)(5).

140.    The South Carolina Children's Code aims to establish an effective system of protection of children from injury and harm while living in public and private residential agencies and institutions meant to serve them. S.C. Code Ann. § 63-7-10(B)(5).

141.    When children must be placed in care away from their homes, the State shall insure that they are protected against any harmful effects resulting from the temporary or permanent inability of parents to provide care and protection for their children. S.C. Code Ann. § 63-7-20(D) (2008).

142.    All children have the right to be safe and secure in their daily lives. The foremost consideration in choosing a placement for a child is safety and the immediate safety and risk of children must be assessed continually and serves as the foundation for all child protective service and foster care interventions.[3]

143.    The most fundamental charge of any foster care system is protecting the safety of children in its custody. 45 C.F.R. 1355.34(b)(1)(i)(A).

---

[3] FCA Bates No. 006514-006515.

144.    SCDSS administers the provisions of Title 63, Chapter 11, Article I of South Carolina regulations regarding private agencies, such as Adoption Advocacy, Inc. S.C. Code Ann. § 63-11 (2008); S.C. Code Ann. § 63-7-1210 (2008) et seq.

145.    The provision of foster care and adoption services is highly regulated in the state of South Carolina by the South Carolina Department of Social Services. See Title 63, Chapters 1, 7, 9, 11 of the South Carolina Code of Laws and Chapter 114, Articles 1, 5, 43, and 49. SCDSS also regulates, licenses, and monitors Child Placing Agencies, such as Adoption Advocacy, Inc. and certified adoption investigators. S.C. Code of Regs. §114-4910, et seq., S.C. Code Reg. §114-4370.

146.    SCDSS administers the provisions of Title 63, Chapter 11, Article I of South Carolina Code of Laws and Chapter 114, Article 49 of the South Carolina Code of Regulations regarding private agencies. SCDSS is required to monitor and license child placing agencies. S.C. Code of Regs. §114-4910, et seq.

147.    SCDSS is a signatory and administrator for the Interstate Compact on the Placement of Children. S.C. Code Ann. §§63-9-2000 through 63-9-2290.

**C.  Adoption Advocacy, Inc.**

148.    Adoption Advocacy, Inc. is a "child placing agency" as it "facilitates the placement of children for the purpose of adoption" and it is an "…entity who offers services for compensation where the intend of those services is to arrange or secure adoptions…" S.C. Code Ann. §63-9-30; S.C. Code Reg. §114-4910. As a "child placing agency", Adoption Advocacy, Inc. is subject to regulations, licensure scheme, and monitoring by the South Carolina Department of Social Services. S.C. Code of Regs. §114-4910, et seq.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

149.    Adoption Advocacy, Inc. is a nonprofit domestic corporation registered to do business in the state of South Carolina.

150.    When a child is the ward of the State and the child is placed in a foster home pending adoption, Adoption Advocacy, Inc. assumes the constitutional duties and responsibility for the safety and well-being of the minor child. Adoption Advocacy, Inc. is required to assess and monitor the home for the safety and well-being of the minor child in accordance with generally accepted social work standards.

151.    An assessment includes the following:

a.    Investigate the home of the prospective adoptive parent is a suitable one for the placement of a child;
b.    Investigate the emotional maturity, finances, health, relationships, and any other relevant characteristics of the prospective adoptive parent affect the parent's ability to accept, care, and provide a child with an adequate environment as the child matures;
c.    Investigate whether the prospective adoptive parent has ever been involved in any proceeding concerning allegedly neglected, abandoned, abused, or delinquent children;
d.    Investigate whether the prospective adoptive parent has completed a course or counseling in preparation for adoption;
e.    Investigate whether the prospective adoptive parent is approved for placement of a child for purposes of adoption, and if not approved, a statement of the reasons for not approving the prospective adoptive parent;
f.    Adult physical examinations;
g.    Request a criminal background check and a SCDSS Registry of Abuse and Neglect check;
h.    Any other information that is disclosed by the investigation that would be of value to or would assist the court in deciding the case;
i.    The adoptive parents and all adults who live in the home to include background checks, speaking with collateral sources, neighbors, and members of the community about the parents;
j.    Obtaining a copy of the birth certificates and social security cards of each household member;
k.    Review of the health and medical records of the children who are already in the home;
l.    Assess the children's medical care and condition;
m.    Interview all of the children who reside in the home while outside of the presence of other adults;
n.    Assess the children's physical and mental condition;

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

    o.  Contact the children's teachers and schools;
    p.  Speak with collateral sources, neighbors and members of the community;
    q.  Assess the suitability of the home; and
    r.  Contact children not living in the home.

152.    Generally accepted social work standards require:

    a.  The caseworker to interview all members of a family, to include children. The children should be interviewed alone and outside the presence of their caregivers.
    b.  Each interview to be documented.
    c.  Multiple visits with each child and increased visits when red flags or concerns arise.
    d.  Federal, South Carolina, and Ohio law and regulations require that caseworkers make a face-to-face visit with each foster child once a month.
    e.  That each child in the home should be interviewed during each face-to-face visit to ensure that the placement is safe and appropriate for the foster child.
    f.  That the caseworker make contact with each child's school and daycare to assess their impressions of the safety of the other children in the home and their parenting abilities.
    g.  That the caseworker contact child welfare agencies, law enforcement agencies, current and previous employers, churches, schools, daycares, and businesses;
    h.  Extended family members, friends, prior spouses, and neighbors;

*See* FCA Bates No. 011700-011701, 011705-011715. *See also* the Child Welfare League of America *Standards of Excellence for Adoption Services*; National Association of Social Workers *Standards for Social Work Practice in Child Welfare*; Council on Accreditation *Standards for Adoption Services*.

153.    Failure to follow generally accepted social work practices can result in a disruption in the adoption, or even worse, physical or mental harm to the child and sometimes death.

154.    Adoption Advocacy, Inc.'s employees, June Bond, Joe Hanyes, and Amy Carr, are "certified adoption investigators", licensed, regulated, and monitored by the South Carolina Department of Social Services. S.C. Code Reg. §114-4370.

155.    Adoption Advocacy, Inc.'s employees, June Bond and Joe Haynes, owed a professional duty, legal duty, and constitutional duty to A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G. to place them in a safe foster care placement, free from abuse, neglect, and starvation.

156.    Adoption Advocacy, Inc.'s employees, June Bond and Joe Haynes, owed a professional, duty, legal duty, and constitutional duty to provide A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G. with medical care and mental health care when they learned she was abused by the Mitchells.

157.    Adoption Advocacy, Inc., June Bond, and Joe Haynes were required to regularly report to Franklin County Children Services monthly home visits, home studies, adoptive family investigations, and any safety concerns to Franklin County Children Services.

158.    Adoption Advocacy, Inc., June Bond, and Joe Haynes were paid by Franklin County Childrens Services to protect A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G. from harm.

## VI.    General allegations applicable to all claims.

159.    Plaintiffs incorporate paragraphs 1-158 as if incorporated herein verbatim.

160.    Sometime in the late 1990s, Yulanda Mitchell "broke a child's arm while potty training" the child.[4]

161.    A.M.L., J.J.G., J.J.L., and R.D.M. share a biological mother. Although they have no biological link to E.R.L., they, along with S.T.S., are siblings, as the children lived in the same adoptive home, were raised as siblings, and suffered together the worst abuses imaginable. In the aftermath of their ordeal, they are now spread among four adopted families across the low country.

---

[4] FCA Bates No. 028710.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

162.    On May 9, 2005, A.M.L., at approximately ten-months old, fractured her right tibia and fibula bone.[5]

163.    A.M.L. had previously fractured her left elbow on March 17, 2005.[6] A physician ordered a full skeletal survey of A.M.L. to be conducted.[7]

164.    A.M.L. and her siblings, to include J.J.G., were taken into the custody of the State of Ohio in the early morning hours of May 10, 2005.[8]

165.    In June 2005, J.J.L. was born and upon her discharge from the hospital on June 22, 2005, she was placed in the custody of the State of Ohio.[9] R.D.M. was born in August 2006 and he was placed in foster care with J.J.L.[10]

166.    Sometime before 2005, an adoptive placement for another child was disrupted after Yulanda Mitchell physically abused the child. The Beaufort County Family Court made a finding of abuse and neglect and placed Yulanda Mitchell's name on the South Carolina Department of Social Services' Registry of Abuse and Neglect for physically abusing a foster child that was placed in her home.

167.    On June 11, 2005, Beaufort County Sheriff's Office responded to a complaint of child abuse perpetrated by Yulanda Mitchell. The complaint was forwarded by Corporal K. Denham of the Beaufort County Sheriff's Office to Caseworker Lee at Beaufort County Department of Social Services.[11]

---

[5] FCA Bates No. 000015, 004984-004996, 004778-004790.
[6] FCA Bates No. 004800-004808, 004813-004814.
[7] FCA Bates No. 004781, 004983.
[8] FCA Bates No. 004786, 004737, 007729.
[9] FCA Bates No. 004369, 004646-004647, 004659-004661, 004369.
[10] FCA Bates No. 000015, 008231.
[11] FCA Bates No. 028709-028710.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

168.    SCDSS failed to remove S.T.S. from the Mitchell home even though the Mitchells did not have custody of S.T.S. and SCDSS and the Family Court had determined Yulanda Mitchell had physically abused another foster child.

169.    SCDSS failed to investigate the allegations of abuse in:

    a.  Failing to interview the children;
    b.  Failing to interview neighbors, relatives, and other collateral sources who had daily contact with the children;
    c.  Failing to obtain medical records and speak with the medical providers for S.T.S.;
    d.  Failing to present the children for forensic interviews;
    e.  Failing to present the children for medical examinations;
    f.  Failing to speak with the children outside of the presence of Yulanda Mitchell;
    g.  Failing to inspect the children's home;
    h.  Failing to remove the children from the home;

170.    S.T.S. would be starved and beaten by the Mitchells until 2016.

171.    On January 26, 2009, A.M.L., J.J.L., J.J.G., and R.D.M. were placed in the permanent custody of the State of Ohio.[12] The Ohio Family Court placed the children in the permanent custody of Franklin County Children Services.[13]

172.    On April 13, 2009, five months before his adoption, the school nurse referred S.T.S. to a pediatrician for, "poor growth".[14] Before that, S.T.S. had bever been to a pediatrician.[15] The pediatrician learned that the Mitchells had cared for S.T.S. ever since he was two months old.[16]

173.    On May 8, 2009, S.T.S. was diagnosed with failure to thrive.[17]

---

[12] FCA Bates No. 000015, 008145.
[13] FCA Bates No. 000016.
[14] FCA Bates No. 011784-011785.
[15] FCA Bates No. 011783.
[16] FCA Bates No. 011783.
[17] FCA Bates No. 011780.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

174.    Herbert and Bernard Mitchell adopted S.T.S. on September 18, 2009.[18]

175.    On January 25, 2010, A.M.L. weighed 45.63 lbs.[19] On October 26, 2009, J.J.L. was 39 and ¼ inches tall and weighed 36.4 lbs.[20] and R.D.M. was 37 inches tall and weighed 35.7 lbs.[21] On December 18, 2009, J.J.G. weighed 49 lbs. 4. oz.[22]

176.    On March 11, 2010, Franklin County Children Services placed A.M.L., J.J.L., J.J.G., and R.D.M., in Bluffton, South Carolina through the Interstate Compact on the Placement of Children with the South Carolina Department of Social Services.[23] SCDSS, Magnelia Washington Cotttrell, Charles Brown, SCDSS Case Worker #1, SCDSS Case Worker #2, and SCDSS Case Worker Supervisor #1 conducted the placement, assessment, and monitoring of the children in the home on behalf of SCDSS. Adoption Advocacy, Inc., June Bond, and Joe Haynes contracted with Franklin County Childrens Services to conduct the placement, assessment, and monitoring of the children in the home. Franklin County Childrens Services, FCCS Case Worker #1, FCCS Case Worker #2, and FCCS Case Worker Supervisor #1 were responsible for approving and monitoring the placement of A.M.L., J.J.L., J.J.G., and R.D.M.

177.    J.J.G. was 6 years and 9 months. A.M.L. was 5 years and 8 months. J.J.L. was 4 years and 8 months. R.D.M. was 3 years and 7 months. S.T.S. was 6 years and 10 months.

178.    The children were placed in the home of Yulanda Mitchell and Herbert Bernard Mitchell, Sr. at 86 Pine Forest Drive, Bluffton, South Carolina. Yulanda Mitchell and Herbert

---

[18] FCA Bates No. 008145-008146.
[19] FCA Bates No. 004893, 004897
[20] FCA Bates No. 004483-004484, 004487.
[21] FCA Bates No. 008677, 008684.
[22] FCA Bates No. 008018, 008021.
[23] FCA Bates No. 008145.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

Mitchell lived in the three-bedroom home of 1,639 square feet. Their two adult sons lived in the home along with S.T.S.[24] The home lacked the necessary space for six children and four adults.

179.    Public records demonstrate that prior to and during the adoption, Yulanda Mitchell and Herbert Bernard Mitchell, Sr. had been sued by several payday loan vendors and their home was in foreclosure during the time A.M.L., J.J.L., J.J.G., and R.D.M. were placed in the home for adoption.

180.    Prior to the placement of A.M.L., J.J.L., J.J.G., and R.D.M. and S.T.S.'s adoption, a previous adoptive placement was disrupted after Yulanda Mitchell physically abused the child. The Beaufort County Family Court made a finding of abuse and neglect and placed Yulanda Mitchell's name on the South Carolina Department of Social Services' Registry of Abuse and Neglect for physically abusing a foster child that was placed in her home.

181.    Yulanda Mitchell, Herbert Mitchell, South Carolina Department of Social Services, Magnelia Washington Cotttrell, Charles Brown, SCDSS Case Worker #1, SCDSS Case Worker #2, SCDSS Case Worker Supervisor #1, Franklin County Childrens Services, FCCS Case Worker #1, FCCS Case Worker #2, FCCS Case Worker Supervisor #1, Adoption Advocacy, Inc., June Bond, and Joe Haynes knew or should have known Yulanda Mitchell's name on the South Carolina Department of Social Services' Registry of Abuse and Neglect for physically abusing a foster child and knew that placing A.M.L., J.J.L., J.J.G., and R.D.M. in the home endangered the children.

182.    Yulanda Mitchell, Herbert Mitchell, South Carolina Department of Social Services, Magnelia Washington Cotttrell, Charles Brown, SCDSS Case Worker #1, SCDSS Case Worker #2, SCDSS Case Worker Supervisor #1, Franklin County Childrens Services, FCCS

---

[24] FCA Bates No. 011781.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

Case Worker #1, FCCS Case Worker #2, FCCS Case Worker Supervisor #1, Adoption

Advocacy, Inc., June Bond, and Joe Haynes defrauded the Beaufort County Family Court and

committed perjury by concealing the fact that Yulanda Mitchell was on South Carolina

Department of Social Services' Registry of Abuse and Neglect.

183.    Yulanda Mitchell was employed at Michael C. Riley Elementary School in

Bluffton, South Carolina as a teacher's assistant.

184.    When Child Placing Agencies place children in a pre-adoptive home, the

Agencies are required to investigate the family's financial circumstances, the composition of the

family, to include all adults and children living in the home and assess the home itself to

determine whether it is suitable for all of the children.

185.    Upon A.M.L., J.J.L., J.J.G., and R.D.M. arrival from Ohio, the Mitchells

immediately enrolled R.D.M. and J.J.L. at The Children's Center, a day care located at 20 Bridge

Street, Bluffton, South Carolina, next door to Michael C. Riley Elementary School. Before the

summer of 2010 began, the director of the Children's Center made two reports to the South

Carolina Department of Social Services for neglect of R.D.M. due to the severe weight loss he

suffered.

186.    South Carolina Department of Social Services, Magnelia Washington Cotttrell,

Charles Brown, SCDSS Case Worker #1, SCDSS Case Worker Supervisor #1, Franklin County

Childrens Services, Adoption Advocacy, Inc., June Bond, and Joe Haynes failed to properly

investigate the reports of child abuse of R.D.M.

187.    On March 23, 2010, A.M.L. was 5 years and 8 months of age, 43 inches tall and

weighed 45 lbs., 8 oz.[25] On March 29, 2010, J.J.L. was 4 years and 9 months of age, 42 inches

---

[25] FCA Bates No. 000139.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

tall, and weighed 37 lbs.[26] On March 29, 2010, R.D.M. was three years and 7 months of age, 40 inches tall, and weighed 37 lbs.[27] On March 30, 2010, J.J.G. was 6 years and 10 months of age, 47 inches tall, and weighed 48 lbs. and 5 oz.[28]

188.    When A.M.L., J.J.L., J.J.G., and R.D.M. were placed in the Mitchell home, Franklin County Children Services and the state of Ohio maintained legal custody of A.M.L., J.J.L., J.J.G., and R.D.M. until the day they were adopted. S.C. Code Ann. §63-9-510; S.C. Code Ann. §63-9-2200(5)(a); Ohio Rev. Code §5103.20(IV).

189.    On June 6, 2010, A.M.L., J.J.L., J.J.G., and R.D.M. were adopted by Yulanda Mitchell and Herbert Mitchell through a decree by the Beaufort County Family Court.

190.    By July 30, 2010, A.M.L. weighed 40 lbs., 8 oz, having lost 5 lbs. since the March 11, 2010, placement.[29] On July 30, 2010, J.J.L. weighed 33 and ½ lbs., having lost 4 lbs. since the March 2010 placement.[30] By August 5, 2010, R.D.M. weighed 32 lbs. 8 oz, having lost 4 and ½ lbs.[31] By August 5, 2010, J.J.G. weighed 44 lbs. and 12 oz, having lost 3 and ½ lbs.[32]

191.    From March 11, 2010, until June 6, 2010, A.M.L., J.J.L., J.J.G., and R.D.M. were beaten and starved by Yulanda Mitchell.

192.    Over the next six years, A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. were starved and beaten by the Mitchells.

---

[26] FCA Bates No. 001738, 001740, 001787, 001789.
[27] FCA Bates No. 008967.
[28] FCA Bates No. 008036.
[29] FCA Bates No 000136.
[30] FCA Bates No. 001736, 001737, 001785, 001786.
[31] FCA Bates No. 008965.
[32] FCA Bates No. 008034.

193.    The following height-weight chart tracks A.M.L.'s abuse during the time she was placed with the Mitchells[33]:

| A.M.L. Growth from January 25, 2010 through June 14, 2017 | | | |
|---|---|---|---|
| Key: Yellow – Period in Mitchell Home; Blue: Post-removal | | | |
| Date | Age | Height (Inches) | Weight (Pounds) |
| 01/25/2010 | 5 yrs. 6 mos. | | 45.63 |
| 03/23/2010 | 5 yrs. 8 mos. | 43" | 45 lbs. 8 oz |
| 05/19/2010 | 5 yrs. 10 mos. | 44" | 45 lbs. 8 oz |
| 07/30/2010 | 6 yrs. 0 mos. | 43.2" | 40 lbs. 8 oz |
| 03/28/2011 | 6 yrs. 8 mos. | 45.9" | 46 lbs. 9 oz |
| 04/21/2011 | 6 yrs. 9 mos. | 45.5" | 44 lbs. 8 oz |
| 08/02/2011 | 7 yrs. 0 mos. | 45.5" | 42 lbs. 8 oz |
| 10/06/2011 | 7 yrs. 2 mos. | 45.5" | 44 lbs. |
| 12/27/2011 | 7 yrs. 5 mos. | 45.5" | 43 lbs |
| 01/25/2012 | 7 yrs. 6 mos. | 45" | 46 lbs. 8 oz |
| 03/30/2012 | 7 yrs. 8 mos. | 45" | 47 lbs. |
| 04/04/2012 | 7 yrs. 8 mos. | 45" | 46.4 lbs. |
| 05/09/2012 | 7 yrs. 10 mos. | 44.75" | 48 lbs. |
| 03/06/2013 | 8 yrs. 7 mos. | 45.5" | 50.6 lbs. |
| 09/25/2013 | 9 yrs. 2 mos. | 46" | 49 lbs. |
| 03/24/2014 | 9 yrs. 8 mos. | 47" | 52 lbs. |
| 07/23/2014 | 10 yrs. 0 mos. | 48" | 52 lbs. |
| 11/24/2014 | 10 yrs. 4 mos. | 48" | 52.2 lbs. |
| 04/17/2015 | 10 yrs. 9 mos. | 49" | 52 lbs. |
| 08/03/2015 | 11 yrs. 0 mos. | 50" | 50 lbs. |
| 01/05/2016 | 11 yrs. 5 mos. | 49.25" | 48 lbs. |
| 06/03/2016 | 11 yrs. 10 mos. | 49.25" | 58 lbs. |
| 08/08/2016 | 12 yrs. 1 mos. | 50" | 56 lbs. |
| 11/08/2016 | 12 yrs. 4 mos. | 51" | 65 lbs. |
| 11/23/2016 | 12 yrs. 4 mos. | 65" | 71 lbs. |
| 01/25/2017 | 12 yrs. 6 mos. | 51.26" | 73 lbs. 6.6 oz |
| 02/22/2017 | 12 yrs. 7 mos. | 51.97" | 78 lbs. 0.7 oz |
| 04/07/2017 | 12 yrs. 9 mos. | 52.64" | 78 lbs. 9.5 oz |
| 06/14/2017 | 12 yrs. 11 mos. | 53.62" | 86 lbs. 3.2 oz |

---

[33] FCA Bates No. 000001, 000029, 000032, 000039, 000047-000053, 000062, 000065, 000068, 000072, 000075, 000080-000081, 000084, 000087, 000090, 000093, 000096, 000125-000126, 000128-000130, 000132-000133, 000135-000139, 000183, 000196, 000208, 000246, 000298-000303, 000322, 000398, 000602, 000606, 000613, 000699, 000703, 000705, 000708, 000732, 000736, 000738, 000740, 000742, 000743, 000745, 000746, 000769, 000773, 000775, 000778, 000789, 000796, 000800, 000802, 000805, 000809, 000831, 000835, 000837, 000842, 000844, 000849, 001668, 004720, 004737, 004754, 004779, 004794, 004805, 004828, 004838, 004850, 004854, 004860, 004865, 4873, 004878, 004893, 004987, 004897,

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

194.    The following height-weight chart tracks J.J.L.'s abuse during the time she was placed with the Mitchells [34]:

| Date | Age | Height (Inches) | Weight (Pounds) |
|------|-----|-----------------|-----------------|
| J.J.L. Growth from January 25, 2010 through June 14, 2017 | | | |
| Key: Yellow – Period in Mitchell Home; Blue: Post-removal | | | |
| 10/26/2009 | 4 yrs. 4 mos. | 39.25" | 36.4 lbs. |
| 03/29/2010 | 4 yrs. 9 mos. | 42" | 37 lbs. |
| 05/19/2010 | 4 yrs. 11 mos. | 42" | 37 lbs. |
| 07/30/2010 | 5 yrs. 1 mos. | 41.1" | 33 lbs. 8 oz |
| 10/27/2010 | 5 yrs. 4 mos. | 42.1" | 39 lbs. 8 oz |
| 06/30/2011 | 6 yrs. 0 mos. | 41.6" | 36.6 lbs. |
| 08/02/2011 | 6 yrs. 1 mos. | 42.3" | 36 lbs. |
| 09/08/2011 | 6 yrs. 2 mos. | 43" | 39 lbs. 8 oz |
| 10/06/2011 | 6 yrs. 3 mos. | 43" | 39 lbs. 8 oz |
| 12/21/2011 | 6 yrs. 6 mos. | 43" | 36 lbs. |
| 03/30/2012 | 6 yrs. 9 mos. | 43.9" | 39 lbs. 8 oz |
| 05/18/2012 | 6 yrs. 11 mos. | 42.75" | 38 lbs. |
| 06/27/2012 | 7 yrs. 0 mos. | 43" | 37 lbs. |
| 03/06/2013 | 7 yrs. 8 mos. | 43" | 38.2 lbs. |
| 09/25/2013 | 8 yrs. 3 mos. | 43" | 39 lbs. |
| 03/24/2014 | 8 yrs. 9 mos. | 44" | 43 lbs. |
| 07/23/2014 | 9 yrs. 1 mos. | 44.5" | 43 lbs. |
| 11/24/2014 | 9 yrs. 5 mos. | 44.5" | 43.2 lbs. |
| 04/17/2015 | 9 yrs. 10 mos. | 45.75" | 43.8 lbs. |
| 08/03/2015 | 10 yrs. 1 mos. | 46" | 41 lbs. |
| 01/05/2016 | 10 yrs. 6 mos. | 46" | 40.5 lbs. |
| 06/03/2016 | 10 yrs. 11 mos. | 46" | 43.6 lbs. |
| 08/01/2016 | 11 yrs. 1 mos. | 46" | 40.6 lbs. |
| 11/01/2016 | 11 yrs. 4 mos. | 46.5" | 48 lbs. |
| 11/23/2016 | 11 yrs. 5 mos. | 46" | 55.5 lbs. |
| 12/01/2016 | 11 yrs. 5 mos. | 46" | 54 lbs. |
| 01/25/2017 | 11 yrs. 7 mos. | 47.24" | 54.9 lbs. |
| 04/07/2017 | 11 yrs. 9 mos. | 48.78" | 58 lbs. 10.3 oz |
| 06/14/2017 | 12 yrs. 0 mos. | 48.7" | 64 lbs. 0.7 oz |

[34] FCA Bates No. 000001, 000131, 000298-000303, 001619, 001625, 001627, 001632-001640, 001654, 001656, 001659, 001661, 001664, 001666, 001668, 001670, 001672, 001675, 001677, 001680,001682, 001685, 001685, 0001687-001688, 001692, 001726, 001728-001731, 001734-001738, 001740, 001775, 001777-001779, 001780, 001783-001787, 001789, 0001977, 002008, 002107, 002126, 002127, 002131, 002158, 002161, 002163, 002165, 002198, 002204, 002206, 002244, 002247, 002286, 002307, 002478, 002481, 002502, 002506, 002509, 002513, 002528, 002533, 002535, 002579, 002583, 002585, 002590, 002610, 002614, 002616, 002618, 001922, 001935, 001936, 002692, 002696, 002699, 002702, 002705, 002721, 002724, 002728, 002732, 002734, 002742, 002776, 004462, 004469, 004473, 004476-004477, 004483-004484, 004487, 004490, 004494, 004500, 004506, 004517, 004526, 004537, 004543, 004572, 004584, 004599, 004608, 004627,004630, 004636, 004638, 004640-004644, 004646, 004652-004658, 004659, 004690, 004696

195.    The following height-weight chart tracks R.D.M.'s abuse during the time he was placed with the Mitchells [35]:

| R.D.M. Growth from January 25, 2010 through December 11, 2017 | | | |
|---|---|---|---|
| Key: Yellow – Period in Mitchell Home; Blue: Post-removal | | | |
| Date | Age | Height (Inches) | Weight (Pounds) |
| 10/26/2009 | 3 yrs. 2 mos. | 37" | 35.7 lbs. |
| 03/29/2010 | 3 yrs. 7 mos. | 42 | 37 lbs. |
| 08/05/2010 | 4 yrs. 0 mos. | 42 | 37 lbs. |
| 03/30/2011 | 4 yrs. 7 mos. | 41.1 | 33 lbs. 8 oz |
| 08/02/2011 | 4 yrs. 11 mos. | 42.3 | 36 lbs. |
| 08/10/2012 | 6 yrs. 0 mos. | 43 | 37 lbs. |
| 09/05/2012 | 6 yrs. 1 mos. | 43 | 38.2 lbs. |
| 08/14/2013 | 7 yrs. 0 mos. | 43 | 39 lbs. |
| 12/23/2013 | 7 yrs. 4 mos. | 44 | 43 lbs. |
| 09/22/2014 | 8 yrs. 1 mos. | | |
| 07/27/2015 | 8 yrs. 11 mos. | 45.75 | 43.8 lbs. |
| 09/02/2015 | 10 yrs. 1 mos. | 46 | 41 lbs. |
| 08/01/2016 | 9 yrs. 11 mos. | 46 | 40.6 lbs. |
| 11/01/2016 | 10 yrs. 2 mos. | 46.5 | 48 lbs. |
| 11/23/2016 | 10 yrs. 3 mos. | 46 | 55.5 lbs. |
| 12/01/2016 | 10 yrs. 3 mos. | 46 | 54 lbs. |
| 02/09/2017 | 10 yrs. 6 mos. | 47.24 | 54.9 lbs. |
| 04/03/2017 | 10 yrs. 7 mos. | 48.78 | 58 lbs. 10.3 oz |
| 05/15/2017 | 10 yrs. 9 mos. | 48.7 | 64 lbs. 0.7 oz |
| 12/11/2017 | 11 yrs. 4 mos. | | |

---

[35] FCA Bates No. 008207, 008209, 008231, 008230, 008233, 008234, 008696, 008697, 008235, 008236, 008701, 008704, 008713, 008721, 008722, 008728, 008730, 008733, 008625, 008736, 008737, 008740, 008742, 008744, 008752-008755, 008760, 008765, 008766, 008771, 008775, 008777, 008782, 008787, 008788, 008795, 008798, 008809, 008812, 008816, 008645, 008684, 008655, 008684, 008677, 008684, 008967, 008967, 008965, 008979, 008963, 008964, 008962, 008845, 008846, 008843, 011330, 008940, 011326, 011325, 008837, 011319, 011318, 008834, 008832, 011312, 008829, 008866-008875, 000298-000303, 011656, 011654, 011651, 011608, 008477, 008475, 008531, 011530, 008445, 008442, 011525, 011522, 011519, 011515.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

196.    The following height-weight chart tracks J.J.G.'s abuse during the time he was placed with the Mitchells[36]:

| Date | Age | Height (Inches) | Weight (Pounds) |
|---|---|---|---|
| J.J.G. Growth from January 25, 2010 through August 28, 2017 | | | |
| Key: Yellow – Period in Mitchell Home; Blue: Post-removal | | | |
| Date | Age | Height (Inches) | Weight (Pounds) |
| 12/18/2009 | 6 yrs. 7 mos. | 39.25" | 36.4 lbs. |
| 03/30/2010 | 6 yrs. 10 mos. | 47" | 48 lbs. 5 oz |
| 05/19/2010 | 7 yrs. 0 mos. | 47" | 48 lbs. 8 oz |
| 08/05/2010 | 7 yrs. 2 mos. | 46.3" | 44 lbs. 12 oz |
| 03/28/2011 | 7 yrs. 10 mos. | 47.6" | 56 lbs. 11 oz |
| 08/01/2011 | 8 yrs. 2 mos. | 47.8" | 50 lbs. 8 oz |
| 10/06/2011 | 8 yrs. 4 mos. | 48" | 50 lbs. |
| 12/27/2011 | 8 yrs. 7 mos. | 48" | 51 lbs. |
| 01/25/2012 | 8 yrs. 8 mos. | 48" | 55 |
| 03/30/2012 | 6 yrs. 9 mos. | 48" | 55 lbs. 4 oz |
| 05/18/2012 | 9 yrs. 0 mos. | 48" | 55 lbs. |
| 06/27/2012 | 9 yrs. 1 mos. | 47.5" | 54 lbs. |
| 03/13/2013 | 9 yrs. 9 mos. | 49" | 57 lbs. |
| 08/12/2013 | 10 yrs. 2 mos. | 49" | 52 lbs. |
| 04/21/2014 | 10 yrs. 11 mos. | 50" | 58 lbs. |
| 06/18/2014 | 11 yrs. 1 mos. | 50" | 60 lbs. |
| 09/29/2014 | 11 yrs. 4 mos. | 51.75" | 62 lbs. |
| 01/14/2015 | 11 yrs. 7 mos. | 51.25" | 60 lbs. |
| 03/12/2015 | 11 yrs. 9 mos. | 51.25" | 63 |
| 03/20/2015 | 11 yrs. 10 mos. | 51" | 63 |
| 04/16/2015 | 11 yrs. 11 mos. | 52" | 62.2 lbs. |
| 07/27/2015 | 12 yrs. 2 mos. | 52" | 60.63 lbs. |
| 07/31/2015 | 12 yrs. 2 mos. | 52.5" | 58 lbs. |
| 02/15/2016 | 12 yrs. 9 mos. | 53 | 63.2 lbs. |
| 06/13/2016 | 13 yrs. 0 mos. | 53.5" | 65 lbs. |
| 08/08/2016 | 13 yrs. 2 mos. | 53.5" | 64 lbs. |
| 11/01/2016 | 13 yrs. 5 mos. | 54" | 69.5 lbs. |
| 11/23/2016 | 13 yrs. 6 mos. | 53.25" | 78.25 lbs. |
| 12/01/2016 | 13 yrs. 6 mos. | 53.5" | 77.5 lbs. |
| 02/09/2017 | 13 yrs. 8 mos. | 54.25" | 77.75 lbs. |
| 02/17/2017 | 13 yrs. 9 mos. | | 79.35 lbs. |
| 04/07/2017 | 13 yrs. 10 mos. | 55.28" | 83 lbs. 0.1 oz |
| 08/28/2017 | 14 yrs. 3 mos. | 57.56" | 94 lbs. 5.7 oz |

---

[36] 007773, 007775, 007781, 007775, 007603, 007737, 007954, 007960, 007965, 007970, 007978, 007983, 008021, 007986, 008021, 007995, 008021, 008004, 008021, 008014, 008021, 008021, 008018, 008021, 008036, 008035, 008034, 008033, 008031, 008030, 008028, 008027, 008025, 011438, 011435, 011427, 011422, 011412, 011410, 011404, 011401, 011668, 011399, 011394, 011390, 011389, 011385, 011379, 011375, 011372, 008167-008177, 000298-000303, 011665, 011504, 011501, 011499, 008116, 008121.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

197.    The following height-weight chart tracks S.T.S.'s abuse during the time he was placed with the Mitchells[37]:

| S.T.S. Growth from April 13, 2009 through June 14, 2017 | | | |
| Key: Yellow – Period in Mitchell Home; Blue: Post-removal | | | |
| Date | Age | Height (Inches) | Weight (Pounds) |
|---|---|---|---|
| 04/13/2009 | 5 yrs. 11 mos. | 40" | 32 lbs. |
| 04/21/2009 | 5 yrs. 11 mos. | 40" | 33 lbs. |
| 05/06/2009 | 5 yrs. 11 mos. | | 33.95 lbs. |
| 08/05/2010 | 7 yrs. 2 mos. | 43.3" | 34 lbs. 12 oz |
| 08/01/2011 | 8 yrs. 2 mos. | 46" | 42 lbs. 8 oz |
| 08/10/2012 | 9 yrs. 3 mos. | 48" | 46 lbs. |
| 09/05/2012 | 9 yrs. 3 mos. | 48" | 48 lbs. |
| 08/14/2013 | 10 yrs. 3 mos. | 49" | 48 lbs. |
| 12/23/2013 | 10 yrs. 7 mos. | 50" | 54 lbs. |
| 06/18/2014 | 11 yrs. 1 mos. | 51" | 59 lbs. |
| 07/27/2015 | 12 yrs. 2 mos. | 55" | 62 lbs. |
| 07/25/2016 | 13 yrs. 2 mos. | 57.25" | 74 lbs. |
| 11/23/2016 | 13 yrs. 6 mos. | 58.25" | 86.25 lbs. |
| 12/01/2016 | 13 yrs. 6 mos. | 58.25" | 86.75 lbs. |
| 02/09/2017 | 13 yrs. 8 mos. | 59.75" | 89 lbs. |
| 04/07/2017 | 13 yrs. 10 mos. | 60.79" | 93 lbs. 0.6 oz |
| 10/23/2017 | 14 yrs. 5 mos. | 64" | 109 lbs. 16 oz |

198.    Over the nearly six and a half years A.M.L. was placed in the Mitchell home, she gained less than 11 lbs. and only grew seven inches.

199.    A.M.L. was seen by Seaside Pediatrics and Dr. Berrigan from March 23, 2010, until March 30, 2012.

200.    In the nearly two years that A.M.L. was under the care of Seaside Pediatrics and Dr. Berrigan, A.M.L. gained only one pound, eight ounces and grew two inches.

201.    Over the nearly six and a half years J.J.L. was placed in the Mitchell home, she gained only 3 and ½ lbs. and only grew four inches.

---

[37] 011784, 011783, 011782, 011787, 011781, 011780, 011362-011363, 011361, 011357-011359, 011352-011353, 011348-011351, 0011668, 011343-011345, 011340-011342, 000298-000303, 011488-011489, 011486-011487, 011483-011484, 011870, 011452-011454, 011472-011475, 011446-011448, 011460-011463.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

202.     J.J.L. was seen by Seaside Pediatrics and Dr. Berrigan from March 22, 2010, until March 30, 2012.

203.     In the two years that J.J.L. was under the care of Seaside Pediatrics and Dr. Berrigan, J.J.L. gained only two pounds, eight ounces and grew less than two inches.

204.     Over the nearly six and a half years R.D.M. was placed in the Mitchell home, he gained only 5 lbs. and only grew four inches.

205.     R.D.M. was seen by Seaside Pediatrics and Dr. Berrigan from March 29, 2010, until August 2, 2011.

206.     In the year and a half that R.D.M. was under the care of Seaside Pediatrics and Dr. Berrigan, R.D.M. lost three pounds and only grew .3 of an inch.

207.     Over the nearly six and a half years J.J.G. was placed in the Mitchell home, he gained only 16 lbs. and only grew six and a half inches.

208.     J.J.G. was seen by Seaside Pediatrics and Dr. Berrigan from March 30, 2010, until March 30, 2012.

209.     In the two years that J.J.G. was under the care of Seaside Pediatrics and Dr. Berrigan, J.J.G. gained only six pounds, twelve ounces and grew one inch.

210.     Over the nearly seven and a half years S.T.S. was placed in the Mitchell home, he gained only 42 lbs. and only grew seventeen inches.

211.     S.T.S. was seen by Seaside Pediatrics and Dr. Berrigan from April 13, 2009, until December 27, 2011.

212.     In the two and a half years that S.T.S. was under the care of Seaside Pediatrics and Dr. Berrigan, S.T.S. gained only fourteen pounds and grew seven inches.

213.    On August 5, 2010, the director of the Children's Center daycare in Bluffton, South Carolina reported to Seaside Pediatrics and Dr. Berrigan, R.D.M.'s pediatrician, that R.D.M. showed signs of neglect, food restrictions, and behavior problems related to abuse and neglect.[38]

214.    This should have triggered awareness of very concerning parental behavior toward a child by Seaside and Dr. Berrigan.

215.    By August 2010, SCDSS received a report indicating that a female minor child was beaten the previous night and left with severe bruising on the buttocks and the back of her thighs.[39] The Mitchells told SCDSS that J.J.L. had a rash on her buttocks from sitting in wet diapers because "she does not tell anyone she is wet/soiled."[40]

216.    SCDSS failed to investigate the allegations of abuse in:

    a.  Failing to interview the children;
    b.  Failing to interview teachers and administrators at M.C. Riley Elementary School;
    c.  Failing to interview neighbors and other collateral sources who had daily contact with the children;
    d.  Failing to obtain medical records and speak with the medical providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.;
    e.  Failing to present the children for forensic interviews;
    f.  Failing to present the children for medical examinations;
    g.  Failing to speak with the children outside of the presence of Yulanda Mitchell;
    h.  Failing to follow up with the children after Yulanda Mitchell retaliated against the children for disclosing abuse and neglect;
    i.  Failing to inspect the children's home;
    j.  Failing to remove the children from the home;

---

[38] FCA Bates No. 008964.
[39] FCA Bates No. 000017.
[40] FCA Bates No. 000017.

217.    In January 2011, a report was made to SCDSS that A.M.L. disclosed she was hit by a belt.[41]

218.    SCDSS failed to investigate the allegations of abuse in:

    a.  Failing to interview the children;
    b.  Failing to interview teachers and administrators at M.C. Riley Elementary School;
    c.  Failing to interview neighbors and other collateral sources who had daily contact with the children;
    d.  Failing to obtain medical records and speak with the medical providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.;
    e.  Failing to present the children for forensic interviews;
    f.  Failing to present the children for medical examinations;
    g.  Failing to speak with the children outside of the presence of Yulanda Mitchell;
    h.  Failing to follow up with the children after Yulanda Mitchell retaliated against the children for disclosing abuse and neglect;
    i.  Failing to inspect the children's home;
    j.  Failing to remove the children from the home;

219.    Before March 28, 2011, the Director of the Children's Center day care in Bluffton, South Carolina sent a letter to R.D.M.'s pediatrician, Maureen Berrigan, M.D., raising concerns that Yulanda Mitchell was withholding food from R.D.M.[42]

220.    Again, this should have triggered awareness of very concerning parental behavior toward a child by Seaside and Dr. Berrigan.

221.    By virtue of her training and education, Dr. Berrigan is educated on signs of abuse and neglect.

222.    She is also aware that when one child at home as at risk, all children in the home are at risk.

---

[41] FCA Bates No. 000017.
[42] FCA Bates No. 008970, 008963-008964.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

223.    Seaside and Dr. Berrigan were aware that children in the Mitchell home were abused and neglected and failed to do anything.

224.    Seaside and Dr. Berigan were aware that A.M.L., J.J.L., J.J.G., R.D.M. and S.T.S. had failed to thrive and gain weight and the children were not growing appropriately.

225.    Seaside and Dr. Berrigan, and any medical provider are aware that failure to thrive and growth deficiency can be caused by starvation and improper nutrition.

226.    When a child is being starved, abused or neglected, it demands immediate attention by treating medical provider.

227.    On July 27, 2011, Jennifer Frankle, J.J.L.'s teacher, noted that J.J.L. "has an obsession with food. Her day revolves around snack time and lunch. One day a snack was not available for her and she could not function for the remainder of the morning until lunch time."[43]

228.    On August 2, 2011, Seaside and Dr. Berrigan noted R.D.M. was stealing chocolate and food from other children at school and was drinking out of the toilet at school.[44] Dr. Berrigan also noted that R.D.M.'s weight decreased from 75% to 12%.[45] Dr. Berrigan also noted that J.J.L.'s weight was down from 30% to 4%.[46] J.J.G.'s weight was down from 40% in March 2010 to 14% on August 5, 2010.[47] A.M.L.'s weight dropped from 62% in March 2010 to 23% on July 30, 2010.[48]

---

[43] FCA Bates No. 001807-001808.
[44] FCA Bates No. 008961.
[45] FCA Bates No. 008962.
[46] FCA Bates No. 001734
[47] FCA Bates No. 008034-008037
[48] FCA Bates No. 000136-000138

229.    The fact that Seaside and Dr. Berrigan did little to protect A.M.L., J.J.L., J.J.G., R.D.M. and S.T.S. who exhibited obvious signs of abuse and neglect is a reckless breach of the standard of care.

230.    On May 2, 2012, S.T.S. was disciplined at school for stealing a pack of crackers from a classmate's lunch box.[49]

231.    On April 3, 2012, Yulanda Mitchell changed the children's medical provider to Palmetto Pediatrics and Dr. Lowe.[50] Palmetto and Dr. Lowe followed the children and took frequent height and weight recordings until the removal of the children from their parents in November 2016.

232.    A.M.L. was seen by Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe from April 4, 2012, until August 8, 2016.

233.    In the four years of A.M.L. was under the care of Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe, A.M.L. gained only nine pounds, twelve ounces and grew five inches.

234.    J.J.L. was seen by Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe from May 7, 2012, until November 1, 2016.

235.    In the four years of J.J.L. was under the care of Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe, J.J.L. gained less than two pounds and grew three and a quarter inches.

236.    R.D.M. was seen by Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe from August 10, 2012, until August 1, 2016.

---

[49] FCA Bates No. 029101-029102
[50] FCA Bates No. 001747.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

237.     In the four years of R.D.M. was under the care of Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe, R.D.M. gained less than three and a half pounds and grew three inches.

238.     J.J.G. was seen by Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe from May 18, 2012, until August 8, 2016.

239.     In the four years of J.J.G. was under the care of Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe, J.J.G. gained only nine pounds and grew five and a half inches.

240.     S.T.S. was seen by Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe from August 10, 2012, until July 25, 2016.

241.     In the four years of S.T.S. was under the care of Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe, S.T.S. gained only 18 pounds and grew less than nine half inches.

242.     It was obvious that the children were being starved, tortured and abused.

243.     In April 2012, a report to SCDSS alleged R.D.M. had a bruise on his arm as a result of being hit with a shoe by his mother. It had also been alleged that the children were hoarding food.[51]

244.     On January 29, 2013, R.D.M. was referred to the Coastal Empire Mental Health by the Beaufort County School District for food stealing behaviors.[52]

245.     On April 30, 2013, S.T.S. was disciplined for not returning a pack of crackers to his teacher that he had stolen.[53] Instead, he ate the crackers.

---

[51] FCA Bates No. 000017.
[52] FCA Bates No. 008850.
[53] FCA Bates No. 029101.

246. On August 14, 2013, S.T.S. was referred to a pediatric endocrinologist at MUSC due to failure to thrive but the Mitchells never took him to an appointment.[54] On August 15, 2013, R.D.M. was referred to a pediatric endocrinologist at MUSC due to failure to thrive but the Mitchells never took him to an appointment.[55] S.T.S. was diagnosed with failure to thrive.[56]

247. In September 2013 R.D.M. disclosed Yulanda Mitchell had picked him up over her head and dropped him to the floor 20 times because he had a bad day in school.[57] R.D.M. had a bump on his head and a temperature of 102 degrees with a bilateral ear infection.[58] R.D.M. stated his body ached and it sometimes hurt to breathe but he had no marks or other bruises on his body.[59] During an interview, R.D.M. stated that food was withheld from him as punishment in the home.[60] SCDSS closed its file on November 6, 2013.[61]

248. SCDSS failed to investigate the allegations of abuse in:

   a. Failing to interview the children;
   b. Failing to interview teachers and administrators at M.C. Riley Elementary School;
   c. Failing to interview neighbors and other collateral sources who had daily contact with the children;
   d. Failing to obtain medical records and speak with the medical providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.;
   e. Failing to present the children for forensic interviews;
   f. Failing to present the children for medical examinations;
   g. Failing to speak with the children outside of the presence of Yulanda Mitchell;
   h. Failing to follow up with the children after Yulanda Mitchell retaliated against the children for disclosing abuse and neglect;
   i. Failing to inspect the children's home;
   j. Failing to remove the children from the home;

---

[54] FCA Bates No. 011893, 011356.
[55] FCA Bates No. 011325
[56] FCA Bates No. 011385
[57] FCA Bates No. 000017.
[58] FCA Bates No. 000017
[59] FCA Bates No. 000017.
[60] FCA Bates No. 000017.
[61] FCA Bates No. 000017.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

249.     On September 25, 2013, Sheryl B. Keating at Coastal Empire Mental Health noted R.D.M. was referred back because he continued to steal food and hoard food.[62] The therapist reported the school had tried to intervene.[63] R.D.M. also reported that he was beaten.[64]

250.     On October 9, 2013, Palmetto Pediatrics of the Lowcountry, LLC and Dr. Lowe made another appointment for R.D.M. to see Dr. Rice, an endocrinologist at MUSC on December 5, 2013.[65] The Mitchells never took him to an appointment.[66] That same day, Palmetto Pediatrics of the Lowcountry, LLC and Dr. Lowe made a referral for J.J.G. to see the same endocrinologist.[67]

251.     By October 2013, the Beaufort County School District referred A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. to Wright Directions, LLC, d/b/a Wright Directions Family Services because the children were stealing food, "…kids aren't being fed and wanted to have them weighed daily."[68]

252.     WDFS provide social services and mental health services related to "stealing food" and disruptive behaviors.[69] Reported behaviors included stealing food, asking for food, eating wasted food out of the garbage cans.[70]

253.     On October 29, 2013, R.D.M. participated in an initial assessment with Yulanda Mitchell and Nicki Nichols of WDFS. Nicki Nichols noted:

---

[62] FCA Bates No. 008852.
[63] FCA Bates No. 008852.
[64] FCA Bates No. 008852.
[65] FCA Bates No. 011323, 011322.
[66] FCA Bates No. 011889.
[67] FCA Bates No. 011417.
[68] FCA Bates No.
[69] FCA Bates No. 011852-011861, 011813-011817, 004929-004934, 004301-004305, 004968-004975, 004301-004305, 004322-004333,
[70] FCA Bates No. 011852, 004929-004934.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

[R.D.M.] spoke softly and quietly during assessment and spoke more when his mother was out of the room. When mother was present and Co. asked a question [R.D.M.] would look everyone except at Co. and his mother directed him to make eye contact with Counselor. [R.D.M.] sat still in his chair and only fidgeted when asked questions directly regarding stealing food[71]

254.    The Wright Directions Family Services Defendants knew that troubling behavior of one child in a home could be indicative of signs of abuse of neglect to all children. Here, the Wright Directions Family Services Defendants observed extremely troubling behaviors of five children from October 29, 2013 through September 21, 2015.[72]

255.    The Wright Directions Family Services Defendants were aware of troubling behaviors of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

256.    Yulanda Mitchell also told Wright Directions Family Services that the reason S.T.S. stole food was because he had been in numerous foster homes during early childhood when, in fact, he had lived with her since he was 2 months old.[73]

257.    Over the next two years, Wright Directions, LLC, Renee Sutton, LPC, Nikki Nichols, LPC, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4 provide family services to A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. weekly or multiple times a week and billed Medicaid under the diagnosis code of "child neglect – nutrition".

258.    The services provided by the Wright Directions Family Service Defendants included counseling, social work, psychotherapy, skills training and development, diagnostic assessments, family stabilization services, treatment or case planning, multidisciplinary evaluations, and case management.

---

[71] FCA Bates No. 026997.
[72] FCA Bates No. 023238-028546.
[73] FCA Bates No. 011852, 011814

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

259.    These services included speaking with the children's services providers, educators, and medical professionals and obtaining records from each stakeholder in order to assess each child and formulate a treatment plan or case plan.

260.    During the two years the Wright Directions Family Services Defendants provided services to A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., they never contacted the children's medical provider or sought to obtain the children's medical records.

261.    In addition, they consistently ignored the children's food stealing and food seeking behaviors from October 2013 through September 2015.

262.    During almost two years the Wright Directions Family Services Defendants provided services to A.M.L., A.M.L. gained only three pounds and grew only three inches.

263.    The Wright Directions Family Services Defendants would see A.M.L. or provide services for A.M.L. over 124 times between November 5, 2013 through May 15, 2015.

264.    During two years the Wright Directions Family Services Defendants provided services to J.J.L., J.J.L. gained only four and a half pounds and grew only two and three-quarters inches.

265.    The Wright Directions Family Services Defendants would see J.J.L. or provide services for J.J.L. over 128 times between November 5, 2013 through May 15, 2015.

266.    During the eighteen months the Wright Directions Family Services Defendants provided services to R.D.M., R.D.M. gained only 0.8 of a pound and grew only one and three-quarters inches.

267.    The Wright Directions Family Services Defendants would see R.D.M. or provide services for R.D.M. over 148 times between November 5, 2013 through September 21, 2015.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

268.     During the eighteen months the Wright Directions Family Services Defendants provided services to J.J.G., J.J.G. gained only ten pounds and grew only three inches.

269.     The Wright Directions Family Services Defendants would see J.J.G. or provide services for J.J.G. over 169 times between November 5, 2013 through September 21, 2015.

270.     During the eighteen months the Wright Directions Family Services Defendants provided services to S.T.S., S.T.S. gained only eight pounds and grew only five inches.

271.     The Wright Directions Family Services Defendants would see S.T.S. or provide services for S.T.S. over 85 times between November 5, 2013 through May 15, 2015.

272.     The Wright Directions Family Services Defendants knew that troubling behavior of one child in a home could be indicative of signs of abuse of neglect to all children.

273.     The Wright Directions Family Services Defendants was aware of troubling behaviors of all of the children.

274.     All of the Wright Directions Family Services Defendants should have noticed the children were being starved and abused.

275.     A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. disclosed that they and their siblings were being starved and physically abused. The School Employees disclosed the Children's food stealing behaviors to the Wright Directions Family Services Defendants.

276.     All of the Wright Directions Family Services Defendants had an obligation and duty to provide a continuum of care to these children.

277.     All of the Wright Directions Family Services Defendants had an obligation and duty to protect these children.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

278.    WDFS and Nicki Nichols conducted a Diagnostic Assessment on J.J.G., S.T.S., J.J.L., R.D.M., and A.M.L. on November 5, 2013.[74] In the education portion of the assessment for each child, Nicki Nichols, LPC, wrote:

> [M]om worried kids are feeling tension between she and the principal. School believes kids aren't being fed and wanted to have them weighed daily. Mom shared they eat and that is not the issue, she is unsure why they are stealing.[75]

279.    J.J.G., S.T.S., J.J.L., R.D.M., and A.M.L. were all referred to a psychiatrist by Nicki Nichols and WDFS. Over the next two years, neither Nicki Nichols, nor Renee Sutton, the children's other therapists, followed up on Yulanda Mitchell's noncompliance in refusing to take the children to a psychiatrist.

280.    In S.T.S.'s assessment, Nicki Nichols and WDFS wrote:

> "MC Riley School- Ms. Debbie Brian- client is adopted. He recently got suspended for 3 days for stealing a ham sandwich from another student, he doesn't turn in his work and teacher is concerned he doesn't tell the truth and he cries when confronted."[76]

281.    None of S.T.S.'s treatment plan and assessment focused on food insecurity.

282.    Nichols also noted that Yulanda Mitchell was unable to provide the basis for the ADD/ADHD medications for J.J.G., J.J.L., and A.M.L., writing, "mom not being able to identify symptoms and not having access to PCP diagnosis and criteria…"[77]

283.    Across the board, the children were treated for poor impulse control by Nicki Nichols and WDFS, instead of addressing and ruling out food insecurity. In other words, the children were being starved and over the next two years, the Wright Directions Family Services

---

[74] FCA Bates No. 023532-023564; 023520-023528.
[75] FCA Bates No. 023384-023418; 023532-023564; 004334-004351; 004951-004967.
[76] FCA Bates No. 023532-023564; 023520-023528.
[77] FCA Bates No. 023384-023418; 023532-023564; 004334-004351; 004951-004967

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

Defendants provided these starving Children mental health services for poor impulse control when they stole food, ate out of trashcans, and hoarded food.

284.    On November 8, 2013, Nicki Nichols and WDFS conducted Family Therapy with Yulanda Mitchell and A.M.L., J.J.G., R.D.M., and S.T.S.[78] J.J.G.'s and S.T.S.'s therapy focused on the children receiving food as rewards.

285.    For the majority of these Family Therapy Sessions, Nicki Nichols and WDFS again billed Medicaid for four hours of Family Therapy when they were only allowed to bill for one hour. This was Medicaid fraud.

286.    On November 8, 2013, Palmetto Pediatrics of the Lowcountry, LLC and Dr. Lowe made another appointment for S.T.S. to see Dr. Rice, an endocrinologist at MUSC on December 5, 2013.[79] The Mitchells never took him to an appointment.[80]

287.    Instead, both S.T.S. and R.D.M. suddenly gained 6 lbs. and 5 lbs. before their next pediatrician's appointment.[81]

288.    During a November 20, 2013 family therapy session, Nicki Nichols and WDFS learned:

> …a little girl didn't eat all her cookies at lunch, and he asked if he could have them and she told him "no"; the girl threw them away and he asked the custodian if he could have them and was told "no again".[82]

289.    During a November 26, 2013 family therapy session, Yulanda Mitchell informed that R.D.M. and A.M.L. were not allowed to take a bag to school.[83] Nicki Nichols never

---

[78] FCA Bates No. 027001-027002; 024344-024345; 025904-025905; 028440-028441;
[79] FCA Bates No. 011354.
[80] FCA Bates No. 011889, 011320.
[81] FCA Bates No. 011889, 011320, 011889.
[82] FCA Bates No. 027013-027014.
[83] FCA Bates NO. 027011-027012; 024352-024353.

bothered to ask about this when she was alone with R.D.M. or A.M.L., where she would have learned that the Children hid food in the bag so they and their siblings could eat. Nicki Nichols reported:

> Mrs. Mitchell shared that 2 months ago she took away patient's bookbag and has been stapling his snack bag so there is evidence if he takes it ahead of time…[84]

290.    During the same session, Yulanda Mitchell complained the S.T.S. was given juice at school by another child.[85]

291.    On December 10, 2013, Nicki Nichols and WDFS provided R.D.M. mental health therapy for lacking impulse control because"

> [R.D.M.] was caught with food in his specials class, has been going out of his area and getting a drink after he was told not too, and that he intentionally tripped another student in a lunch line.[86]

292.    On December 17, 2013, Nicki Nichols and WDFS provided R.D.M. mental health therapy for lacking impulse control and A.M.L., and J.J.G. mental health therapy for not telling on R.D.M. when R.D.M. took food from some of A.M.L.'s friends in the lunch room.[87] The next day's therapy with S.T.S., R.D.M., A.M.L., and J.J.G. focused on not stealing things and telling an adult when the children saw a sibling steal or take food from someone else.[88]

293.    On December 27, 2013 Nicki Nichols and WDFS conducted an exercise during individual therapy where each child acknowledged that it was wrong to take candy from others.[89]

---

[84] FCA Bates No. 027011-027012
[85] FCA Bates No. 028446-028447.
[86] FCA Bates No. 027015-027016.
[87] FCA Bates No. 024834-024835; 024364-024365; 026889-026890.
[88] FCA Bates No. 028460-028461; 026891-026892; 024836-024837; 024234-024235.
[89] FCA Bates No. 024238-024239; 024840-024841; 026895-026896; 028464-028465.

294.    In January 2015, a report was made to SCDSS that the children were being physically abused and the children were constantly stealing food at school.[90] The children were forced to sleep on the floor and sometimes placed in a dark closet.[91] SCDSS closed the case in March 2015.[92]

295.    On January 17, 2014, Nicki Nichols and WDFS helped the children process the loss of Yulanda Mitchell's mother. Each child shared memories of the grandmother that related to food. T.S.T. remembered he "used to "cook with her"" and would give them snacks.[93] R.D.M. remembered she "gave us sweets"[94];J.J.G. shared "he helped her cook…she made really good oatmeal with sugar and honey".[95] A.M.L. stated she "gave them snacks…and she cooked really good grits."[96]

296.    On January 23, 2014, Nicki Nichols and WDFS noted:

> [A.M.L. was] taking things and hiding in her bedroom and eating or drinking them. She even shared that [A.M.L.] drank out of her grandbaby's bottle. When asked, [A.M.L.] would only say "i don't know or I just wanted it". Mrs. Mitchell shared they have been having to keep track of snacks, etc. and they know when they are missing[97]

Nicki Nichols and WDFS had the starving A.M.L. verbalize "understanding that if she asks and is told "no' then she cannot have something and that is the rule."[98]

---

[90] FCA Bates No. 000017.
[91] FCA Bates No. 000017.
[92] FCA Bates No. 000018.
[93] FCA Bates No. 028470-028471.
[94] FCA Bates No. 026901-026902.
[95] FCA Bates No. 024846-024847.
[96] FCA Bates No. 024244-024245.
[97] FCA Bates No. 024246-024247.
[98] FCA Bates No. 024246-024247

297.    The February 4, 2014 sessions for S.T.S., A.M.L., J.J.G., and R.D.M. focused on telling the truth.[99]

298.    On February 11, 2014, Nicki Nichols and WDFS learned that R.D.M. and J.J.L. took a cookie out of the lunchroom and were caught by the lunch lady.[100]

299.    On February 25, 2014, Nicki Nichols and WDFS were told:

…[R.D.M.] admitted to continously stealing and just "not getting caught". He stole cookies from the much room everyday last week and yesterday he has a perfect day. She shares she and her sister had a long talk w him about what will happen if he continues to steal. His mom shared she will take him to visit a prison to see what it is like. [R.D.M.] admitted to stealing, · He could ever. State consequences of continued stealing" kicked out of school, go to jail, get in trouble." Other times he was asked what could help and he wouldn't even make eye contact. Mom shared she will buy " rubber pants" and check his socks daily. Also she is going to try to incorporate cookies as a snack choice 1 x week as a trial to see if it will kee him from stealing.[101]

It was also reported that A.M.L. "stole out of another child's lunchbox - a pop tart. She shared she had asked if she could have it, was told no and topknot anyways."[102]

300.    On February 27, 2014, WDFS began providing Behavior Modification to A.M.L.[103] WDFS employee Tenile Inman and WDFS claimed they provided 1 hour and 45 minutes of behavior modification while at school, with a goal of:

Goal: creating a reward system for positive(non-defiant/impulsive) behaviors and consequences for neg. /unsafe behaviors and problem-solving obstacles to decreasing defiant and impulsive behaviors[104]

301.    The next day, Tenile Inman and WDFS claimed they provided 1 hour and 45 minutes of behavior modification while at school.

---

[99] FCA Bates No. 028474-028475; 026905-026906; 024850-024851; 024248-024249.
[100] FCA Bates No. 026907-026908
[101] FCA Bates No. 026911-026912
[102] FCA Bates No. 024254-024255.
[103] FCA Bates No. 024259-024260.
[104] FCA Bates No. 024259-024260.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

302.    On March 1, 2014, WDFS again recommended that A.M.L., J.J.G., S.T.S., J.J.L. and R.D.M. consult with a psychiatrist.[105]

303.    On March 3, 2013 A.M.L. was disciplined for taking a snack and $5.00 from the classroom.[106] She was caught when she tried to use the $5.00 to buy cookies in the school café.

304.    On March 4, 2014, the A.M.L., R.D.M., S.T.S., and J.J.G. were provided individual therapy focusing on respecting other people's property.[107]

305.    On March 6, 2014 S.T.S. and R.D.M. began Behavior Modification with Renee Sutton.[108]

306.    On March 7, 2014, Debra Bryan, the school social worker at M.C. Riley Elementary School gave the children's background information to Tenile Inman and WDFS.[109] This included the school's concerns that Yulanda Mitchell withheld food from the children.

307.    On March 10, 2014, Renee Sutton claimed she conducted 1 hour and 45 minutes of Behavior Modification at the Children's School with A.M.L., the same amount of time with R.D.M., and 1 hour and 15 minutes with S.T.S.[110] During the Behavior Modification session with R.D.M., R.D.M. stated he was still hungry after lunch and said his hunger was "5 on a 1-5 scale for hunger".[111]

308.    On March 10, 2014, Nicki Nichols and WDFS learned S.T.S. stole honeybuns and hid in Yulanda Mitchell's bathroom to eat them.[112] S.T.S. even admitted to eating chips off of the

---

[105] FCA Bates No. 023302-023308; 023512-023518; 004312-004315; 004935-004936.
[106] FCA Bates No. 028734-028735.
[107] FCA Bates No. 028482-028483; 026913-026914; 024858-024859; 024263-024264.
[108] FCA Bates No. 028484-028485.
[109] FCA Bates No. 024265-024266
[110] FCA Bates No. 026917-026918; 024267-024268
[111] FCA Bates No. 026917-026918.
[112] FCA Bates No. 028488-028489

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

floor.[113] Nicki Nichols and WDFS has S.T.S. "verbalize[ ] knowing it was wrong to steal and to lie but could not share why he took the items and understood the consequences of actions and how it led to lack of trust."[114] Nicki Nichols and WDFS also learned R.D.M. was stealing food at school, among other behaviors.[115] They also learned A.M.L. stole a child's lunch and $5 and was caught trying to buy cookies at the school café.[116]

309.    On March 10, 2014, Nicki Nichols and WDFS were told by Yulanda Mitchell that she no longer wanted them to conduct family therapy and individual therapy in the home in the evenings and on Saturday after 11:00 a.m.

310.    On March 11, 2014, Nicki Nichols and WDFS conducted Individual Therapy at the Children's school.[117]

311.    On March 12, 2014, Nicki Nichols and WDFS learned from Yulanda Mitchell, "Caregiver stated initial frustration with process of service delivery. Caregiver shared desired outcome for client performance. Caregiver inquired about service delivery, time, location, and frequency."[118]

312.    On March 13, 2014, R.D.M. reported to Renee Sutton and WDFS that he was "tired and hungry on a scale of 5."[119]

313.    On March 17, 2014, S.T.S.'s teacher reported to Renee Sutton that "food and items stuffed in his desk when it was cleaned out recently."[120] S.T.S.'s response was to express

---

[113] FCA Bates No. 028488-028489
[114] FCA Bates No. 028488-028489.
[115] FCA Bates No. 026921-026922
[116] FCA Bates No. 024269-024270
[117] FCA Bates No. 028490-028491; 026923-026924; 024776-024777; 024271-024272.
[118] FCA Bates No. 024277-024278.
[119] FCA Bates No. 026929-026930.
[120] FCA Bates No. 028504-028505.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

"he was afraid of punishment".[121] S.T.S. requested that Renee Sutton "tell mom that he had a hard day."[122]

314.    On March 20, S.T.S. told his teacher that he did not have a snack so that he could get an additional sack.[123] That same day, R.D.M. was pulled out of class for Behavior Modification, but wanted it to end at the exact time the Specials/Literacy class began.[124] This class usually provided treats or a snack. During A.M.L.'s Behavior Modification session, she "indicated hunger value as 4 before and after consuming snack".[125] During J.J.G.'s Behavior Modification Session, J.J.G. stated that two of his three favorite things involved food – going to Station 300 and Golden Corral.[126]

315.    During March 25, 2014 Behavior Modification with Renee Sutton, S.T.S. reported that "he was hungry at 2, which is 30 minutes after lunch…REDACTED…He reported be able to request a different food, which was a root cause to a lie last week."[127] J.J.G. focused on one of his enjoyments in helping Yulanda Mitchell out, which was packing his siblings' snack for school.[128]

316.    On March 28, 2014, Renee Sutton documented that R.D.M. was taken to the Assistant Principal's office to discuss R.D.M. requesting another student's food. The peer told his teacher that R.D.M. "wanted his food that he didn't want but was afraid to give it to him."[129] R.D.M. expressed fear and crying because he had to go home with a note saying he asked for

---

[121] FCA Bates No. 028504-028505.
[122] FCA Bates No. 028504-028505.
[123] FCA Bates No. 028507-028508.
[124] FCA Bates No. 026939-026940.
[125] FCA Bates No. 024293-024294.
[126] FCA Bates No. 024788-024789.
[127] FCA Bates No. 028514-028515.
[128] FCA Bates No. 024794-024795.
[129] FCA Bates No. 026955-026956

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

food. He asked Rennee Sutton to come take him home, but Yulanda Mitchell refused to allow him to ride with her.[130]

317.    On April 1, 2014, Renee Sutton had a discussion with Yulanda Mitchell regarding the incident with R.D.M. the Friday before and the "school's attention around food, stating she "was ready to drive down there" but then "I prayed for strength".[131]

318.    On April 1, 2014, Renee Sutton documented a discussion with R.D.M. where he reported that "Time Out" means "being sent to the closet and repeated that his mother said "to not be telling family business"".[132] Renee Sutton explained to R.D.M. "that punishment of whipping and timeouts are sometimes used by parents as a way to teach kids who make bad choices." [133] Renee Sutton wrote, "[J.J.L.] commented that they didn't use to receive these things. [Sutton] inquired duration of timeout and whether it seemed fair or unfair. [R.D.M.] didn't respond.[134]

319.    On April 2, 2014, A.M.L. and J.J.G. participated in Family Therapy with WDFS employee Amy Berryhill and Yulanda Mitchell. During the therapy, Yulanda Mitchell discussed A.M.L. hoarding food.[135] Yulanda Mitchell also told Amy Berryhill that J.J.G. is still taking food during the session. During a Behavior Modification session with WDFS employee Natasha Ferguson, J.J.G. reported that R.D.M. "stole his snack and placed it under his bed."[136]

---

[130] FCA Bates No. 026955-026956
[131] FCA Bates No. 026963-026964
[132] FCA Bates No. 026961-026962
[133] FCA Bates No. 026961-026962
[134] FCA Bates No. 026961-026962
[135] FCA Bates No. 024324-024325
[136] FCA Bates No. 024812-024813

320.    On April 3, 2014 Natasha Ferguson conducted Behavior Modification Services with J.J.G. and recorded that J.J.G. was excited about meeting with Amy Berryhill the previous day and "good the food he ordered was."[137]

321.    On April 4, 2014, Renee Sutton conducted Family Support with Yulanda Mitchell regarding the children eating snacks.[138] During Behavior Modification with Renee Sutton, S.T.S. reported that he was "hungry" by the end of it and his lunch occurs late in the day. He also spoke about French fries.[139] That same day, Renee Sutton conducted Behavior Modification with R.D.M. and Sutton focused on impulse control.[140] R.D.M. also took a snack and put it in his pocket in homeroom.[141] R.D.M. denied taking the snack, but was given the option of returning the snack or having it put on his behavior chart, which would be reported to his mother.[142] R.D.M. returned the snack. Sutton also observed that R.D.M.'s knee was hurting.[143] R.D.M. at first resisted Sutton's request to call Yulanda Mitchell.[144] During the phone call with Yulanda Mitchell, Renee Sutton recorded, "expressed concern that not reported to school due to accusations of abuse and wanted to make sure that she is not being accused of something when kids are hurt in activity occurring at school".[145]

---

[137] FCA Bates No. 024818-024819
[138] FCA Bates No. 028346-028347
[139] FCA Bates No. 028343-028344
[140] FCA Bates No. 026973-026974
[141] FCA Bates No. 026973-026974
[142] FCA Bates No. 026973-026974
[143] FCA Bates No. 026973-026974
[144] FCA Bates No. 026973-026974
[145] FCA Bates No. 026973-026974

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

322.    On April 4, 2014, WDFS employee Tenile Inman conducted behavior modification with A.M.L.[146] During the session, A.M.L. "expressed not taking belongings of others and resisting need to keep large amounts of food hidden."[147]

323.    On April 7, 2014, Renee Sutton conducted Behavior Modification with R.D.M. and R.D.M. declined to answer her as to why he stole food the week before.[148]

324.    On April 9, 2014 Renee Sutton called Yulanda Mitchell to report that R.D.M. had asked a new student for food.[149]

325.    On April 14, 2014, WDFS therapist Amy Berryhill conducted Family Therapy with R.D.M. and Yulanda Mitchell and they discussed R.D.M.'s "issues with listening and taking food."[150] During Behavior Modification with Renee Sutton, R.D.M. requested more food. R.D.M. wanted to know what food would be served.[151]

326.    On April 21, 2014 Renee Sutton provided Behavior Mofication to R.D.M. and noted:

> Patient requested MHS to eat lunch with him when normally he has stated a preference for MHS to not join him around friends. Patient requested for MHS' food when it appeared MHS wasn't eating. He reported he was a level 10 on the hungry scale but did so with a giggle and smile. REDACTED. Later, he reported feeling full and denied eating any other food.[152]

327.    On April 22, 2014, during a Behavior Modification session with Renee Sutton, R.D.M. described friendship as "sharing food".

---

[146] FCA Bates No. 024328-024329
[147] FCA Bates No. 024328-024329
[148] FCA Bates No. 026978-026979
[149] FCA Bates No. 026982-026985.
[150] FCA Bates No. 026790-026791
[151] FCA Bates No. 026788-026789
[152] FCA Bates No. 026802-026804.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

328.    On April 29, 2014 Yulanda Mitchell spoke with Tanille Inman regarding A.M.L. "having chocolate found on her persona [sic]"[153]

329.    During a one-hour individual therapy session with R.D.M. on April 30, 2014, Renee Sutton wrote:

> On several occasions, he made conditional statements to stop the session when he couldn't have things that he wanted. At times, he reports that he doesn't want to tell anything about what happens at home but shares at a later time in session.[154]

330.    On May 7, 2014 Yulanda Mitchell presented to Renee Sutton numerous reasons for refusing to let the Child participate in extracurricular activities and for her and her husband to not participate in family therapy.[155]

331.    On May 13, 2014, S.T.S. described to Renee Sutton his birthday where he received one gift (monopoly) but no celebration or cake.[156]

332.    On May 16, 2014, Tenille Inman recorded that A.M.L.:

> verbalized concern for meal time and feelings of hunger. A.M.L. stated inability to cope until scheduled meal time…A.M.L. verbalized having lack of food to soothe feelings of hunger. A.M.L. explained wanting more and feeling sad when she cannot have more food. A.M.L. agreed to remain patient until scheduled snack.[157]

333.    On May 19, 2014 Renee Sutton met with R.D.M. Sutton noted, R.D.M. "requested MHP to attend lunch with him and asked how much food was on MHP plate. He does not attempt to share his feelings other than happy but makes clear requests."[158] That same day J.J.G. told Natasha Ferguson during behavior modification "that he did not do anything this weekend for his birthday. Client stated that his mom cooked his favorite meal and that he got a

---

[153] FCA Bates No. 0241162-0241163
[154] FCA Bates No. 026819-026820
[155] FCA Bates No. 026825-026826
[156] FCA Bates No. 028399-028400
[157] FCA Bates No. 024194-024195
[158] FCA Bates No. 026831-026832

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

sorry game for his birthday. Javair stated that the shoes [Ferguson] gave to him for his birthday he cant wear them until next year."[159] A.M.L. told Tenile Inman that the Children "sleep in school uniforms each evening to prepare for upcoming school day."[160]

334.    J.J.G. received individual therapy with Renee Sutton May 22, 2014. "He reported all children sleeping in the same room with some on the floor."[161] During Behavior Modification, Natasha Ferguson wrote:

> J.J.G. also said that his sister told on him for eating his snack in the bus line when he was not really eating his snack. Client acknowledged that he did eat a little piece since his snack since it was kind of already open. J.J.G. said his mother took the whole snack from him so he did not have a snack today[162]

335.    On May 23, 2014, Tenile Inman conducted Behavior Modification with A.M.L., stating:

> A.M.L. discussed feeling hungry. A.M.L. verbalized feeling fear when seeking support from staff. A.M.L. stated staff may say no or give consequence when asking for aid. A.M.L. stated feeling good during good decisions and sad when in trouble. A.M.L. explained taking food from peers as cause for feeling hungry.[163]

336.    On May 27, 2017, R.D.M.'s teacher told Renee Sutton that he was "sneaking to eat snacks during class".[164]

337.    On May 28, 2014, Yulanda Mitchell reported to Renee Sutton that A.M.L. stole from another child's backpack.[165]

338.    On May 30, 2014 Renee Sutton conducted Individual Therapy with A.M.L. During therapy, Renee Sutton recorded:

---

[159] FCA Bates No. 024698-024699.
[160] FCA Bates No. 024196-024197.
[161] FCA Bates No. 024708-024709.
[162] FCA Bates No. 024706-024707.
[163] FCA Bates No. 024206-024207.
[164] FCA Bates No. 028408-028409; 026835-026836.
[165] FCA Bates No. 024214-024215.

She replied smells (chocolate) as trigger with embarrassment and shock in getting caught. She initiated questions to learn about imprisonment and correct emotional word definitions. She reported not stealing again because of punishment and in using 5-finger counting phrase…to avoid stealing when smell food in classroom.[166]

339.    On June 2, 2014, R.D.M. participated in Behavior Modification with Natasha Ferguson. She reported, "Client stated that when he gets fried chicken he is happy or when he gets to spend time with his mother it makes him happy as well."[167]

340.    On June 3, 2014, Renee Sutton conducted Individual Therapy with A.M.L. and recorded, "A.M.L.….excitely telling about the food in the classroom."

341.    During the week of June 9, 2014, WDFS held a camp which Renee Sutton pushed Yulanda Mitchell to allow the Children to attend. During the week, WDFS, Renee Sutton, and other employees billed Medicaid for 32 hours of Behavior Modification, six hours of individual therapy, two hours of family therapy, and .75 hours of family support. Other "Medicaid" camps were held in the summer.

342.    The week of June 16, 2014, WDFS held another camp

343.    On June 18, 2014, Yulanda Mitchell took J.J.G. to Dr. Lowe to have his ADHD medications increased even though he was not taking it in the summer.[168]

344.    On June 19, 2014, during an individual therapy session, A.M.L. told Renee Sutton "that a friend gives food/toys but later clarified that [Sutton] was still a friend even if [she] didn't give food/toy like what was done with other siblings."[169]

---

[166] FCA Bates No. 024216-024217
[167] FCA Bates No. 024720-024721.
[168] FCA Bates No. 011408-011411
[169] FCA Bates No. 024036-024037

345.    On June 25, 2014, Renee Sutton noted an Individual Therapy Session that R.D.M. "continues to request a lot of food and eat twice as much as other siblings if given the chance to do so."[170]

346.    On July 8, 2014 A.M.L. told her Behavior Modification facilitator that her meal was her best memory of a recent trip.[171]

347.    On July 16, 2014 WDFS employee Eleza Sebesta provided Behavior Modification to R.D.M. and wrote:

> Patient ate his food very quickly on this date and asked his peers for the rest of their food. Patient ignored staff's request to wait until others are done eating. Patient spoke with MHS about what he had to eat during his absences and confirmed that he was fed. Patient responded with "Yea, Yea" when MHS assured him that he would get enough to eat throughout the day.[172]

348.    On July 22, 2014, Renee Sutton recorded the following Individual Therapy Notes:

> RDM presented in extremely happy mood saying, "I missed you". He requested session knowing possible receipt of food could occur but had not been stated by MHP. He attempted completing action towards goal while in community but at times refused to perform task related to ft. He eventually performed task with slight prompting of what to say to store clerk. He did not provide much detail on fast week's activity at home, not giving any insight to his changed mood and compliant behavior. He stated, "she [MHP] will look after us". He was able once to maintain self-control with food after eating a lot, leaning back and saying, "oh my belly is full". Then, after 20 minutes he returned to not using self-control in eating food. At end, he didn't offer gratitude and it was not clear if he understood explanations about process and expectations about receiving food even he made eye contact. He was observed being around siblings with food not able to say no to offerings and requesting portions from them, eating from all options. At times, he would remember to request eating from MHP's peanuts prior to getting them.[173]

349.    That same day, R.D.M. told the "Medicaid" camp staff that he was going to the bathroom, but instead, he stole food from the kitchen.

---

[170] FCA Bates No. 026867-026868
[171] FCA Bates No. 024054-024055
[172] FCA Bates No. 026883-026884
[173] FCA Bates No. 026887-026888

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

350.    On November 7, 2014, 2015 R.D.M. stole a snack from another student and a can of Vienna sausages from the food drive box.[174]

351.    On November 9, 2014 Victoria Jamison and WDFS performed Behavioral Modification with R.D.M. who informed her that he got in trouble for taking someone's snack and lying about it. He indicated to MHS that he took the snack because he wanted to. "When my stomach growls, I eat."[175]

352.    On November 11, 2014 Victoria Jamison and WDFS performed Behavioral Modification with R.D.M. who informed her that he took a canned good that did not belong to him.[176]

353.    On November 14, 2014 Victoria Jamison and WDFS performed Behavior Modification for J.J.L. who asked her for food off of her tray.[177]

354.    On November 14, 2014 Victoria Jamison and WDFS performed Behavior Modification for R.D.M. who stated to MHS that he got caught going to the restroom to eat a cereal bar. He expressed to MHS that he wanted his snack.[178]

355.    On November 17, 2014 Victoria Jamison and WDFS performed Behavioral Modification with J.J.L. and noted that the resource teacher saw the snack hidden under her paper but allowed her to have it because she mentioned that she does not receive snacks. The resource teacher informed MHS that the child mentioned that her mom does not give her snacks at school anymore.[179]

---

[174] FCA Bates No. 029060
[175] FCA Bates No. 026768-026769
[176] FCA Bates No. 026772-026773
[177] FCA Bates No. 024502-024503
[178] FCA Bates No. 026784-026785
[179] FCA Bates No. 026464-026465

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

356.    On November 19, 2014 Victoria Jamison and WDFS performed Family Support and noted that mom said J.J.L. does not get a snack at school because her teaher did not get back to her about when she allows student to eat snacks.[180]

357.    On November 19, 2014 Victoria Jamison and WDFS performed Family Support and noted that R.D.M was suspended from school so she kept went ahead and did not allow him to go to school the rest of the week.[181]

358.    On November 20, 2014 Victoria Jamison and WDFS performed Family Support and noted that mom kept R.D.M home from school this week so he could see what it was like not to be in school and see his friends.[182]

359.    On November 24, 2014 Dr. Lance low of Palmetto Pediatrics saw A.M.L. and noted that she had gained .2 pounds from previous visit.[183]

360.    On November 24, 2014 Dr. Lance low of Palmetto Pediatrics saw J.J.L. and noted that he had gained .2 pounds from previous visit.[184]

361.    On December 1, 2014 Victoria Jamison and WDFS performed Behavioral Modification with R.D.M and noted that she was informed by teacher that R.D.M. had hidden a dinner roll stuffed in his jacket.[185]

362.    On December 5, 2014 Victoria Jamison and WDFS performed Behavioral Modification with R.D.M. R.D.M. expressed to MHS "Every time my stomach growls it means that I am hungry and that is when I take stuff".[186]

---

[180] FCA Bates No. 026468-026439
[181] FCA Bates No. 026586-026587
[182] FCA Bates No. 026588-026589
[183] FCA Bates No. 000078-000080
[184] FCA Bates No. 001669-001671
[185] FCA Bates No. 026590-026591
[186] FCA Bates No. 026604-026605

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

363.    On December 8, 2014 Victoria Jamison and WDFS performed Behavioral Modification with R.D.M. and it was decided that he would notebook throughout the day every time he feels hungry. R.D.M. stated he was still hungry after lunch.[187]

364.    On December 9, 2014 Victoria Jamison and WDFS performed Behavioral Modification with A.M.L. MHS noted that a classmate of A.M.L. told her that if someone brings chips or other food items to lunchroom, A.M.L. will talk to that particular person and ask them if she can have some of their food.[188]

365.    On December 9, 2014 Renee Sutton and WDFS performed Famkily Therapy for J.J.G.. MHS noted she attempted to bring J.J.G out of emoting and frozen posture after attempting to speak to mother.[189]

366.    On December 16, 2014 A.M.L. took snacks out of another student's book bag.[190]

367.    On December 18, 2014 Renee Sutton and WDFS performed Family Therapy for and noted that the teachers reported stealing incident at school.[191]

368.    On December 18, 2014 Victoria Jamison and WDFS performed Behavioral Modification with A.M.L. who expressed to MHS that she took students snack because she wanted to.[192]

369.    On December 19, 2014 Renee Sutton and WDFS performed Individual Therapy for R.D.M. MHS noted he did not complain or ask for items he could not eat. He stuffed extra items that he could eat in his mouth, filling it full and not chewing slowly.[193]

---

[187] FCA Bates No. 026606-026607
[188] FCA Bates No. 023969-023970
[189] FCA Bates No. 024530-024531
[190] FCA Bates No. 029087
[191] FCA Bates No. 026334-026335
[192] FCA Bates No. 023987-023988
[193] FCA Bates No. 026634-026635

370.    On December 19, 2014 Victoria Jamison and WDFS performed Behavioral Modification with R.D.M. who told her that he felt hungry because she was eating cookies in front of him.[194]

371.    On January 6, 2015 Victoria Jamison and WDFS performed Behavioral Modification with A.M.L. who told MHS that Mrs. Sutton gave her a water bottle so that it will help her to not take food items that do not belong to her.[195]

372.    On January 7, 2015 Victoria Jamison and WDFS performed Family Support. MHS Noted that mom stated she does not want the school or anyone else to feel like the kids are being neglected.[196]

373.    On January 8, 2015 A.M.L. took another students snack ou of their lunchbox.[197]

374.    On January 8, 2015 Renee Sutton and WDFS performed Individual Therapy for J.J.L. MHS noted she told MHS that she told on her sister for asking her for food.[198]

375.    On January 12, 2015 R.D.M. stole snacks from another student.[199]

376.    On January 12, 2015 Victoria Jamison and WDFS performed Behavioral Modification with R.D.M. They discussed his taking items. R.D.M. would not explain why he took the items.[200].

377.    On January 14, 2015 Dr. Lance low of Palmetto Pediatrics saw J.J.G. and noted that he had lost two pounds from previous visit and prescribed Adderall and clonidine.[201].

---

[194] FCA Bates No. 026632-026633
[195] FCA Bates No. 0123998-023999
[196] FCA Bates No. 026644-026645
[197] FCA Bates No. 029087
[198] FCA Bates No. 026360-026361
[199] FCA Bates No. 029060
[200] FCA Bates No. 026652-026653
[201] FCA Bates No. 008080-008082

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

378.    On January 15, 2015 A.M.L. was eating a snack during a timed math test.[202]

379.    On January 26, 2015 Victoria Jamison and WDFS performed Behavioral Modification with J.J.G. who told MHS that the doctor said that he had to eat more and drink more.[203]

380.    On January 20, 2015 A.M.L. left the room she was supposed to be in and was found in another room looking through a treat bag belonging to a teacher.[204]

381.    On January 20, 2015 Renee Sutton and WDFS performed Family Therapy for family.  MHS noted that father stated the children need milk products to stop stealing and to help them gain weight. Mom openly discussed children's recent stealing but did not reveal consequences.[205]

382.    On January 22, 2015 Victoria Jamison and WDFS performed Behavioral Modification with A.M..L. who told MHS that she would have to start drinking Almond Mild because she is not eating enough.[206]

383.    On January 26, 2015 Renee Sutton and WDFS performed Individual Therapy for R.D.M. MHS noted that peers reported that he had an empty food bag in his desk.[207]

384.    On January 26, 2015 Victoria Jamison and WDFS performed Family Support and met with mom and noted that mom stated A.M.L. must have taken the snack from someone. [208]

---

[202] FCA Bates No. 029090
[203] FCA Bates No. 024376-024377
[204] FCA Bates No. 028733
[205] FCA Bates No. 026662-026663
[206] FCA Bates No. 024020-024021
[207] FCA Bates No. 026670-026671
[208] FCA Bates No. 023827- 023828

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

385.    On January 26, 2015  J.J.L. ate another student's snack and was untruthful about it.[209]

386.    On January 26, 2015 Victoria Jamison and WDFS performed Behavioral Modification with J.J.L. who told MHS that she does not know how the snack got into her desk; someone must have put it there.[210]

387.    On January 28, 2015 Renee Sutton and WDFS performed Crisis Management  for family.  MHS noted that mom talked about possible move from current school.[211]

388.    On January 28, 2015 Renee Sutton and WDFS performed Crisis Management  for family.  MHS noted that she addressed with mom multiple attempts to schedule as session at home for R.D.M and youngest sister who are both part of a DSS investigation. MHP answered DSS questions regarding family, events, signs of neglect, and diagnosis. MHS noted mom did not reply to phone or text messages or answer phone.[212]

389.    On January 29, 2015 A.M. L. stole a students goldfish crackers.[213]

390.    On February 10, 2015 Victoria Jamison and WDFS performed Family Support and met with mom to discuss what A.M.L's snack was for today.[214]

391.    On February 4, 2015 A.M.L. took a snack from a teacher's lunchbox which was behind the teacher's desk.[215]

---

[209] FCA Bates No. 029021
[210] FCA Bates No. 026194-026195
[211] FCA Bates No. 026678-026679
[212] FCA Bates No. 026684-026685
[213] FCA Bates No. 028733
[214] FCA Bates No. 023837-023838
[215] FCA Bates No. 028733

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

392.    On February 5, 2015 Renee Sutton and WDFS performed Individual Therapy for A.M.L. MHS noted that A.M.L. reported a hunger rating of 2 and pointed to her lower bowels as hunger pains.[216]

393.    On February 9 2015 Amla stole a snack from another student lunch box.[217]

394.    On February 9, 2015 R.D.M. stole another student's snack from his book bag. [218]

395.    On February 10, 2015 J.J.L. had food that belonged to another student in her desk It was reported that she was asking other students for food. She hid food in a Ziploc in her desk.[219]

396.    On February 10, 2015 Victoria Jamison and WDFS performed Behavior Modification for R.D.M. and engaged in a conversation about him missing school.[220]

397.    On February 10, 2015 Victoria Jamison and WDFS performed Family Support MHS noted mom acknowledged that A.M.L. took a snack from home, took someone else's snack, and got a banana from the teacher. Mom stated to MHS that she did not want the school o think that she deprived the children from food.[221]

398.    On February 11, 2015 Victoria Jamison and WDFS performed Behavior modification  for R.D.M. MHS noted that she confronted R.D.M about taking his snack out at school when he was not suppose to.[222]

399.    On February 11, 2015 Renee Sutton and WDFS performed Crisis Management for R.D.M. MHS noted she discussed with DSS the increase in frequency of stealing as

---

[216] FCA Bates No. 023849-023850
[217] FCA Bates No. 029086
[218] FCA Bates No. 029060
[219] FCA Bates No. 029021
[220] FCA Bates No. 026498-026499
[221] FCA Bates No. 023861-023862
[222] FCA Bates No. 026502-026503

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

potentially caused by attention seeking, She informed DSs of R.D.M. sitting in closet to do homework, highlighting the complexity of the home space limitations and high stress observed at home from many sources (poverty, other members living in household, increased parental medical conditions), and potential neuropsychological/audio issues that R.D.M. may be encountering. MHP noted that she reviewed with school principal consequences of repeated stealing incidents and discussed plans of how to manage the complexity of R.D.M. and sibling's case in order to help them. MHP noted that she attempted to contact mom to discuss concerns.[223]

400.    On February 11, 2015 Renee Sutton and WDFS performed Family Therapy for R.D.M.  It was noted that child made statements of being placed in a closet to do homework and given a small bowl of food when he has bad behavior.[224]

401.    On February 12, 2015 Victoria Jamison and WDFS performed Behavior modification  for R.D.M. MHS noted that R.D.M. told MHS that his auntie told him that if he was good he would get an extra snack when he gets home.[225]

402.    On February 12, 2015, the South Carolina Department of Social Services requested the children's growth charts from the pediatrician.[226]

        a.   Again, this should have triggered awareness of very concerning parental behavior toward a child by Palmetto Pediatrics of the Lowcountry, LLC, and Dr. Lowe.

        b.   By virtue of his training and education, Dr. Lowe is educated on signs of abuse and neglect.

---

[223] FCA Bates No. 026506-026507
[224] FCA Bates No. 026508-026509
[225] FCA Bates No. 026510-026511
[226] FCA Bates No. 000077.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

c. He is also aware that when one child at home as at risk, all children in the home are at risk.

d. Palmetto Pediatrics of the Lowcountry, LLC, and Dr. Lowe were aware that children in the Mitchell home were abused and neglected and failed to do anything.

e. Palmetto Pediatrics of the Lowcountry, LLC, and Dr. Lowe were aware that A.M.L., J.J.L., J.J.G., R.D.M. and S.T.S. had failed to thrive and gain weight and the children were not growing appropriately.

f. Palmetto Pediatrics of the Lowcountry, LLC, and Dr. Lowe, and any medical provider are aware that failure to thrive and growth deficiency can be caused by starvation and improper nutrition.

g. When a child is being starved, abused or neglected, it demands immediate attention by treating medical provider.

h. Physicians, medical care providers and counselors are not simply first line reporters, they are also responsible to ensure that the child is safe.

i. If DSS was failing to respond appropriately to a child in crisis, the medical care provider or counselor needs to go above and beyond to protect the child.

j. One cannot simply assume that if the state becomes involved that everything will be okay.

k. If a medical provider or therapist sees continuing lack of weight and growth, this is an obvious sign or abuse and neglect.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

l. Palmetto and Dr. Lowe did very little to protect the children from the Mitchells or ineptitude of other people.

m. The fact that Palmetto and Dr. Lowe did little to protect children by obvious signs of abuse and neglect is a reckless breach of the standard of care.

403.    On February 13, 2015 Renee Sutton and WDFS performed Individual Therapy for A.M.L. It was noted that child reported asking a peer for food and stating hunger scale of 5 while laughing and giggling.[227]

404.    On February 17, 2015 Victoria Jamison and WDFS performed Behavior modification for J.J.G. MHS noted that J.J.G. expressed to her that his brother was still asking others for their food knowing that he was not suppose to.[228]

405.    On February 17, 2015 Coleen Long from DSS requested the children's most recent weight/growth charts from Palmetto Pediatrics.[229]

406.    On February 18, 2015 Victoria Jamison and WDFS performed Behavior modification  for R.D.M. MHS noted that R.D.M. had taken his valentine candy and put it in his desk and was eating it all morning.[230]

407.    On February 17, 2015, S.T.S.'s, R.D.M.'s, J.J.G.'s, A.M.L.'s and J.J.L.'s pediatric records noted that his physician had received a release for the South Carolina Department of Social Services to obtain the children's growth chart.[231]

408.    SCDSS failed to investigate the allegations of abuse in:

a. Failing to interview the children;

---

[227] FCA Bates No. 023871-023872
[228] FCA Bates No. 024432-024433
[229] FCA Bates No. 000077
[230] FCA Bates No. 026520-026521
[231] FCA Bates No. 011318, 011346, 011400, 001668.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

b.  Failing to interview teachers and administrators at M.C. Riley Elementary School;

c.  Failing to interview neighbors and other collateral sources who had daily contact with the children;

d.  Failing to obtain or read the children's medical records and speak with the medical providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.;

e.  Failing to present the children for forensic interviews;

f.  Failing to present the children for medical examinations;

g.  Failing to speak with the children outside of the presence of Yulanda Mitchell;

h.  Failing to follow up with the children after Yulanda Mitchell retaliated against the children for disclosing abuse and neglect;

i.  Failing to inspect the children's home;

j.  Failing to remove the children from the home;

409.    On February 18, 2015 Victoria Jamison and WDFS performed Behavior modification for R.D.M. MHS noted that R.D.M. expressed to her that she is always disturbing him during lunch, recess, and class time and specials. He also expressed that his teacher's snack looks really good but instead he had to eat his boring apple sauce.[232]

410.    On February 20, 2015 Victoria Jamison and WDFS performed Behavior modification for A.M.L.. MHS noted that mom stated A.M.L. and her sibling took someone's snack.[233]

411.    On February 23, 2015 Victoria Jamison and WDFS performed Behavior modification for J.J.G. It was noted by MHS that J.J.G indicated to her that his brother was taking food during breakfast but he told the guidance counselor about the situation.[234]

412.    On February 25, 2015 Victoria Jamison and WDFS performed Behavior modification for R.D.M. MHS noted that R.D.M. indicated that MHS was not happy that he had taken someone's tater tot off of their tray during lunch.[235]

---

[232] FCA Bates No. 026522-026523
[233] FCA Bates No. 023885-023886
[234] FCA Bates No. 024442-024443
[235] FCA Bates No. 026534-026535

413.    On February 27, 2015 R.D.M. stole strawberries from another student.[236]

414.    On March 3, 2015 Renee Sutton and WDFS performed Family Therapy. It was noted that mom would not commit to another session, mom would not reply concerning if appointments for R.D.M.'s further evaluation, mom turned flow chart over on table and did not respond, mom reported her intent not to attend anymore meetings at school, and confessed to not reading bibliography provided months ago.[237]

415.    On March 4, 2015 J.J.L. took cookies from another student.[238]

416.    On March 5, 2015 Victoria Jamison  and WDFS performed Behavior Modification for J.J.L.. It was noted that child expressed the reason she took something that did not belong to her the day before.[239]

417.    On March 11, 2015 Victoria Jamison and WDFS performed Family Support for R.D.M. It was noted that mom stated to R.D.M. while MHS monitored "you need to go to school and not tell those people at the school what is going on in this household."[240]

418.    On March 13, 2015 Renee Sutton and WDFS performed Individual Therapy for J.J.L. It was noted that child reported she took a peers food when no one was around just after her individual session. She stated her thoughts were "to take" when she saw the cookies. She reported that her mom knew. MHP noted that mom did not acknowledge her text.[241]

419.    On March 10, 2015 R.D.M. asked another student for their snack.[242]

---

[236] FCA Bates No. 029060
[237] FCA Bates No. 026550- 026551
[238] FCA Bates No. 029021
[239] FCA Bates No. 026256-026257
[240] FCA Bates No. 026552-026553
[241] FCA Bates No. 026262-026263
[242] FCA Bates No. 029059

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

420.    On March 11, 2015 Victoria Jamison  and WDFS performed Behavior Modification for R.D.M. It was noted that child reported he had silent lunch for a few more days because he asked someone for their snack and ate it.[243]

421.    On March 13, 2015 Renee Sutton and WDFS performed Individual Therapy for J.J.L. It was noted that child reported not taking medicines.[244]

422.    On March 16, 2015 AML stole a bag of goldfish from another student lunch box.[245]

423.    On March 17, 2015 A.M.L. stole another students snack.[246]

424.    On March 20, 2015 Renee Sutton and WDFS performed Individual Therapy for A.M.L. It was noted that teacher reported school suspension earlier in week due to A.M.L. stealing food froom peer book bag.[247]

425.    On March 20, 2015 Renee Sutton and WDFS performed Individual Therapy for R.D.M. It was noted that mom did not attend and R.D.M. reported that mom had not brought his almond milk.[248]

426.    On March 24, 2015 R.D.M. stole another students snack.[249]

427.    On March 25, 2015 Renee Sutton and WDFS performed Individual Therapy for J.J.L. It was noted that J.J.L. was in a happy mood but then slightly changed to withdrawn when

---

[243] FCA Bates No. 026558-026559
[244] FCA Bates No. 026270-026271
[245] FCA Bates No. 029086
[246] FCA Bates No. 029086
[247] FCA Bates No. 023915-023916
[248] FCA Bates No. 026560-026561
[249] FCA Bates No. 029059

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

JJ.L. explained that "mom asks what we talk about" and "mom doesn't want us to talk anymore".[250]

428.    On March 31, 2015 Renee Sutton and WDFS performed Family Therapy for J.J.L.  MHP noted that discharge paperwork was completed for discharge of J.J.L. and the other four siblings.[251]

429.    On April 13, 2015 J.J.G was a  no-show to his appointment with Palmetto Pediatrics.[252]

430.    Inexplicably, Franklin County Children Services, SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes, placed E.R.L. into an adoptive placement at the Mitchell home in April 2015. SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, and SCDSS Case Worker Supervisor #2 conducted the placement, assessment, and monitoring of the children in the home on behalf of SCDSS. Adoption Advocacy, Inc., June Bond, and Joe Haynes contracted with Franklin County Childrens Services to conduct the placement, assessment, and monitoring of the children in the home. Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, and FCCS Case Worker Supervisor #4 were responsible for approving and monitoring the placement of E.R.L.

431.    From April 2015 until her adoption on October 15, 2015, E.R.L. remained both a citizen of Ohio and a ward of the state in the custody of the state of Ohio and was entitled to her constitutional right to a safe and secure placement free of abuse, neglect, and starvation.

---

[250] FCA Bates No. 206274-026275
[251] FCA Bates No. 026276-026277
[252] FCA Bates No. 011393

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

432.    Yulanda Mitchell, Herbert Mitchell, South Carolina Department of Social Services, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #5, Adoption Advocacy, Inc., June Bond, and Joe Haynes defrauded the Beaufort County Family Court and committed perjury by concealing the fact that Yulanda Mitchell was on South Carolina Department of Social Services' Registry of Abuse and Neglect.

433.    Yulanda Mitchell, Herbert Mitchell, SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes defrauded the Beaufort County Family Court and committed perjury by concealing the fact that Yulanda Mitchell was on South Carolina Department of Social Services' Registry of Abuse and Neglect.

434.    SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes returned to the Mitchell home in 2015, and over the past five years, A.M.L. had only gained only 6 ½ lbs., J.J.L. had only gained 6 ½ lbs., R.D.M. had only gained seven lbs., J.J.G. had only gained 20 lbs., and S.T.S. had only gained 28 lbs.

435.    When E.R.L. was placed in the Mitchell home, Franklin County Children Services and the state of Ohio maintained legal custody of E.R.L. S.C. Code Ann. §63-9-510; S.C. Code Ann. §63-9-2200(5)(a); Ohio Rev. Code §5103.20(IV).

436.    On April 14, 2015 R. Sutton and WDFS completed a Discharge Summary Form for A.M.L. The form noted that the last service date was March 20, 2015, the diagnosis was

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

oppositional defiant Do, other specified ADHD, other specified stress related trauma, and child neglect.[253]

437.    On April 14, 2015 R. Sutton and WDFS completed a Discharge Summary Form for J.J.L. The form noted that the last service date was March 31, 2015, the diagnosis was Adj. D/O with mixed disturbance emotions and conduct, learning disorder DOC impairment in reading, writing, math, child neglect.[254]

438.    On April 14, 2015 R. Sutton and WDFS completed a Discharge Summary Form for S.T.S. The form noted that the last service date was February16, 2015, the diagnosis was other specified disruptive, impulsive, child neglect, other specified trauma stress related. It was also noted "Adoptive parent non-compliant to meetings/sessions/tx plan.[255]

439.    On April 16, 2015 Annette N. Thomas, MD of Palmetto Pediatrics saw J.J.G. It was noted mother reported J.J.G. had no bad comments from teachers at school, parent reported no mood swings with medication, and parent did not report poor appetite. It was noted that J.J.G had lost .8 pounds since the last visit and he could not have tomatoes or dairy products. J.J.G.'s medication of Adderall was continued and he was additionally prescribed Ritalin and clonidine.[256]

440.    On April 17, 2015 Loretta Marion, DO. of Palmetto Pediatrics saw A.M.L. It was noted that she had lost .2 pounds. Loretta Marion, DO. noted that she did not understand the diagnosis of ADHD  because A.M.L. had not had her medication and was sitting quietly with her

---

[253] FCA Bates No. 004927-004928
[254] FCA Bates No. 004299-004300023785-023784
[255] FCA Bates No.
[256] FCA Bates No. 008073-008075

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

sister and reading a book and playing. Loretta Marion, DO. Prescribed three months of Vyvanse and two months of Ritalin.[257]

441.    On April 17, 2015 Loretta Marion, DO. of Palmetto Pediatrics saw J.J.L. for ADHD and Weight Loss. She noted that cannot support the diagnosis of ADD when this girl had not had her medication and was sitting quietly with her sister and reading a book. Loretta Marion, DO. noted that the Adderall dose is high. She prescribed three more months of Adderall. Loretta Marion, DO noted that J.J.L. can not have tomatoes or dairy.[258]

442.    On April 22, 2015 R.D.M. went into another students book bag to get their snack.[259]

443.    On April 23, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for A.M.L. Mom told CM that A.M.L. has really made a complete turn around.[260]

444.    On April 23, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for R.D.M. CM noted that he had asked the custodian for a pack of crakers hat was going to be thrown into the trach. Mom told CM that she refuses to go to the school or take their call.[261]

445.    On April 23, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for S.T.S. Mom told CM that she refuses to go to the school or take their call.[262]

---

[257] FCA Bates No. 000075-000076
[258] FCA Bates No. 001666-001667
[259] FCA Bates No. 029059
[260] FCA Bates No. 023917-023918
[261] FCA Bates No. 026562-026563
[262] FCA Bates No. 028327-028328.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

446.    On April 23, 2015 R.D.M. stole a pack of gum. [263]

447.    On April 30, 2015 R.D.M. asked numerous students for their snacks and took snacks from two students.[264]

448.    On May 1, 2015 R.D.M. asked another student for a snack and also took a snack from another student.[265]

449.    On May 1, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for A.M.L.[266]

450.    On May 1, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for J.J.G.[267]

451.    On May 1, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for J.J.L.[268]

452.    On May 1, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for R.D.M. CM was informed that he is still having a hard time with asking for things from school personnel. Mom told CM that he just keeps asking even when he has his snacks in his book bag. CM was informed that the school has been calling and mom is not answering. Mom told CM that she refuses to go to the school or take their call.[269]

453.    On May 1, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for S.T.S. Mom told CM that she tells S.T.S. every morning that he school is just looking for something so be on his best behavior. Mom told CM that she tells the children

---

[263] FCA Bates No. 029059
[264] FCA Bates No. 029059
[265] FCA Bates No. 029059
[266] FCA Bates No. 023919-023920
[267] FCA Bates No. 024470-024471
[268] FCA Bates No. 026278-026279
[269] FCA Bates No. 026564-026565

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

not to take anything of ask for anything because the school is just waiting for them to slip up so they can call DSS. Mom told CM that one of the children got a referral for asking for crackers. Mom told CM that she refuses to go to the school or take their calls. CM told mom that she needed to hear what they had to say.[270]

454.    On May 8, 2015 R.D.M., stole pizza from another student.[271]

455.    On May 11, 2015 R.D.M., was found with food in his desk.[272]

456.    On May 11, 2015 J.J.L. took a cookie off of another student's tray [273]

457.    On May 14th 2015 A.M.L. was caught trying to steal a bag of goldfish from another student book bag.[274]

458.    On May 15, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for A.M.L. CM noted that she spoke to mom who stated she is just tired of the school calling with petite things.[275]

459.    On May 15, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for J.J.G. CM noted that she spoke to J.J.G. at school to find out what is really going on at home.[276]

460.    On May 15, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for J.J.L. Mom told CM that J.J.L. is still having issues at school and she

---

[270] FCA Bates No. 028329-028330
[271] FCA Bates No. 029059
[272] FCA Bates No. 029059
[273] FCA Bates No. 029021
[274] FCA Bates No. 029086
[275] FCA Bates No. 023921-023922
[276] FCA Bates No. 024472-024473

is frustrated and tired of the school calling all the time and she may home school the children next year.[277]

461.    On May 15, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for R. D. M. Mom told CM that she sends snacks with him everyday and reinforces rule of not asking for extra money.[278]

462.    On May 15, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for S.T.S. CM noted that mom said he had no reported incidents at school of taking or asking for anything.[279]

463.    On May 19, 2015 A.M.L. stole another student snack on her way to her desk. fate stamped.[280]

464.    On June 17, 2015 Barbara Williams and WDFS attempted to perform Transitional Case Management Services for S.T.S., R.D.M., J.J.L., J.J.G. (purpose of contact with J.J.G. was to decrease intensity, duration, and frequency of emotional outburst and clingy/defiant behaviors), and A.M.L., Mom told CM that this week would not be a good week for a visit.[281]

465.    On July 1, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for S.T. S., R.D.M., J.J.G., and A.M.L., and CM noted that mom will not return any calls.[282]

---

[277] FCA Bates No. 026280-026281
[278] FCA Bates No. 026566-026566
[279] FCA Bates No. 028331-028332
[280] FCA Bates No. 02871
[281] FCA Bates No. 028333-028334; 026568-026569; 026282-026283;024474-024475;023923-023924
[282] FCA Bates No. 028533-028534; 026570-026571; 024864-024865; 024366-024367

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

466.    On July 9, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for A.M.L.[283]

467.    On July 9, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for J.J.G.  For the purpose of attending and participating in the plan created by his dentist and maintaining his smile and healthy teeth. CM notes that mom is not returning her call and CM cannot set an appointment to visit her and the minor children.[284]

468.    On July 9, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for R.D.M. CM notes that mom is not returning her call and CM cannot set an appointment to visit her and the minor children.[285]

469.    On July 9, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for S.T.S.[286]

470.    On July 12, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for A.M.L. Mom told CM that the reason she has not been returning her calls is that she is adopting a sister of the children she has. Mom told CM she could come see the children on July 13, 2015.[287]

471.    On July 12, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for J.J.G. for the purpose of attending and participating in the plan created by his dentist and maintaining his smile and healthy teeth. Mom told CM that the reason she has

---

[283] FCA Bates No. 024368-024369
[284] FCA Bates No. 024866-024867
[285] FCA Bates No. 026572-026573
[286] FCA Bates No. 028535-028536
[287] FCA Bates No. 024370-024371

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

not been returning her calls is that she is adopting a sister of the children she has. Mom told CM she could come see the children on July 13, 2015.[288]

472.    On July 12, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for S.T.S. Mom stated she is adopting a sister of the children she has. Mom told Cm she could come see the children on July 13, 2015.[289]

473.    On July 12, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for R.D.M. Mom told CM that the reason she has not been returning her calls is that she is adopting a sister of the children she has. Mom told Cm she could come see the children on July 13, 2015.[290]

474.    On July 13, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for J.J.L. for the purpose of attending and participating in the plan created by his dentist and maintaining his smile and healthy teeth. CM had a conversation with mom the night before and was told to visit at 10:00am. Upon arrival no one was home. CM called and finally got an answer. Mom said she forgot and needed to reschedule.[291]

475.    On July 13, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for R.D.M. [292]

476.    On July 13, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for S.T.S.. [293]

---

[288] FCA Bates No. 024868-024869
[289] FCA Bates No. 028537-028538
[290] FCA Bates No. 028537-028538
[291] FCA Bates No. 024870-024871
[292] FCA Bates No. 026576-026576
[293] FCA Bates No. 028539-028540

477.    On July 13, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for A.M.L. [294]

478.    On July 17, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for A.M.L. Mom told CM she was having problems with child telling truth and making appropriate decisions in all situations.[295]

479.    On July 17, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for J.J.L. for the purpose of attending and participating in the plan to maintain his smile an healthy teeth.[296]

480.    On July 17, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for R.D.M. CM inquired as to why he was in his room and was told that he was not able to come out of his room for he was on punishment. He did tell CM that he was bad that he stole some food and he was not allowed to come out of his room. Mom told Sam that one issue that she is having with him is that he is still stealing food. Mom stated that while packing for the vacation she found all of the wrappers from food in his suitcase. Mom stated that he has been stealing food at night while they sleep, she stated that she has even found chicken bones wrapped up in napkins behind the dresser or in the closet. Mom stated that she can ask him and he will tell her that he did not do it and if she keeps asking he will finally give in and tell the truth. Mom stated that she does not know what she is going to do with him for when he gets back to school she is afraid that he is going to do the same thing.[297]

---

[294] FCA Bates No. 024372-024373
[295] FCA Bates No. 024374-024375
[296] FCA Bates No. 024872-024873
[297] 026578-026579

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

481.    On July 17, 2015 Barbara Williams and WDFS performed Transitional Case Management Services for S.T.S.[298]

482.    On July 27, 2015 Dr. Lance low of Palmetto Pediatrics saw R.D.M. and noted his problems as failure to thrive, small for gestational age, adopted child, and eczema. He noted that he can't have tomatoes or dairy products. He made a referral to Peds Endocrinology due to failure to thrive in childhood, small for gestational age, and eczema.[299]

483.    On July 27, 2015, S.T.S.'s nurse at the pediatrician noted that S.T.S. was 1% weight percentile, 7% height percentile, and 1% body mass index percentile.[300]

484.    On July 27, 2015 Dr. Lance Low of Palmetto Pediatrics saw S.T.S. and noted that he can't have tomatoes or dairy products.[301]

485.    On July 31, 2015 Dr. Lance low of Palmetto Pediatrics saw J.J.L. and noted that he had lost over two pounds since his previous visit.  He noted that he can't have tomatoes or dairy products. He wrote a prescriptions for Clonidine, Concerta, Cetirizine, and Prednisone. He continued J.J.L. on previously prescribed Adderall.[302]

486.    On July 31, 2015 Dr. Lance low of Palmetto Pediatrics wrote a prescription for J.J.L. stating that he can't have tomatoes or dairy products.[303]

487.    On August 3, 2015 Dr. Lance low of Palmetto Pediatrics saw A.M.L. and noted that she had lost two pounds since her previous visit.  He noted that she can't have tomatoes or

---

[298] FCA Bates No. 028541-028542
[299] FCA Bates No. 08371-008373
[300] FCA Bates No. 011344-011345.
[301] FCA Bates No. 011343-011345
[302] FCA Bates No. 008068-008070
[303] FCA Bates No. 028789.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

dairy products. He wrote a prescription for Vyvanse and melatonin. He noted that mother

claimed her meds are also wearing off early.[304] Bates stamp

488.    On August 3, 2015, Dr. Lance low of Palmetto Pediatrics saw J.J.L. and wrote a

prescription for Adderall, made a referral to Peds Endocrinology due to short statue, and

prescribed chewable multivitamins-iron. He noted that mother claimed her meds are also

wearing off early.[305]

489.    On August 3, 2015 Dr. Lance low of Palmetto Pediatrics wrote a prescription for

A.M.L. stating that she can't have tomatoes or dairy products.[306]

490.    On August the 28th 2015 RDM went into Mrs Pinckney's classroom without

permission and took four granola bars that were secured in a cabinet above a sink.[307]

491.    On September 1, 2015 A.M.L. stole food from the guidance counselor's office.[308]

492.    On September 2, 2015 Doctor Lance Lowe of Palmetto Pediatrics saw R.D.M. for

the purpose of behavior concerns. He was informed that the mother wanted to figure out why

R.D.M. is stealing at school and placing food in his lunch box R.D.M. stole at school on Friday,

was caught and then stole again on Monday. Dr. Lance Lowe also referred R.D.M. To a

nutritionist for failure to thrive in childhood, small for gestational age, and adopted child.[309]

493.    On September 4, 2015 Dr. Lance low of Palmetto Pediatrics referred R.D.M. to a

nutritionist and a child psychologist.[310]

---

[304] FCA Bates No. 000072-000074
[305] FCA Bates No.001664-001665
[306] FCA Bates No. 001664-001665
[307] FCA Bates No. 029050
[308] FCA Bates No. 029050
[309] FCA Bates No. 008369; 011314
[310] FCA Bates No. 011312

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

494.    On September 11, 2015 RDM stole another student snack and put it in his desk.[311]

495.    Oh September 11, 2015 mom called Dr. Lance Lowe of Palmetto Pediatrics to refill J.J.G. prescription for Concerta to treat his ADHD. She requested two refills.[312]

496.    On September the 14th 2015 J.J.G. was giving a prescription by Dr. Lance Lowe of Palmetto Pediatrics for Concerta to treat ADHD.[313]

497.    On September the 15th 2015 A.M.L. stole four pieces of candy.[314]

498.    On September 16 2015 R.D.M. stole another student's snack.[315]

499.    On September 17, 2015 R.D.M. was found eating a bag of muffins that was on the teachers desk that did not belong to him.[316]

500.    On September 21, 2015 S.T.S had been tardy to class six times. Dr. Bournias spoke with mom. She is aware that if there are any additional tardies S.T.S. will be assigned detention.[317]

501.    On September 21, 2015 Michelle Alverez and WDFS performed Transitional Case Management Services for R.D.M. and J.J.G. for the purposes of maintaining their "smile and healthy teeth".[318] Michelle Alverez and WDFS noted the "family no longer wanting services to current Case Manager no longer with the company."[319]

---

[311] FCA Bates No. 029050
[312] FCA Bates No. 011384
[313] FCA Bates No. 011383
[314] FCA Bates No. 028731
[315] FCA Bates No. 029050
[316] FCA Bates No. 029050
[317] FCA Bates No. 028988
[318] FCA Bates No. 024874-024875; 26580-26581.
[319] FCA Bates No. 024874-024875; 26580-26581.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

502.    On September 25, 2015 R.D.M. was disciplined by the school for eating a snack that didn't belong to him.[320] A.M.L. stole the snack from a Pre-K student.[321]

503.    Between November 2014 and October 2016, R.D.M. received referrals at school 28 times for stealing food to include taking food out of trash cans.

504.    Again, SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes ignored the Mitchell's financial circumstances, the lack of suitability of the 1,639 square foot home to house three adults and six children in three bedrooms, and the chronic physical abuse and starvation of the children in the home.

505.    SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes also ignored the troubling reports of abuse and neglect of E.R.L.'s siblings before her placement in the home.

506.    A review of S.T.S.'s medical records would have shown SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes that S.T.S. had been raised by the Mitchells since age two months and been diagnosed with failure to thrive.

---

[320] FCA Bates No. 029050
[321] FCA Bates No. 028731.

507.    A review of S.T.S.'s medical records would have shown SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes that the Mitchells were untruthful about who lived in the home.

508.    A review of the A.M.L.'s, J.J.L.'s, R.D.M.'s, J.J.G.'s, and S.T.S.'s medical records would have shown SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes that the children were diagnosed with failure to thrive and there were concerns in the community that the children were being starved.

509.    Contacting schools, daycares, and members of the community by SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes would have shown that there were deep concerns that the Mitchells abused and starved the five children.

510.    Had SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes conducted a proper assessment, it would have learned that the schools have referred the children to mental health services due to stealing food and adverse behaviors.

511.    Had SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, Franklin County Childrens Services, FCCS Case

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

Worker #4, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes conducted a proper assessment, they would have learned that the children stole food at school, ate food out of the garbage cans, and were so deprived of water at times that they drank out of the toilets.

512.    Had SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes conducted a proper assessment, it would have learned that Yulanda Mitchell reported that all of the children, A.M.L. J.J.L., R.D.M., J.J.G., and S.T.S., that "…all siblings from same biological mother and foster homes, and all siblings have similar food-seeking patterns and symptoms."[322] As noted above, S.T.S. had lived with the Mitchells since he was two months. Similarly, Yulanda Mitchell reported that S.T.S. had been traumatized by his biological mother and in foster homes in his early years when, in fact, he had lived with her.[323]

513.    E.R.L. was adopted by order of the Beaufort County Family Court on October 15, 2015, in the matter of *Mitchell v. Franklin County Ohio Children Services*, 2015-DR-07-01009 (Beaufort County Family Court October 15, 2015). From April 14, 2014, until the month after E.R.L. was adopted on October 15, 2015, she lost one and a half pounds.[324] This weight loss was caused by the Mitchells starving her.

514.    During the pre-adoptive placement E.R.L. and her siblings were starved by the Mitchells. R.D.M. and J.J.G. stated that it was mostly E.R.L. who was not allowed to eat.[325]

---

[322] FCA Bates No. 011852.
[323] FCA Bates No. 011852.
[324] FCA Bates No. 005597 and 001092.
[325] FCA Bates No. 008849, 008166.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

R.D.M. stated that E.R.L. would cry for food and water when she was in her room.[326]They were only allowed to eat dinner on the weekends.[327] The children were beaten on their arms, legs, and stomachs.[328] While these children were starved, they were required to watch the Mitchells eat complete meals. E.R.L. was physically abused by the Mitchells and she watched her other siblings be abused. This abused experienced by E.R.L. included physical beatings with whips, rulers, belts, shoes, hangers, and hands, punching, being swung around by her appendages, twisting and hyperextending extremities.[329] Yulanda Mitchell would take pictures with her phone of the food in the cabinets to make sure the children did not steal food.[330] The boys bedroom had a lock on the outside of the door.[331]

515.    The following height-weight chart tracks E.R.L.'s abuse during the time she was placed with the Mitchells [332]:

---

[326] FCA Bates No. 008849.
[327] FCA Bates No. 008854.
[328] FCA Bates No. 008854.
[329] FCA Bates No. 008849, 008166
[330] FCA Bates No. 008166
[331] FCA Bates No. 008166.
[332] FCA Bates No. 005594, 005806, 005810, 005538, 005541, 005542, 005548, 005551, 005552-005553, 005583, 005589, 005554, 005583, 005589, 005558, 005583, 005589, 005563, 005583, 005589, 005565, 005583, 005589, 005572, 005583, 005589, 005203, 005576, 005583, 005589, 005597, 001668, 001092, 001091, 001087, 001085, 001099, 000298-000303, 001066-001073, 001061, 001097, 001139, 001156, 001169, 001182, 001246, 001274, 001278, 001282, 001301, 001305, 001310, 001328, 001332, 001335, 001337, 001364, 001368, 001370, 001374, 001376, 001389, 001393, 001395, 001398, 001407, 001414, 001418, 001420, 001423, 001425, 001441, 001445, 001448, 001450, 001453, 001501, 001505, 001508, 001512, 001516, 001539, 001543, 001544, 001547, 001549, 001552, 001585, 001590, 001593, 001598.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

| E.R.L. Growth from April 13, 2009 through June 14, 2017 | | | |
| Key: Yellow – Period in Mitchell Home; Blue: Post-removal | | | |
| Date | Age | Height (Inches) | Weight (Pounds) |
|---|---|---|---|
| 03/10/2014 | 2 yrs. 3 mos. | 34" | 28.4 lbs. |
| 11/30/2015 | 3 yrs. 4 mos. | 39" | 27 lbs. |
| 12/07/2015 | 4 yrs. 0 mos. | 39" | 28 lbs. |
| 07/25/2016 | 4 yrs. 8 mos. | 39" | 26 lbs. |
| 10/31/2016 | 4 yrs. 11 mos. | 39" | 27.86 lbs. |
| 11/04/2016 | 4 yrs. 11 mos. | 38" | 30.4 lbs. |
| 11/08/2016 | 4 yrs. 11 mos. | 40" | 33 lbs. |
| 11/24/2016 | 5 yrs. 0 mos. | 39.25" | 35 lbs. |
| 01/12/2017 | 5 yrs. 1 mos. | 38.5" | 40 lbs. |
| 04/07/2017 | 5 yrs. 4 mos. | 41.58" | 43 lbs. 3.4 oz |
| 08/09/2017 | 5 yrs. 8 mos. | 43.3" | 46 lbs. 15.3 oz |
| 10/04/2017 | 5 yrs. 10 mos. | 44.88" | 49 lbs. 7.9 oz |

516.   In November 2015, Yulanda Mitchell changed E.R.L.'s medical provider to Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe. Palmetto and Dr. Lowe followed E.R.L. and took frequent height and weight recordings until her removal from the Mitchells in November 2016.

517.   E.R.L. was seen by Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe from November 30, 2015, until October 31, 2016.

518.   In the eleven months E.R.L. was under the care of Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe, E.R.L. gained less than a pound and did not grow in height.

519.   It was obvious that the children were being starved, tortured and abused.

520.   In March 2016, a report was made to SCDSS that R.D.M. disclosed that he has been eating food out of the garbage cans at school after other children discarded the items and that he only gets one meal at home as a consequence for stealing food.[333] Another report was made to SCDSS in April 2016 regarding S.T.S. stealing food.[334]

---

[333] FCA Bates No. 000018.
[334] FCA Bates No. 000018.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

    a. Failing to interview the children;
    b. Failing to interview teachers and administrators at M.C. Riley Elementary School;
    c. Failing to interview neighbors and other collateral sources who had daily contact with the children;
    d. Failing to obtain or read the children's medical records and speak with the medical providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.;
    e. Failing to present the children for forensic interviews;
    f. Failing to present the children for medical examinations;
    g. Failing to speak with the children outside of the presence of Yulanda Mitchell;
    h. Failing to follow up with the children after Yulanda Mitchell retaliated against the children for disclosing abuse and neglect;
    i. Failing to inspect the children's home;
    j. Failing to remove the children from the home;

521. On July 27, 2016, S.T.S.'s nurse at the pediatrician noted that S.T.S. was 3% weight percentile, 6% height percentile, and 8% body mass index percentile.[335]

522. On November 3, 2016 E.R.L. and her siblings A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. entered foster care when they were placed in Emergency Protective Custody.[336] R.D.M. had written a note to his school teacher in October 2016 disclosing that he and his siblings were being beaten at home with a hanger, belt, and ruler.[337] He reported that the beatings left bruises on his legs and his adoptive mother would keep him home from school the next day or until the marks went away.[338] J.J.L. reported that one of her oldest adoptive brothers, who were biological children of the adoptive parents, would be told by the adoptive mother to beat J.J.L. because she stole food.[339] R.D.M. further disclosed feeling unsafe in the home, being constantly hungry due to food restrictions, and being forced to sleep on the floor without covers or pillows.[340]

---

[335] FCA Bates No. 011342.
[336] FCA Bates No. 000298-000303.
[337] FCA Bates No. 000018.
[338] FCA Bates No. 000018.
[339] FCA Bates No. 000018.
[340] FCA Bates No. 000018.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

523.    During the Mitchell's plea under North Carolina v. Alford, the Solicitor stated:

Physical abuse: The children were made to stand against walls, popped with rulers, belt, or shoes; pulling of ears and hair; bending fingers back; mental abuse; locked in the bedroom while others were allowed to eat; made to sleep on the floor with no blanket; share cold bath water with siblings; food deprivation; the withholding of water and food as punishment; made to watch the other children eat.[341]

524.    All of the children were diagnosed with severe failure to thrive.[342]

525.    A Probable Cause Hearing was held by the Beaufort County Family Court on November 7, 2016, and the Court found probable cause for E.R.L., A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. to remain in SCDSS's custody. The Court found probable cause based upon the following facts:

There was probable cause for law enforcement to take emergency protective custody and for the South Carolina Department of Social Services (SCDSS) to assume legal custody of the children because SCDSS received a report on October 26, 2016 alleging that one of the minor children was caught stealing food at school for the second time in two days. The child reportedly has a history of stealing food from classmates and classrooms and taking food out of garbage cans. All of the minor children in the home were interviewed the following day. The children alleged that they are sent to their rooms and not allowed to eat dinner any time they get in trouble at home or school. The children also alleged they are hit with a belt, ruler, or hanger when they get in trouble. Three of the children had forensic medical examinations on November 1, 2016. These exams were conducted by Kristin Dalton, CPNP. Ms. Dalton reviewed records for five of the six children and discovered that the children's heights and weights fall far below the first percentile. Ms. Dalton also noted that two of the children examined have patterned scars on their bodies. SCDSS established a prima facie case based on the foregoing allegations.[343]

526.    On November 15, 2016, Hope Haven of the Lowcountry conducted an intake summary.[344] S.T.S. disclosed that when he was 3 years of age, he defecated in his clothes while at a family gathering and when the family returned home, Yulanda Mitchell made him eat his

---

[341] FCA Bates No. 007512.
[342] FCA Bates No. 011486, 011483, 011657, 011666
[343] FCA Bates No. 000300.
[344] FCA Bates No. 011811-011819.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

feces as punishment.[345] He also reported that Yulanda Mitchell punched him in the mouth and made him bleed.[346]

527.    The children also disclosed the following:

One of the children was caught stealing food at school twice and had a history of stealing food from classmates, classrooms, and from garbage cans; the children would be sent to their rooms without dinner when they got in trouble at home or at school; the children were forbidden to have milk, dairy products or tomato products (the adoptive parents claimed the children were allergic to these which is untrue); the children were forced to regularly sleep on the floor without bedding; a forensic examination revealed patterned scars on two of the children's bodies; medical records indicated five out of the six siblings fell "far below" the first percentile for height and weight.[347]

528.    On July 24, 2017, in the matter of South Carolina Department of Social Services v. Yulanda Mitchell a/k/a Yolanda Mitchell and Herbert Mitchell, Docket No. 2016-DR-07-01364, the Beaufort County Family Court made the following finding:

…S.T.S., J.J.G., A.M.L., J.J.L., R.D.M., and E.R.L. were physically abused and willfully and recklessly neglected by Yulanda Mitchell a/k/a/ Yolanda Mitchell… S.T.S., J.J.G., A.M.L., J.J.L., R.D.M., and E.R.L. were willfully and recklessly neglected by Herbert Mitchell. [348]

529.    On several occasions, between March 11, 2010 through November 3, 2016, S.T.S., J.J.G., R.D.M., A.M.L., J.J.L. and E.R.L. were taken to First Zion Missionary Baptist Church and pastor Tyrone B. Beckett by Yulanda Mitchell and Herbert Bernard Mitchell to correct the children for stealing food, being disobedient, and disclosing abuse and neglect.

530.    Between March 11, 2010, through November 3, 2016, R.D.M. was physically beaten and threatened with beatings at First Zion Missionary Baptist Church and pastor Tyrone B. Beckett for stealing food, being disobedient, and disclosing abuse and neglect.

---

[345] FCA Bates No. 011818.
[346] FCA Bates No. 011818.
[347] FCA Bates No. 000018.
[348] FCA Bates No. 003335.

531.    Between March 11, 2010, through November 3, 2016, teachers, nurses, guidance counselors, social workers, and principals at M.C. Riley Elementary School made numerous reports to SCDSS regarding the abuse, neglect, and starvation of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

532.    Between March 11, 2010, through November 3, 2016, Beaufort County School District Administrator #1 and Beaufort County School District Administrator #2, instructed the teachers, nurses, guidance counselors, social workers, and principals to stop reporting the Mitchells to SCDSS for abusing, neglecting, and starving A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. Upon information and belief, Beaufort County School District Administrator #1, and Beaufort County School District Administrator #2 informed the teachers, nurses, guidance counselors, social workers, and principals that abuse and neglect was part of the black culture in the low country, which is patently false.

533.    Between March 11, 2010, through November 3, 2016, Beaufort County School Board Member #1 threatened to terminate and/or discipline the school principal and employees of M.C. Riley Elementary School if the principal and her staff continued to report the abuse of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. to SCDSS.

534.    That as a direct and proximate result of the Defendants' acts and omissions, A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. suffered the following injuries: violation of their constitutional rights, great and permanent mental harm and injury, physical pain from the battery, emotional distress, alteration of their lifestyles, psychological trauma, apprehension, anxiety, depression, embarrassment, shame, and a loss of enjoyment of life, all resulting from the abuse they suffered, which has and will in the future cause them to spend money for mental health treatment services and medical care.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

## VII.    Claims.

**A.  First Zion Missionary Baptist Church Defendants.**

### First Cause of Action
**Assault**
**(First Zion Missionary Baptist Church and Tyrone B. Beckett)**

535.    Plaintiffs incorporate paragraphs 1-534 as if incorporated herein verbatim.

536.    Between March 11, 2010 and November 3, 2016, First Zion Missionary Baptist Church and Tyrone B. Beckett threatened to beat R.D.M. for stealing food, being disobedient, and disclosing abuse and neglect.

537.    The conduct of Defendants First Zion Missionary Baptist Church and Tyrone B. Beckett placed Plaintiff R.D.M. in reasonable fear of bodily harm.

538.    Plaintiff R.D.M. seeks damages, punitive damages, and costs of this action.

### Second Cause of Action
**Battery**
**(First Zion Missionary Baptist Church and Tyrone B. Beckett)**

539.    Plaintiffs incorporate paragraphs 1-538 as if incorporated herein verbatim.

540.    Between March 11, 2010 and November 3, 2016, First Zion Missionary Baptist Church and Tyrone B. Beckett beat R.D.M. for stealing food, being disobedient, and disclosing abuse and neglect.

541.    Defendants First Zion Missionary Baptist Church and Tyrone B. Beckett inflicted forcible contact upon the persons of R.D.M.

542.    Plaintiff R.D.M. seek damages, punitive damages, and costs of this action.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

**B.  Wright Directions Family Services Defendants Treatment Claims.**

543.    Plaintiffs incorporate paragraphs 1-542 as if incorporated herein verbatim.

544.    The Wright Directions Family Services Defendants include Wright Directions, LLC, Renee Sutton, LPC, Nicki Nichols, LPC, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, and WDFS Employee #4.

545.    The Wright Directions Family Services Defendants knew that troubling behavior of one child in a home could be indicative of signs of abuse of neglect to all children.

546.    The Wright Directions Family Services Defendants were aware of troubling behaviors of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

547.    The Wright Directions Family Services Defendants would provide services for A.M.L. 124 times, J.J.L. 128 times, R.D.M. 148 times, J.J.G. 169 times, and S.T.S. 85 times between November 5, 2013 through May 15, 2015.

548.    From November 5, 2013 through May 15, 2015, WDFS would bill Medicaid $15,334.99 for

549.    The Wright Directions Family Services Defendants provided counseling, social work, psychotherapy, skills training and development, diagnostic assessments, family stabilization services, treatment or case planning, multidisciplinary evaluations, and case management to A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

550.    The Wright Directions Family Services Defendants should have noticed that the children were being starved and abused.

551.    The Wright Directions Family Services Defendants had an obligation and duty to provide a continuum of care to A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

552.    The Wright Directions Family Services Defendants had an obligation and duty to protect A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

553.    It was obvious from medical, educational, and case management documentation that The Wright Directions Family Services Defendants were not gaining weight and not growing in a normal fashion.

554.    There is no documentation for any attempts by The Wright Directions Family Services Defendants to determine the cause of this troubling situation.

555.    The Wright Directions Family Services Defendants were in the best position to be able to prevent or mitigate the abuse and starvation foisted on children.

556.    They knew by seeing ALL of these children that obvious abuse and neglect was ongoing, yet they did not do anything to protect these children.

557.    South Carolina has mandatory reporting laws.

558.    Specifically, S. C. Code Ann. Section 63-7-310 provides, in pertinent part:

(A)  A mental health professional … shall report in accordance with this section when in the person's professional capacity, the person has received information which gives the person reason to believe that a child's physical and mental health or welfare has been or may be adversely affected by abuse or neglect.
…

(D)      Reports of child abuse or neglect may be made orally by telephone or otherwise to the county department of social services or to a law enforcement agency in the county where the child resides or is found.

559.    These reporting laws require someone who learns of emotional abuse, sexual abuse, physical abuse, or acts perpetrated on a minor that puts them in danger or potential danger, to report this act or persons committing the acts to the proper authorities.

560.    This mandatory reporting does not include a private right of action for negligence per se as enunciated in *Doe v. Marion*, 645 S.E.2d 245, 373 S.C. 390 (2007).

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

561.    Though there is no private right of action under thew mandatory reporting statute, failure to report abuse, torture and neglect is an industry standard subject to the common law of negligence.

562.    Failure to protect a child with obvious signs of abuse and/or neglect is also reckless and grossly negligent and not subject to caps.

563.    Even if someone were to suggest that The Wright Directions Family Services Defendants were not subject to mandatory reporting, their failure to protect the AML (and her siblings) was a breach of medical and non-medical standards of care.

564.    The Wright Directions Family Services Defendants failed to take reasonable steps and/or failed to implement reasonable safeguards to protect A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

565.    Furthermore, at no point during the periods of time alleged, did Defendants have in place an adequate system or procedures to supervise and/or monitor employees, representatives, or agents to ensure they protected at-risk children.

566.    Having been in the Wright Directions Family Services Defendants care, which should have provided A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. normal opportunities for protection, the Wright Directions Family Services Defendants owed a duty to inform someone or take whatever steps were necessary to protect AML from further starvation, torture and/or abuse.

567.    The Wright Directions Family Services Defendants' knowing acquiescence and silence with respect to the known, or reasonably knowable, activities of child abusers, constituted a course of conduct through which acts of abuse and neglect were condoned, approved, and effectively authorized.

568.    Through their failure to timely respond to and attempt to stop or mitigate the acts referenced herein, and for all of the other reasons set forth in this Complaint including, without limitation, their failure to take the steps necessary to prevent the occurrence of such reprehensible acts, the Wright Directions Family Services Defendants ratified said actions.

569.    But for the Wright Directions Family Services Defendants actions and failures to act, A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. would not have sustained injuries and damages.

570.    Affidavits from qualified medical professionals specifying at least one breach of the standard of care on behalf of each Wright Directions Family Services Defendants are attached hereto as Exhibit A.

## Third Cause of Action
### Medical and Professional Negligence
### (Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4,)

571.    Plaintiffs incorporate paragraphs 1-570 as if incorporated herein verbatim.

572.    Plaintiffs A.M.L., J.J.L., R.D.M., and J.J.G. will amend and be included in this claim at a later date when they are able to submit an affidavit in conjunction with the amended complaint.

573.    At all times relevant to the allegations contained herein, Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, and WDFS Employee #4 and their employees and/or agents, owed duties to S.T.S., and in general to all minors receiving care in their facilities and/or by their employees and/or agents.

574.    Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, and WDFS Employee #4 undertook the duty to

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

render medical care, therapeutic services and/or professional family services care to S.T.S. in accordance with the prevailing professional standards of care in the national community.

575.    S.T.S. asserts that he suffered multiple occurrences of medical and professional negligence which will be demonstrated and specifically determined during discovery.

576.    Notwithstanding said undertakings, and while S.T.S. was under the care of Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, and WDFS Employee #4 and/or their nurses, counselors, agents, and/or employees, etc., said Defendants and/or their nurses, counselors, agents, and/or employees, etc. departed from prevailing and acceptable professional standards of care and treatment and were thereby negligent, grossly negligent, reckless and in violation of the duties owed to S.T.S. and are liable for one or more of the following acts of omission or commission, any or all of which are departures from the prevailing and acceptable professional standards of care:

a.  In failing to properly recognize and/or timely respond to, treat, and/or properly monitor S.T.S.;
b.  In failing to properly communicate the decompensation of S.T.S. to appropriate persons or entities;
c.  In failing to stop or mitigate the abuse, torture and harm to a child;
d.  In failing to properly notify law enforcement or any other state agency about the abuse, torture and harm to S.T.S.;
e.  In failing to obtain appropriate consults from specialists able to properly diagnose and treat S.T.S.;
f.  In failing to document issues related to the patient continuing failure to gain weight and/or grow;
g.  In failing to recognize torture and abuse on sibling of S.T.S. to help prevent further and abuse to the minor;
h.  In failing to recognize signs and symptoms consistent with failing to thrive;
i.  In failing to properly train and educate employees and/or agents, or if properly trained and educated, their failure to act appropriately under the circumstances;
j.  In Defendant's employees failure to exercise independent judgment and skill and act to the protect S.T.S. and her siblings;

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

k.  In failing to have proper policies and procedures in place, or if they did have policies and procedures applicable, the failure of Defendants to follow such policies and procedures;

l.  In failing to follow proper basic social services and human services practices in speaking with the children's services providers, educators, and medical professionals and obtaining records from each stakeholder in order to assess each child and formulate a treatment plan or case plan;

m.  In such other particulars as may be ascertained through discovery undertaken pursuant to the South Carolina Rules of Civil Procedure.

577.    As a direct and proximate result of the negligence, gross negligence, recklessness, and willful and wanton departure from proper medical care by Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, and WDFS Employee #4, agents, and/or employees as noted above, A S.T.S. suffered from severe and debilitating injuries which resulted terrible injuries and harm.

578.    S.T.S. seeks damages, punitive damages, and costs.

**Fourth Cause of Action**
**General Negligence**
**(Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4,)**

579.    Plaintiffs incorporate paragraphs 1-578 as if incorporated herein verbatim.

580.    Upon information and belief, Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, and WDFS Employee #4 have the right or power to direct and control the manner in which its employees and/or agents provide care and operate the business of delivering routine, administrative, ministerial and/or non-medical care.

581.    Upon information and belief, Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, and WDFS Employee #4 have a non-delegable duty to provide physicians, counselors, nurses and other staff

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

adequately trained and able to provide routine, administrative, ministerial and/or non-medical care to patients.

582.     Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, and WDFS Employee #4 and their physicians, nurses, agents, and/or employees, undertook the duty to render routine, administrative, ministerial and/or non-medical care to A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

583.     Plaintiffs assert that they suffered multiple occurrences of negligence which will be demonstrated and specifically determined during discovery

584.     Notwithstanding said undertaking, and while A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. were under the care of Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, and WDFS Employee #4, and their nurses, counselors, agents, and/or employees, said Defendants, and their nurses, counselors, agents and/or employees departed from prevailing and acceptable standards of routine, administrative, ministerial or non-medical care and treatment and were thereby negligent, careless, grossly negligent, reckless and in violation of the duties owed to A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. and are therefore liable for one or more of the following acts of omission or commission:

a.   In failing to communicate their findings to specific medical personnel that could address the findings;
b.   In acting or failing to act in a way that would be appropriate to a member of the public;
c.   In failing to render proper routine care;
d.   In failing to render proper ministerial care;
e.   In failing to render proper administrative care in hiring, training, supervising and discipline decisions;
f.   In failing to create a culture of safety;
g.   In failing to do a proper analysis of abuse and neglect cases which predated the situation with A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.;
h.   In failing to render proper non-medical care;

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

      i.   In failing to staff their respective facilities appropriately;

      j.   In failing to train their employees, nurses, physicians, and/or agents in an appropriate manner;

      k.   In continuing to employ certain employees when Defendants knew or should have known that doing so would result in a patient's harm;

      l.   In such other particulars as may be ascertained through discovery undertaken pursuant to the South Carolina Rules of Civil Procedure.

585.    As a direct and proximate result of the negligence, gross negligence, recklessness, and willful and wanton departure from proper routine, administrative, ministerial, or non-medical care by Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, and WDFS Employee #4, and its agents, and/or employees as noted above, A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. suffered from severe and debilitating injuries which resulted in terrible injuries and harm.

586.    Plaintiffs seek damages, punitive damages, and costs.

### C. Wright Directions Family Services Defendants Fraud Claims

587.    Plaintiffs incorporate paragraphs 1-586 as if incorporated herein verbatim.

588.    Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts owed a specific duty to A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. to provide any therapeutic services they were billed for by the Agency.

589.    The facts clearly demonstrate that these Children were in dire need of competent mental health services and were denied such services even though they paid for such services.

590.    That this fraud started in November 2013 and continued through September 2015. Once the Children were placed in foster care, the fraud began again in July 2017 when Defendants Wright Directions, LLC, Renee Sutton, WDFS Employee #1, WDFS Employee #2,

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts began treating R.D.M. and J.J.G. continued through January 2020.

591.    Instead of providing these services, Plaintiffs will show that Defendants Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts fraudulently provided unnecessary and/or unjustified services, fraudulently billed for services that were not provided, or fraudulently double-billed, triple-billed, and quadruple-billed for family therapy and individual therapy that was conducted as family therapy for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.. Similarly, Defendants Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts fraudulently billed for services that were not provided, or fraudulently double-billed, triple-billed, and quadruple-billed for Behavior Modification Services for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

592.    Plaintiffs will be responsible for reimbursing Medicaid at the end of this matter and it would be unjust for them to be required to reimburse Medicaid as these Defendants' profited through unnecessary and fraudulent billings.

### Fifth Cause of Action
### Civil Conspiracy
### (Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts)

593.    Plaintiffs incorporate paragraphs 1-592 as if incorporated herein verbatim.

594.    Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts conspired, along with others, to fraudulently provide unnecessary

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

and/or unjustified services, fraudulently billed for services that were not provided, or fraudulently double-billed, triple-billed, and quadruple-billed for family therapy and individual therapy that was conducted as family therapy, and behavior modification services for the purpose of injuring Plaintiffs A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. using their health care information and health insurance information to bill Medicaid.

595.    This conspiracy to commit fraud by Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts caused actual harm to Plaintiffs A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. in that other professionals, educators, and community members believed their mental health needs were being addressed, and therefore, they did not need treatment.

596.    In addition, Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts continued to record and represent to Medicaid that the Children's mental health was improving, when, in fact, it was worsening due to the malpractice of Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4,. Had Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts properly informed Medicaid that the Children's mental health was not improving, Medicaid would have refused to allow the Children to continue the treatment by Wright Directions, LLC, and its employees and the Children's mental health treatment would have been transferred to a more competent agency.

597.    Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts acted in a malicious, reckless, and wanton manner in conducting these frauds.

598.    Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts conducted hundreds of acts of fraud from November 2013 through September of 2015.

599.    That additional frauds continued when Wright Directions, LLC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts resumed treatment of R.D.M. and J.J.G. from July 2017 through January 2020.

600.    As a direct and proximate result of Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts conspiracy, Plaintiffs A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. suffered both physical and mental harm from the denial of services for which they actually paid for and never received. The Plaintiffs were in dire need of competent mental health services.

601.    Plaintiffs A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. ask the Court for a reward of actual damages and punitive damages.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

**Sixth Cause of Action**
**18 U.S.C. §1964(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO)**
**(Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS**
**Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright,**
**and Sandra Roberts)**

602.    Plaintiffs incorporate paragraphs 1-601 as if incorporated herein verbatim.

603.    Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts maliciously, recklessly, wantonly, and fraudulently conspired to use the private health information and private health insurance information of Plaintiffs A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. to commit fraud by fraudulently providing unnecessary and/or unjustified services, fraudulently billing for services that were not provided, or fraudulently double-billing, triple-billing, and quadruple-billing for family therapy and individual therapy that was conducted as family therapy, and behavior modification services.

604.    Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts used both electronic devices accessing the internet and the United States Mail to perpetrate these frauds on hundreds of occasions.

605.    In addition, Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts continued to record and represent to Medicaid that the Children's mental health was improving, when, in fact, it was worsening due to the malpractice of Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4,. Had Wright Directions,

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts properly informed Medicaid that the Children's mental health was not improving, Medicaid would have refused to allow the Children to continue the treatment by Wright Directions, LLC, and its employees and the Children's mental health treatment would have been transferred to a more competent agency.

606.    Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts conducted hundreds of acts of fraud from November 2013 through September of 2015.

607.    That additional frauds continued when Wright Directions, LLC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts resumed treatment of R.D.M. and J.J.G. from July 2017 through January 2020.

608.    **Violation of 18 U.S.C. § 1962(a).** Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts received income derived, both directly and indirectly from a pattern of racketeering activity and the unlawful collection of a debt, and these Defendants acted as principals within the meaning of 18 U.S.C. § 2, and used and/or invested, directly and indirectly parts and proceeds from that income. Each Defendant either owned, supervised, or worked for this enterprise.

609.    **Violation of 18 U.S.C. § 1962(b).** Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts, through a pattern of racketeering activity and the collection of an unlawful debt which maintained, directly and indirectly their interest and control of their enterprise which is engaged in the activities of interstate commerce.

610. **Violation of 18 U.S.C. § 1962(c).** Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts were employed by and associated in an enterprise engaged in activities of interstate commerce, conducted and participated, directly and indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity and the collections of unlawful debts.

611. **Violation of 18 U.S.C. § 1962(d).** Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts conspired to violate the provisions of subsection (a), (b), and (c) of 18 U.S.C. §1962.

612. In transmitting the fraudulent billings to Medicaid electronically and in knowing that the fraudulent billings were submitted to Medicaid electronically, the Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts violated 18 U.S.C. §1343, Fraud by wire, radio, or television.

613. In transmitting the fraudulent billings to Medicaid by mail and in knowing that the fraudulent billings were submitted to Medicaid by mail, the Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3,

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts violated 18 U.S.C. §1341, Frauds and swindles, also referred to as mail fraud.

614.    The acts of Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts were the direct and proximate cause of harm to Plaintiffs A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. and these Plaintiffs suffered both physical and mental injuries.

615.    Plaintiffs A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. seek actual and punitive damages and attorneys' fees and costs.

### Seventh Cause of Action
**Violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-140**

(Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts)

616.    Plaintiffs incorporate paragraphs 1-615 as if incorporated herein verbatim.

617.    Pursuant to S.C. Code Ann. § 39-5-140, Plaintiffs A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. a suffered "ascertainable loss of money or property . . . as a result of the use or employment by [Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts] of an unfair or deceptive method, act or practice" through the Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts fraudulently providing unnecessary and/or unjustified services, fraudulently billing for services that were not provided, or fraudulently double-billing, triple-billing, and quadruple-billing for family therapy and individual therapy that was conducted as family

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

therapy, and behavior modification services.  These acts were deceptive, unfair, and have an impact upon the public interest because of their potential for repetition because these actions have occurred in the past, making it likely that they will continue to occur absent deterrence, and the procedures of Wright Directions, LLC, Nikki Nichols, LPC, Renee Sutton, WDFS Employee #1, WDFS Employee #2, WDFS Employee #3, WDFS Employee #4, Jawanda McNair, Gregg Wright, and Sandra Roberts create a potential for repetition of the unfair and deceptive acts.

618.    Plaintiffs have proof of the specific acts disclosing that they and members of the public were adversely affected by the unfair conduct.

619.    Plaintiffs ask for treble damages and reasonable attorney's fees.

**D.  South Carolina Department of Social Services Defendants.**

**Eighth Cause of Action**
**Violation of Fourteenth Amendment Right to a Safe & Secure Placement – 42 U.S.C. §1983**
**(Failure to Protect – Magnelia Washington Cottrell, Charles Brown, SCDSS Case Worker**
**#1, SCDSS Case Worker #2, and SCDSS Case Worker Supervisor #1)**

620.    Plaintiffs incorporate paragraphs 1-619 as if incorporated herein verbatim.

621.    From the time of the placement of A.M.L., J.J.L., R.D.M., and J.J.G., on March 11, 2010, until their adoption on June 10, 2010, A.M.L., J.J.L., R.D.M., and J.J.G. were wards of the state of Ohio, minor children, and unable to protect themselves.

622.    As part of its agreement with the State of Ohio, under the Interstate Compact on the Placement of Children, Magnelia Washington Cottrell, Charles Brown, SCDSS Case Worker

119

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

#1, SCDSS Case Worker #2, and SCDSS Case Worker Supervisor #1 were required to assess, investigate, and monitor A.M.L., J.J.L., R.D.M., and J.J.G. in the Mitchell Foster home to ensure that A.M.L., J.J.L., R.D.M., and J.J.G. were safe and protected. The placement of A.M.L., J.J.L., R.D.M., and J.J.G. in the foster home was at the behest of the State of Ohio and A.M.L., J.J.L., R.D.M., and J.J.G. were entitled to their constitutional right to a safe and secure placement, free of abuse, neglect, and starvation.

623.    The Fourteenth Amendment to the United States Constitution guarantees the right of all children in custody to a safe and secure placement.

624.    Under 42 U.S.C. § 1983, persons acting under color of state law are liable for violating constitutional rights.

625.    Magnelia Washington Cottrell, Charles Brown, SCDSS Case Worker #1, SCDSS Case Worker #2, and SCDSS Case Worker Supervisor #1, acting in their personal capacities, under color of South Carolina Law, were, from March 11, 2010 through A.M.L.'s, J.J.L.'s, R.D.M.'s, and J.J.G.'s adoption on June 10, 2010, deliberately indifferent to A.M.L.'s, J.J.L.'s, R.D.M.'s, and J.J.G.'s constitutional right to a safe and secure foster care placement. They had notice of the following dangers:

    a.    Failing to monitor the safety of foster home of a foster child in the custody of the state of Ohio on a monthly basis pursuant to Ohio law, South Carolina law, and Federal law and generally accepted social work standards.

    b.    Failing to monitor the safety of A.M.L., J.J.L., R.D.M., J.J.G. in the home by speaking with each child, A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the foster home in accordance with generally accepted social work standards.

    c.    Failing to monitor the safety of A.M.L., J.J.L., R.D.M., J.J.G. by speaking with collateral sources, such as day care providers, teachers, and service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. on a monthly basis regarding the care and safety of the children.

    d.    Failing to investigate and assess the safety of the children in the home by reviewing the medical records of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., which

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss over a two month period.

e.     Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors, administrators, and educators for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

f.     Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

g.     Failing to investigate and assess the safety of the children in the home by reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of S.T.S. and another foster child.

h.     Failing to investigate and assess the safety of the children in the home by determining who lived in the home, to include the Mitchells' sons and their grandchildren.

i.     Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

j.     Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

k.     Failing to investigate by observing that S.T.S. failed to grow during the time since SCDSS placed S.T.S. with the Mitchells observe that he looked emaciated.

l.     Failing to observe A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. with Yulanda Mitchell, who visibly showed they were afraid of Yulanda Mitchell.

m.     Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.

626.     Magnelia Washington Cottrell, Charles Brown, SCDSS Case Worker #1, SCDSS Case Worker #2, and SCDSS Case Worker Supervisor #1 ignored these dangers notwithstanding their notice of them.

627.     Magnelia Washington Cottrell, Charles Brown, SCDSS Case Worker #1, SCDSS Case Worker #2, and SCDSS Case Worker Supervisor #1 either misrepresented the safety of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. to the Beaufort County Family Court or they were willfully blind, or incompetent.

628.    A.M.L., J.J.L., R.D.M., and J.J.G. suffered the attacks and starvation and the injuries set out above, were the direct and proximate result of the constitutional violations by Magnelia Washington Cottrell, Charles Brown, SCDSS Case Worker #1, SCDSS Case Worker #2, and SCDSS Case Worker Supervisor #1.

629.    A.M.L., J.J.L., R.D.M., and J.J.G. ask the Court to award damages, punitive damages, and attorneys' fees and cost.

## Ninth Cause of Action
### Gross Negligence under the South Carolina Tort Claims Act
### (South Carolina Department of Social Services)

630.    Plaintiffs incorporate paragraphs 1-629 as if incorporated herein verbatim.

631.    At all times during this matter the A.M.L., J.J.L., R.D.M., and J.J.G. were clients of the South Carolina Department of Social Services.

632.    Under the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10 et seq. of the Code of Laws of South Carolina 1976, as amended, and the Common Law of South Carolina, Defendant SCDSS is liable for its tortious acts and the tortious acts of its employees and agents performed in the scope of their employment when it exercises its responsibility or duty in a grossly negligent manner as to the supervision, protection, control, confinement, or custody of any client. S.C. Code Ann. § 15-78-60(25).

633.    Defendant SCDSS owed a duty of care to A.M.L., J.J.L., R.D.M., and J.J.G. because it is statutorily charged by the General Assembly to investigate allegations of child abuse and neglect, assess and monitor placements of foster children under the Interstate Compact for the Placement of Children, provide services to families in need, to do so in a manner that does not violate individuals' rights and liberties, and does not cause unnecessary harm to any child or family.

634.     From March 11, 2010 through June 10, 2010, SCDSS and its employees and agents, acting within the scope of their employment, were willful, wanton, careless, grossly negligent, and failed to exercise even slight care in exercising its duties and responsibilities of supervision, protection, control, confinement, and/or custody of the Plaintiffs in:

a.     Failing to monitor the safety of foster home of a foster child in the custody of the state of Ohio on a monthly basis pursuant to Ohio law, South Carolina law, and Federal law and generally accepted social work standards.

b.     Failing to monitor the safety of the children. in the home by speaking with each child, A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the foster home in accordance with generally accepted social work standards.

c.     Failing to monitor the safety of the children by speaking with collateral sources, such as day care providers, teachers, and service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. on a monthly basis regarding the care and safety of the children.

d.     Failing to investigate and assess the safety of the children in the home by reviewing the medical records of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and excessive weight loss.

e.     Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors, administrators, and educators for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

f.     Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

g.     Failing to investigate and assess the safety of the children in the home by reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of S.T.S. and another foster child.

h.     Failing to investigate and assess the safety of the children in the home by determining who lived in the home, to include the Mitchells' sons and their grandchildren.

i.     Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

j.     Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

k.     Failing to investigate by observing that S.T.S. failed to grow during the time since SCDSS placed S.T.S. with the Mitchells observe that he looked emaciated.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

l.      Failing to observe A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. with Yulanda Mitchell, who visibly showed they were afraid of Yulanda Mitchell.

m.      Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.

635.    A.M.L., J.J.L., R.D.M., and J.J.G. suffered abuse, starvation, and injuries as set out in this Complaint as the direct and proximate result of the acts and failures to act by SCDSS.

636.    A.M.L., J.J.L., R.D.M., and J.J.G. seek damages, special damages, and costs.

**Tenth Cause of Action**
**Gross Negligence under the South Carolina Tort Claims Act**
**(South Carolina Department of Social Services)**

637.    Plaintiffs incorporate paragraphs 1-636 as if incorporated herein verbatim.

638.    At all times during this matter the A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. were a clients of the South Carolina Department of Social Services.

639.    Under the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10 et seq. of the Code of Laws of South Carolina 1976, as amended, and the Common Law of South Carolina, Defendant SCDSS is liable for its tortious acts and the tortious acts of its employees and agents performed in the scope of their employment when it exercises its responsibility or duty in a grossly negligent manner as to the supervision, protection, control, confinement, or custody of any client. S.C. Code Ann. § 15-78-60(25).

640.    Defendant SCDSS owed a duty of care to A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. because it is statutorily charged by the General Assembly to investigate allegations of child abuse and neglect, assess and monitor placements of abused and neglected children,

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

provide services to families in need, to do so in a manner that does not violate individuals' rights and liberties, and does not cause unnecessary harm to any child or family.

641.    From 2005 through November 3, 2016, SCDSS received numerous reports of abuse and neglect from teachers, social workers, nurses, principals, neighbors, and others in the Bluffton Community and it failed to properly investigate the complaints.

642.    From May 2005 through November 3, 2016, SCDSS and its employees and agents, acting within the scope of their employment, were willful, wanton, careless, grossly negligent, and failed to exercise even slight care in exercising its duties and responsibilities investigate, assess, monitor, and protect A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.in:

    a.    Failing to investigate the S.T.S.'s wellbeing (1) while investigating the abuse of another foster child, (2) after making a determination of physical abuse of the foster child against Yulanda Mitchell, (3) after the Beaufort County Family Court placed Yulanda Mitchell's name on the South Carolina Department of Social Service's registry of abuse and neglect.

    b.    Failing to provide Yulanda Mitchell and S.T.S. a treatment plan and services after the determination of physical abuse of the foster child and placement of Yulanda Mitchell's name on the South Carolina Department of Social Service's registry of abuse and neglect.

    c.    Failing to continue to monitor S.T.S.'s home for a period of time before closing the case.

    d.    Failing to continue to monitor Yulanda Mitchell's adherence to the treatment plan and compliance with services for a period of time before closing the case.

    e.    Failing to monitor the safety of the children in the home during this time, by speaking with each child, including A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the home in accordance with generally accepted social work standards.

    f.    Failing to monitor the safety of the children by speaking with collateral sources, such as day care providers, teachers, and service providers for A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. and the other foster child on a monthly basis regarding the care and safety of the children.

    g.    Failing to investigate and assess the safety of the children in the home by reviewing the medical records of A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and excessive weight loss.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

h.   Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors, administrators, and educators for A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

i.   Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

j.   Failing to investigate and assess the safety of the children in the home by reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. and another foster child.

k.   Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

l.   Failing to investigate by observing that A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. failed to grow while with the Mitchells and make observations that the children looked emaciated.

m.   Failing to observe A A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. with Yulanda Mitchell, who visibly showed they were afraid of Yulanda Mitchell.

n.   Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.

643.   A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. suffered abuse, starvation, and injuries as set out in this Complaint as the direct and proximate result of the acts and failures to act by SCDSS.

644.   The following provides a list of occurrences for each child by date:

a.   A.M.L.:
  i.     August 5, 2010
  ii.    January 2011
  iii.   March 2011
  iv.    August 2011
  v.     April 2012
  vi.    January 29, 2013
  vii.   September 2013
  viii.  November 2013
  ix.    February 2015
  x.     September 2015
  xi.    March 2016
b.   J.J.L.:

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

    i.        August 5, 2010
    ii.       January 2011
    iii.      March 2011
    iv.      August 2011
    v.        April 2012
    vi.      January 29, 2013
    vii.     September 2013
    viii.    November 2013
    ix.      February 2015
    x.        September 2015
    xi.      March 2016

c.    E.R.L.:
    i.        September 2015
    ii.       March 2016

d.    R.D.M.:
    i.        August 5, 2010
    ii.       January 2011
    iii.      March 2011
    iv.      August 2011
    v.        April 2012
    vi.      January 29, 2013
    vii.     September 2013
    viii.    November 2013
    ix.      February 2015
    x.        September 2015
    xi.      March 2016

e.    J.J.G.:
    i.        August 5, 2010
    ii.       January 2011
    iii.      March 2011
    iv.      August 2011
    v.        April 2012
    vi.      January 29, 2013
    vii.     September 2013
    viii.    November 2013
    ix.      February 2015
    x.        September 2015
    xi.      March 2016

f.    S.T.S.:
    i.        June 2005
    ii.       July 2005 through May 10, 2010.
    iii.      May 11, 2010 through June 10, 2010.
    iv.      August 5, 2010
    v.        January 2011
    vi.      March 2011
    vii.     August 2011

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

|      |                   |
|------|-------------------|
| viii. | April 2012 |
| ix.  | January 29, 2013 |
| x.   | September 2013 |
| xi.  | November 2013 |
| xii. | February 2015 |
| xiii. | September 2015 |
| xiv. | March 2016 |

645.    A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. seek damages, special damages, and costs for each occurrence.

### Eleventh Cause of Action
**Violation of Fourteenth Amendment Right to a Safe & Secure Placement – 42 U.S.C. §1983 (Failure to Protect – SCDSS Case Worker #3, SCDSS Case Worker #4, and SCDSS Case Worker Supervisor #2)**

646.    Plaintiffs incorporate paragraphs 1-645 as if incorporated herein verbatim.

647.    From the time of her placement in April 2015 until her adoption on October 15, 2015, E.R.L. was a ward of the state of Ohio, a minor child, and unable to protect herself.

648.    As part of its agreement with the State of Ohio under the Interstate Compact on the Placement of Children, SCDSS Case Worker #3, SCDSS Case Worker #4, and SCDSS Case Worker Supervisor #2 were required to assess, investigate, and monitor E.R.L. in the Mitchell Foster home to ensure that E.R.L. was safe and protected. The placement of E.R.L. in the foster home was at the behest of the State of Ohio and E.R.L. was entitled to their constitutional right to a safe and secure placement, free of abuse, neglect, and starvation.

649.    The Fourteenth Amendment to the United States Constitution guarantees the right of all children in custody to a safe and secure placement.

650.    Under 42 U.S.C. § 1983, persons acting under color of state law are liable for violating constitutional rights.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

651.    SCDSS Case Worker #3, SCDSS Case Worker #4, and SCDSS Case Worker Supervisor #2, acting in their personal capacities, under color of South Carolina Law, were, from April 2015 through E.R.L.'s adoption on October 15, 2015, deliberately indifferent to E.R.L.'s constitutional right to a safe and secure foster care placement. They had notice of the following dangers:

a.    Failing to monitor the safety of foster home of a foster child in the custody of the state of Ohio on a monthly basis pursuant to Ohio law, South Carolina law, and Federal law and generally accepted social work standards.

b.    Failing to monitor the safety of E.R.L. in the home by speaking with each child, A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the foster home in accordance with generally accepted social work standards.

c.    Failing to monitor the safety of E.R.L. by speaking with collateral sources, such as day care providers, teachers, and service providers for E.R.L. on a monthly basis regarding the care and safety of the children.

d.    Failing to investigate and assess the safety of the children in the home by reviewing the medical records of A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss over a two month period.

e.    Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors, administrators, and educators for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

f.    Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers for A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

g.    Failing to investigate and assess the safety of the children in the home by reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. and another foster child.

h.    Failing to investigate and assess the safety of the children in the home by determining who lived in the home, to include the Mitchells' sons and their grandchildren.

i.    Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

j.    Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

k.    Failing to investigate by observing that A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. failed to grow during the time the children were placed with the Mitchells and failing to observe that the children looked emaciated.

l.    Failing to observe A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. with Yulanda Mitchell, as the children visibly showed they were afraid of Yulanda Mitchell.

m.    Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.

652.    SCDSS Case Worker #3, SCDSS Case Worker #4, and SCDSS Case Worker Supervisor #2 ignored these dangers notwithstanding their notice of them.

653.    SCDSS Case Worker #3, SCDSS Case Worker #4, and SCDSS Case Worker Supervisor #2 either misrepresented the safety of E.R.L. to the Beaufort County Family Court or they were willfully blind, or incompetent.

654.    E.R.L. suffered the attacks and starvation and the injuries set out above, were the direct and proximate result of the constitutional violations by SCDSS Case Worker #3, SCDSS Case Worker #4, and SCDSS Case Worker Supervisor #2.

655.    E.R.L. asks the Court to award damages, punitive damages, and attorneys' fees and cost.

**Twelfth Cause of Action**
**Gross Negligence under the South Carolina Tort Claims Act**
**(South Carolina Department of Social Services)**

656.    Plaintiffs incorporate paragraphs 1-655 as if incorporated herein verbatim.

657.    At all times during this matter the E.R.L. was a client of the South Carolina Department of Social Services.

658.    Under the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10 et seq. of the Code of Laws of South Carolina 1976, as amended, and the Common Law of South Carolina,

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

Defendant SCDSS is liable for its tortious acts and the tortious acts of its employees and agents performed in the scope of their employment when it exercises its responsibility or duty in a grossly negligent manner as to the supervision, protection, control, confinement, or custody of any client. S.C. Code Ann. § 15-78-60(25).

659.    Defendant SCDSS owed a duty of care to E.R.L. because it is statutorily charged by the General Assembly to investigate allegations of child abuse and neglect, assess and monitor placements of foster children under the Interstate Compact for the Placement of Children, provide services to families in need, to do so in a manner that does not violate individuals' rights and liberties, and does not cause unnecessary harm to any child or family.

660.    From April 2015 through October 15, 2015, SCDSS and its employees and agents, acting within the scope of their employment, were willful, wanton, careless, grossly negligent, and failed to exercise even slight care in exercising its duties and responsibilities of supervision, protection, control, confinement, and/or custody of E.R.L. in:

a.    Failing to monitor the safety of foster home of a foster child in the custody of the state of Ohio on a monthly basis pursuant to Ohio law, South Carolina law, and Federal law and generally accepted social work standards.

b.    Failing to monitor the safety of the children. in the home by speaking with each child, A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the foster home in accordance with generally accepted social work standards.

c.    Failing to monitor the safety of the children by speaking with collateral sources, such as day care providers, teachers, and service providers for A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. on a monthly basis regarding the care and safety of the children.

d.    Failing to investigate and assess the safety of the children in the home by reviewing the medical records of A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and excessive weight loss.

e.    Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors,

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

administrators, and educators for A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

f.    Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers for A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

g.    Failing to investigate and assess the safety of the children in the home by reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of S.T.S. and another foster child.

h.    Failing to investigate and assess the safety of the children in the home by determining who lived in the home, to include the Mitchells' sons and their grandchildren.

i.    Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

j.    Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

k.    Failing to investigate by observing that A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. failed to grow during the time S.T.S. was placed with the Mitchells observe that the children looked emaciated.

l.    Failing to observe A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. with Yulanda Mitchell, who visibly showed they were afraid of Yulanda Mitchell.

m.    Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.

661.    E.R.L. suffered abuse, starvation, and injuries as set out in this Complaint as the direct and proximate result of the acts and failures to act by SCDSS.

662.    E.R.L. seeks damages, special damages, and costs.

**E.  Franklin County Childrens Services Defendants.**

<u>**Thirteenth Cause of Action**</u>
**Violation of Fourteenth Amendment Right to a Safe & Secure Placement – 42 U.S.C. §1983**
**(Failure to Protect – Franklin County Childrens Services, FCCS Case Worker #1, FCCS Case Worker #2, and FCCS Case Worker Supervisor #1)**

663.    Plaintiffs incorporate paragraphs 1-662 as if incorporated herein verbatim.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

664.    From the time of the placement of A.M.L., J.J.L., R.D.M., and J.J.G., on March 11, 2010, until their adoption on June 10, 2010, A.M.L., J.J.L., R.D.M., and J.J.G. were wards of the state of Ohio, minor children, and unable to protect themselves.

665.    As part of its agreement with the State of South Carolina, under the Interstate Compact on the Placement of Children, Franklin County Childrens Services, FCCS Case Worker #1, FCCS Case Worker #2, and FCCS Case Worker Supervisor #1 were required to assess, investigate, and monitor A.M.L., J.J.L., R.D.M., and J.J.G. in the Mitchell Foster home to ensure that A.M.L., J.J.L., R.D.M., and J.J.G. were safe and protected. The placement of A.M.L., J.J.L., R.D.M., and J.J.G. in the foster home was at the behest of the State of Ohio and A.M.L., J.J.L., R.D.M., and J.J.G. were entitled to their constitutional right to a safe and secure placement, free of abuse, neglect, and starvation.

666.    The Fourteenth Amendment to the United States Constitution guarantees the right of all children in custody to a safe and secure placement.

667.    Under 42 U.S.C. § 1983, persons acting under color of state law are liable for violating constitutional rights.

668.    Franklin County Childrens Services, FCCS Case Worker #1, FCCS Case Worker #2, and FCCS Case Worker Supervisor #1, acting in their personal capacities or under *Monell*, under color of South Carolina Law, were, from March 11, 2010 through A.M.L.'s, J.J.L.'s, R.D.M.'s, and J.J.G.'s adoption on June 10, 2010, deliberately indifferent to A.M.L.'s, J.J.L.'s, R.D.M.'s, and J.J.G.'s constitutional right to a safe and secure foster care placement. They had notice of the following dangers:

a.    Failing to monitor the safety of foster home of a foster child in the custody of the state of Ohio on a monthly basis pursuant to Ohio law, South Carolina law, and Federal law and generally accepted social work standards.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

b.     Failing to monitor the safety of A.M.L., J.J.L., R.D.M., J.J.G. in the home by speaking with each child, A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the foster home in accordance with generally accepted social work standards.

c.     Failing to monitor the safety of A.M.L., J.J.L., R.D.M., J.J.G. by speaking with collateral sources, such as day care providers, teachers, and service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. on a monthly basis regarding the care and safety of the children.

d.     Failing to investigate and assess the safety of the children in the home by reviewing the medical records of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss over a two month period.

e.     Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors, administrators, and educators for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

f.     Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

g.     Failing to investigate and assess the safety of the children in the home by reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of S.T.S. and another foster child.

h.     Failing to investigate and assess the safety of the children in the home by determining who lived in the home, to include the Mitchells' sons and their grandchildren.

i.     Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

j.     Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

k.     Failing to investigate by observing that S.T.S. failed to grow during the time since SCDSS placed S.T.S. with the Mitchells observe that he looked emaciated.

l.     Failing to observe A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. with Yulanda Mitchell, who visibly showed they were afraid of Yulanda Mitchell.

m.    Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

669.    Franklin County Childrens Services, FCCS Case Worker #1, FCCS Case Worker #2, and FCCS Case Worker Supervisor #1 ignored these dangers notwithstanding their notice of them.

670.    Franklin County Childrens Services created and established unconstitutional policies and procedures that directly led to the harms endured by A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. and they are listed below:

a.    Failing to properly vet and investigate adoption placement contractors such as Adoption Advocacy, Inc., June Bond, and Joe Haynes.

b.    Failing to monitor adoption placement contractors such as Adoption Advocacy, Inc., June Bond, and Joe Haynes.

c.    Failing to monitor the safety of an out of state foster home of a foster child in the custody of the state of Ohio on a monthly basis pursuant to Ohio law, South Carolina law, and Federal law and generally accepted social work standards.

d.    Failing to monitor the safety of A.M.L., J.J.L., R.D.M., J.J.G. in the home by speaking with each child, A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the foster home in accordance with generally accepted social work standards.

e.    Failing to monitor the safety of A.M.L., J.J.L., R.D.M., J.J.G. by speaking with collateral sources, such as day care providers, teachers, and service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. on a monthly basis regarding the care and safety of the children.

f.    Failing to investigate and assess the safety of the children in the home by reviewing the medical records of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss over a two month period.

g.    Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors, administrators, and educators for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

h.    Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

i.    Failing to investigate and assess the safety of the children in the home by reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of S.T.S. and another foster child.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

j.    Failing to investigate and assess the safety of the children in the home by determining who lived in the home, to include the Mitchells' sons and their grandchildren.

k.    Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

l.    Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

m.    Failing to investigate by observing that S.T.S. failed to grow during the time since SCDSS placed S.T.S. with the Mitchells observe that he looked emaciated.

n.    Failing to observe A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. with Yulanda Mitchell, who visibly showed they were afraid of Yulanda Mitchell.

o.    Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.

671.    Franklin County Childrens Services, FCCS Case Worker #1, FCCS Case Worker #2, and FCCS Case Worker Supervisor #1 either misrepresented the safety of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. to the Beaufort County Family Court or they were willfully blind, or incompetent.

672.    A.M.L., J.J.L., R.D.M., and J.J.G. suffered the attacks and starvation and the injuries set out above, were the direct and proximate result of the constitutional violations by Franklin County Childrens Services, FCCS Case Worker #1, FCCS Case Worker #2, and FCCS Case Worker Supervisor #1.

673.    A.M.L., J.J.L., R.D.M., and J.J.G. asks the Court to award damages, punitive damages, and attorneys' fees and cost.

## Fourteenth Cause of Action
**Violation of Fourteenth Amendment Right to a Safe & Secure Placement – 42 U.S.C. §1983 (Failure to Protect – Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, and FCCS Case Worker Supervisor #2)**

674.    Plaintiffs incorporate paragraphs 1-673 as if incorporated herein verbatim.

675.    From the time of her placement in April 2015 until her adoption on October 15, 2015, E.R.L. was a ward of the state of Ohio, a minor child, and unable to protect herself.

676.    As part of its agreement with the State of South Carolina under the Interstate Compact on the Placement of Children, Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, and FCCS Case Worker Supervisor #2 were required to assess, investigate, and monitor E.R.L. in the Mitchell Foster home to ensure that E.R.L. was safe and protected. The placement of E.R.L. in the foster home was at the behest of the State of Ohio and E.R.L. was entitled to their constitutional right to a safe and secure placement, free of abuse, neglect, and starvation.

677.    The Fourteenth Amendment to the United States Constitution guarantees the right of all children in custody to a safe and secure placement.

678.    Under 42 U.S.C. § 1983, persons acting under color of state law are liable for violating constitutional rights.

679.    Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, and FCCS Case Worker Supervisor #2, acting in their personal capacities and under *Monell*, under color of South Carolina Law, were, from April 2015 through E.R.L.'s adoption on October 15, 2015, deliberately indifferent to E.R.L.'s constitutional right to a safe and secure foster care placement. They had notice of the following dangers:

a.    Failing to monitor the safety of foster home of a foster child in the custody of the state of Ohio on a monthly basis pursuant to Ohio law, South Carolina law, and Federal law and generally accepted social work standards.

b.    Failing to monitor the safety of E.R.L. in the home by speaking with each child, A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the foster home in accordance with generally accepted social work standards.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

c.      Failing to monitor the safety of E.R.L. by speaking with collateral sources, such as day care providers, teachers, and service providers for E.R.L. on a monthly basis regarding the care and safety of the children.

d.      Failing to investigate and assess the safety of the children in the home by reviewing the medical records of A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss over a two month period.

e.      Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors, administrators, and educators for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

f.      Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers for A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

g.      Failing to investigate and assess the safety of the children in the home by reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. and another foster child.

h.      Failing to investigate and assess the safety of the children in the home by determining who lived in the home, to include the Mitchells' sons and their grandchildren.

i.      Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

j.      Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

k.      Failing to investigate by observing that A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. failed to grow during the time the children were placed with the Mitchells and failing to observe that the children looked emaciated.

l.      Failing to observe A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. with Yulanda Mitchell, as the children visibly showed they were afraid of Yulanda Mitchell.

m.      Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.

680.     Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, and FCCS Case Worker Supervisor #2 ignored these dangers notwithstanding their notice of them.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

681.    Franklin County Childrens Services created and established unconstitutional policies and procedures that directly led to the harms endured by A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. and they are listed below:

a.    Failing to properly vet and investigate adoption placement contractors such as Adoption Advocacy, Inc., June Bond, and Joe Haynes.

b.    Failing to monitor adoption placement contractors such as Adoption Advocacy, Inc., June Bond, and Joe Haynes.

c.    Failing to properly vet and investigate adoption placement contractors such as Adoption Advocacy, Inc., June Bond, and Joe Haynes.

d.    Failing to monitor adoption placement contractors such as Adoption Advocacy, Inc., June Bond, and Joe Haynes.

e.    Failing to monitor the safety of foster home of a foster child in the custody of the state of Ohio on a monthly basis pursuant to Ohio law, South Carolina law, and Federal law and generally accepted social work standards.

f.    Failing to monitor the safety of E.R.L. in the home by speaking with each child, A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the foster home in accordance with generally accepted social work standards.

g.    Failing to monitor the safety of E.R.L. by speaking with collateral sources, such as day care providers, teachers, and service providers for E.R.L. on a monthly basis regarding the care and safety of the children.

h.    Failing to investigate and assess the safety of the children in the home by reviewing the medical records of A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss over a two month period.

i.    Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors, administrators, and educators for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

j.    Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers for A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

k.    Failing to investigate and assess the safety of the children in the home by reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. and another foster child.

l.    Failing to investigate and assess the safety of the children in the home by determining who lived in the home, to include the Mitchells' sons and their grandchildren.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

m.   Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

n.   Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

o.   Failing to investigate by observing that A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. failed to grow during the time the children were placed with the Mitchells and failing to observe that the children looked emaciated.

p.   Failing to observe A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. with Yulanda Mitchell, as the children visibly showed they were afraid of Yulanda Mitchell.

q.   Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.

682.   Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, and FCCS Case Worker Supervisor #2 either misrepresented the safety of E.R.L. to the Beaufort County Family Court or they were willfully blind, or incompetent.

683.   E.R.L. suffered the attacks and starvation and the injuries set out above, were the direct and proximate result of the constitutional violations by Franklin County Childrens Services, FCCS Case Worker #3, FCCS Case Worker #4, and FCCS Case Worker Supervisor #2.

684.   E.R.L. asks the Court to award damages, punitive damages, and attorneys' fees and cost.

### Fifteenth Cause of Action
### Negligence
### (Franklin County Childrens Services)

685.   Plaintiffs incorporate paragraphs 1-684 as if incorporated herein verbatim.

686.   Franklin County Childrens Services is sued under the South Carolina Long Arm Statute, S.C. Code Ann. § 36-2-803.

687.   At all times during this matter the A.M.L., J.J.L., R.D.M., and J.J.G. were clients of the South Carolina Department of Social Services.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

688.    Franklin County Childrens Services is liable for its tortious acts and the tortious acts of its employees and agents performed in the scope of their employment when it exercises its responsibility or duty in a negligent manner as to the supervision, protection, control, confinement, or custody of any client.

689.    Defendant Franklin County Childrens Services owed a duty of care to A.M.L., J.J.L., R.D.M., and J.J.G. because it is statutorily charged by the Ohio General Assembly to investigate allegations of child abuse and neglect, assess and monitor placements of foster children under the Interstate Compact for the Placement of Children, provide services to families in need, to do so in a manner that does not violate individuals' rights and liberties, and does not cause unnecessary harm to any child or family.

690.    From March 11, 2010 through June 10, 2010, Franklin County Childrens Services and its employees and agents, acting within the scope of their employment, were negligent, willful, wanton, careless, grossly negligent in exercising its duties and responsibilities of supervision, protection, control, confinement, and/or custody of the Plaintiffs in:

a.    Failing to monitor the safety of foster home of a foster child in the custody of the state of Ohio on a monthly basis pursuant to Ohio law, South Carolina law, and Federal law and generally accepted social work standards.

b.    Failing to monitor the safety of the children. in the home by speaking with each child, A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the foster home in accordance with generally accepted social work standards.

c.    Failing to monitor the safety of the children by speaking with collateral sources, such as day care providers, teachers, and service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. on a monthly basis regarding the care and safety of the children.

d.    Failing to investigate and assess the safety of the children in the home by reviewing the medical records of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and excessive weight loss.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

e.      Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors, administrators, and educators for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

f.      Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

g.      Failing to investigate and assess the safety of the children in the home by reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of S.T.S. and another foster child.

h.      Failing to investigate and assess the safety of the children in the home by determining who lived in the home, to include the Mitchells' sons and their grandchildren.

i.      Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

j.      Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

k.      Failing to investigate by observing that S.T.S. failed to grow during the time since SCDSS placed S.T.S. with the Mitchells observe that he looked emaciated.

l.      Failing to observe A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. with Yulanda Mitchell, who visibly showed they were afraid of Yulanda Mitchell.

m.      Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.

691.    A.M.L., J.J.L., R.D.M., and J.J.G. suffered abuse, starvation, and injuries as set out in this Complaint as the direct and proximate result of the acts and failures to act by Franklin County Childrens Services.

692.    A.M.L., J.J.L., R.D.M., and J.J.G. seek damages, punitive damages, special damages, and costs.

## Sixteenth Cause of Action
### Negligence
### (Franklin County Childrens Services)

693.    Plaintiffs incorporate paragraphs 1-692 as if incorporated herein verbatim.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

694.    Franklin County Childrens Services is sued under the South Carolina Long Arm Statute, S.C. Code Ann. § 36-2-803.

695.    At all times during this matter the E.R.L. was a client of Franklin County Childrens Services.

696.    Franklin County Childrens Services is liable for its tortious acts and the tortious acts of its employees and agents performed in the scope of their employment when it exercises its responsibility or duty in a negligent manner as to the supervision, protection, control, confinement, or custody of any client.

697.    Defendant Franklin County Childrens Services owed a duty of care to E.R.L. because it is statutorily charged by the General Assembly to investigate allegations of child abuse and neglect, assess and monitor placements of foster children under the Interstate Compact for the Placement of Children, provide services to families in need, to do so in a manner that does not violate individuals' rights and liberties, and does not cause unnecessary harm to any child or family.

698.    From April 2015 through October 15, 2015, Franklin County Childrens Services and its employees and agents, acting within the scope of their employment, were negligent, willful, wanton, careless, grossly negligent in exercising its duties and responsibilities of supervision, protection, control, confinement, and/or custody of E.R.L. in:

    a.    Failing to monitor the safety of the foster home of a foster child in the custody of the state of Ohio on a monthly basis pursuant to Ohio law, South Carolina law, and Federal law and generally accepted social work standards.

    b.    Failing to monitor the safety of the children. in the home by speaking with each child, A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the foster home in accordance with generally accepted social work standards.

    c.    Failing to monitor the safety of the children by speaking with collateral sources, such as day care providers, teachers, and service providers for A.M.L., J.J.L.,

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

E.R.L., R.D.M., J.J.G., and S.T.S. on a monthly basis regarding the care and safety of the children.

d.      Failing to investigate and assess the safety of the children in the home by reviewing the medical records of A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and excessive weight loss.

e.      Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors, administrators, and educators for A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

f.      Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers for A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

g.      Failing to investigate and assess the safety of the children in the home by reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of S.T.S. and another foster child.

h.      Failing to investigate and assess the safety of the children in the home by determining who lived in the home, to include the Mitchells' sons and their grandchildren.

i.      Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

j.      Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

k.      Failing to investigate by observing that A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. failed to grow during the time S.T.S. was with the Mitchells observe that the children looked emaciated.

l.      Failing to observe A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. with Yulanda Mitchell, who visibly showed they were afraid of Yulanda Mitchell.

m.      Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.


699.     E.R.L. suffered abuse, starvation, and injuries as set out in this Complaint as the

direct and proximate result of the acts and failures to act by Franklin County Childrens Services.

700.     E.R.L. seeks damages, punitive damages, special damages, and costs.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

**F.  Adoption Advocacy Defendants.**

### Seventeenth Cause of Action
**Violation of Fourteenth Amendment Right to a Safe & Secure Placement – 42 U.S.C. §1983
(Failure to Protect - Adoption Advocacy, Inc., June Bond, and Joe Haynes)**

701.    Plaintiffs incorporate paragraphs 1-700 as if it were incorporated herein verbatim.

702.    From the time of their placement on March 11, 2010 until their adoption on June 6, 2010, A.M.L., J.J.L., R.D.M., and J.J.G. were wards of the state of Ohio, minor children, and unable to protect themselves.

703.    Adoption Advocacy, Inc., June Bond, and Joe Haynes, were compensated by Franklin County Children Services and the state of Ohio to assess, investigate, and monitor A.M.L., J.J.L., R.D.M., and J.J.G. in the Mitchell Foster home to ensure that A.M.L., J.J.L., R.D.M., and J.J.G. was safe and protected. The placement of A.M.L., J.J.L., R.D.M., and J.J.G.in the foster home was at the behest of the State of Ohio and she was entitled to her constitutional right to a safe and secure placement free of abuse, neglect, and starvation.

704.    The Fourteenth Amendment to the United States Constitution guarantees the right of all children in custody to a safe and secure placement.

705.    Under 42 U.S.C. § 1983, persons acting under color of state law are liable for violating constitutional rights.

706.    Adoption Advocacy, Inc., June Bond, and Joe Hayne, acting in their personal capacities, under color of South Carolina Law, were, from March 11, 2010 until their adoption on June 6, 2010, deliberately indifferent to A.M.L.'s, J.J.L.'s, R.D.M.'s, and J.J.G.'s constitutional right to a safe and secure foster care placement. They had notice of the following dangers:

a. Failing to monitor the safety of foster home of a foster child in the custody of the state of Ohio on a monthly basis pursuant to Ohio law, South Carolina law, and Federal law and generally accepted social work standards.

b. Failing to monitor the safety of A.M.L., J.J.L., R.D.M., and J.J.G. in the home by speaking with each child, A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the foster home in accordance with generally accepted social work standards.

c. Failing to monitor the safety of A.M.L., J.J.L., R.D.M., and J.J.G. by speaking with collateral sources, such as day care providers, teachers, and service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. on a monthly basis regarding the care and safety of the children.

d. Failing to investigate and assess the safety of the children in the home by reviewing the medical records of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions.

e. Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors, administrators, and educators for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

f. Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

g. Failing to investigate and assess the safety of the children in the home by speaking with Beaufort County Department of Social Services regarding the numerous documented complaints of abuse and neglect of S.T.S. and another foster child that was recorded in the children's school and medical records.

h. Failing to investigate and assess the safety of the children in the home by determining who lived in the home, to include the Mitchells' sons and their grandchildren.

i. Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

j. Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

k. Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.

707. Adoption Advocacy, Inc., June Bond, and Joe Haynes ignored these dangers notwithstanding their notice of them.

708.    Adoption Advocacy, Inc., June Bond, and Joe Haynes either misrepresented the safety of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. to South Carolina Department of Social Services, Franklin County Childrens Services, and the Beaufort County Family Court or they were willfully blind, or incompetent.

709.    A.M.L., J.J.L., R.D.M., and J.J.G. suffered the attacks and starvation and the injuries set out above as the direct and proximate result of the constitutional violations by Adoption Advocacy, Inc., June Bond, and Joe Haynes.

710.    A.M.L., J.J.L., R.D.M., and J.J.G. ask the Court to award damages, punitive damages, and attorneys' fees and cost.

**Eighteenth Cause of Action**
**Negligence, Recklessness, Willfulness or Gross Negligence as to June Bond, and Joe Haynes**
**Under the South Carolina Solicitation of Charitable Funds Act**

711.    Plaintiffs incorporate paragraphs 1-710 as if it were incorporated herein verbatim.

712.    Under the South Carolina Solicitation of Charitable Funds Act, § 33-56-10 *et seq.* of the Code of Law of South Carolina 1976, as amended, and the Common Law of South Carolina, Adoption Advocacy, Inc. is liable for its tortious acts and the tortious acts of its employees acting in the scope of their employment.

713.    Adoption Advocacy, Inc.'s employees are also liable for their own tortious actions when, "the employee of the charitable organization whose act or omission gave rise to the claim unless it is alleged and proved in the action that the employee acted in a reckless, wilful, or grossly negligent manner." S.C. Code Ann. §33-56-180(A).

714.    June Bond, Joe Haynes, and Amy Carr, from April 2015 through E.R.L.'s adoption on October 15, 2015, willful, wanton, careless, grossly negligent, and failed to exercise even slight care in having notice of the following dangers:

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

a.    Failing to monitor the safety of foster home of a foster child in the custody of the state of Ohio on a monthly basis pursuant to Ohio law, South Carolina law, and Federal law and generally accepted social work standards.

b.    Failing to monitor the safety of A.M.L., J.J.L., R.D.M., J.J.G. in the home by speaking with each child, A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the foster home in accordance with generally accepted social work standards.

c.    Failing to monitor the safety of A.M.L., J.J.L., R.D.M., J.J.G. by speaking with collateral sources, such as day care providers, teachers, and service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. on a monthly basis regarding the care and safety of the children.

d.    Failing to investigate and assess the safety of the children in the home by reviewing the medical records of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, and failure to follow a pediatrician's instructions.

e.    Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors, administrators, and educators for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

f.    Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers for A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. regarding the treatment of the children.

g.    Failing to investigate and assess the safety of the children in the home by determining who lived in the home, to include the Mitchells' sons and their grandchildren.

h.    Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

i.    Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

j.    Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.

k.    Failing to supervise the social work conducted by June Bond and Joe Haynes placement, assessment, and monitoring of A.M.L., J.J.L., R.D.M., and J.J.G.

715.    A.M.L., J.J.L., R.D.M., and J.J.G. suffered abused, starvation, and injuries as set out in this Complaint as the direct and proximate result of the acts and failures to act by June Bond, and Joe Haynes.

716.     A.M.L., J.J.L., R.D.M., and J.J.G. seek damages, punitive damages, and costs.

**G. Beaufort County School District Defendants.**

<u>**Nineteenth Cause of Action**</u>
**Negligence and Gross Negligence**
**(Beaufort County School District Administrator #1, Beaufort County School District Administrator #2, Beaufort County School District Employee #1)**

717.     Plaintiffs incorporate paragraphs 1-716 as if incorporated herein verbatim.

718.     At all times during this matter the A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. were students of Beaufort County School District.

719.     Plaintiffs A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. allege the acts of Beaufort County School Board Member #1, Beaufort County School District Administrator #1, and Beaufort County School District Administrator #2 were intentional acts, malicious acts, or criminal acts, and these individuals are sued in their individual capacity. The Beaufort County School District is barred by statute from stepping into the shoes of these Defendants.

720.     Beaufort County School Board Member #1, Beaufort County School District Administrator #1, and Beaufort County School District Administrator #2 owed a duty of care to A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. to protect each child from abuse and neglect and report abuse and neglect. In addition, these same Defendants owed a duty not to make the abuse and neglect worse, nor should they instruct and command others to ignore the abuse and neglect and not report it.

721.     From the period of May 11, 2010 through November 3, 2016, Beaufort County School District, Beaufort County School District Administrator #1, Beaufort County School District Administrator #2 instructed teachers, guidance counselors, social workers, nurses, and

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

administrators not to report the abuse and neglect of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. to SCDSS.

722.    Between March 11, 2010, through November 3, 2016, Beaufort County School District and Beaufort County School Board Member #1 threatened to terminate the school principal if she and her staff, to include teachers, nurses, social workers, guidance counselors, and principals, continued to report the abuse of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. to SCDSS.

723.    Beaufort County School Board Member #1, Beaufort County School District Administrator #1, Beaufort County School District Administrator #2, acted outside the scope of their employment, were willful, wanton, careless, grossly negligent, and failed to exercise even slight care in exercising its duties and responsibilities of supervision, protection, control, confinement, and/or custody of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

724.    A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. suffered abuse, starvation, and injuries as set out in this Complaint as the direct and proximate result of the acts and failures to act by Beaufort County School Board Member #1, Beaufort County School District Administrator #1, Beaufort County School District Administrator #2.

725.    A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. seek damages, special damages, costs, and when allowed by law against the individual defendants, punitive damages.

## H. Seaside Pediatrics of Bluffton Defendants.

726.    Plaintiffs incorporate paragraphs 1-725 as if incorporated herein verbatim.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

727.    Seaside Pediatrics of Bluffton, P.C., and Dr. Berrigan knew that troubling behavior of one child in a home could be indicative of signs of abuse of neglect to all children.

728.    Seaside Pediatrics of Bluffton, P.C., and Dr. Berrigan were aware of troubling behaviors of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

729.    Seaside Pediatrics of Bluffton, P.C., and Dr. Berrigan provided services to Plaintiffs A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. from 2008 through 2011.

730.    The Seaside Pediatrics Defendants were singularly responsible for ensuring operations at the pediatric clinic provided safe and competent care to their minor patients, including those who were being, or had been, starved, tortured and abused like A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

731.    At all relevant times, the Seaside Pediatrics Defendants held themselves out as a modern competent medical facility that included trained and skilled physicians.

732.    The Seaside Pediatrics Defendants had the right or power to direct and control the way its employees and/or agents provide care and operate the business of delivering medical and non-medical care for a fee through its facilities.

733.    The Seaside Pediatrics Defendants should have noticed that the children were being starved and abused.

734.    The Seaside Pediatrics Defendants had the right or power to direct and control the way its employees and/or agents hire, retain, supervise, and train staff under its employment or agency.

735.    The Seaside Pediatrics Defendants had non-delegable duties to provide staff with adequate knowledge and training to be able to provide necessary and reasonable medical and non-medical care to patients at its facilities in different Counties in the Low Country of South Carolina.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

736.    The Seaside Pediatrics Defendants had medical and/or non-medical staff who are its agents, servants, and employees, and all acts or omissions complained of herein, performed by said agents, servants, and employees occurred during the course and scope of such agency and/or employment and are therefore imputed to the Seaside Pediatrics Defendants.

737.    The negligent, grossly negligent, reckless, willful or wanton acts, omissions, and liability of Defendants includes that of their agents, principals, employees, and/or servants, both directly and vicariously, pursuant to principals of non-delegable duty, corporate liability, apparent authority, agency, ostensible agency, and/or *respondeat superior*.

738.    The Seaside Pediatrics Defendants had an obligation and duty to provide a continuum of care to A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

739.    The Seaside Pediatrics Defendants had an obligation and duty to protect A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

740.    It was obvious from medical, educational, and case management documentation to the Seaside Pediatrics Defendants that A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. were not gaining weight and not growing in a normal fashion.

741.    There is no documentation for any attempts by the Seaside Pediatrics Defendants to determine the cause of this troubling situation.

742.    The Seaside Pediatrics Defendants were in the best position to be able to prevent or mitigate the abuse and starvation foisted on children.

743.    The Seaside Pediatrics Defendants knew by seeing ALL of these children that obvious abuse and neglect was ongoing, yet they did not do anything to protect these children.

744.    South Carolina has mandatory reporting laws.

745.    Specifically, S.C. Code Ann. §63-7-310 provides, in pertinent part:

(A) A physician…shall report in accordance with this section when in the person's professional capacity, the person has received information which gives the person reason to believe that a child's physical and mental health or welfare has been or may be adversely affected by abuse or neglect.

…

(D) Reports of child abuse or neglect may be made orally by telephone or otherwise to the county department of social services or to a law enforcement agency in the county where the child resides or is found.

746.    These reporting laws require someone who learns of emotional abuse, sexual abuse, physical abuse, or acts perpetrated on a minor that puts them in danger or potential danger, to report this act or persons committing the acts to the proper authorities.

747.    This mandatory reporting does not include a private right of action for negligence per se as enunciated in *Doe v. Marion*, 645 S.E.2d 245, 373 S.C. 390 (2007).

748.    Though there is no private right of action under thew mandatory reporting statute, failure to report abuse, torture and neglect is an industry standard subject to the common law of negligence.

749.    Failure to protect a child with obvious signs of abuse and/or neglect is also reckless and grossly negligent and not subject to caps.

750.    Even if someone were to suggest that the Seaside Pediatrics Defendants were not subject to mandatory reporting, their failure to protect A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. was a breach of medical and non-medical standards of care.

751.    The Seaside Pediatrics Defendants failed to take reasonable steps and/or failed to implement reasonable safeguards to protect A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

752.    Furthermore, at no point during the periods of time alleged, did Defendants have in place an adequate system or procedures to supervise and/or monitor employees, representatives, or agents to ensure they protected at-risk children.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

753.    Having been in the Seaside Pediatrics Defendants care, which should have provided A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. normal opportunities for protection, the Seaside Pediatrics Defendants owed a duty to inform someone or take whatever steps were necessary to protect A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. from further starvation, torture and/or abuse.

754.    The Seaside Pediatrics Defendants' knowing acquiescence and silence with respect to the known, or reasonably knowable, activities of child abusers, constituted a course of conduct through which acts of abuse and neglect were condoned, approved, and effectively authorized.

755.    Through their failure to timely respond to and attempt to stop or mitigate the acts referenced herein, and for all of the other reasons set forth in this Complaint including, without limitation, their failure to take the steps necessary to prevent the occurrence of such reprehensible acts, the Seaside Pediatrics Defendants ratified said actions.

756.    But for the Seaside Pediatrics Defendants' actions and failures to act, A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. would not have sustained injuries and damages.

757.    Affidavits from qualified medical professionals specifying at least one breach of the standard of care on behalf of each Seaside Pediatrics Defendants are attached hereto as Exhibit B.

**Twentieth Cause of Action**
**Medical and Professional Negligence**
**(Seaside Pediatrics of Bluffton, P.C. and Maureen Berrigan, M.D.)**

758.    Plaintiffs incorporate paragraphs 1-757 as if incorporated herein verbatim.

759.    At all times relevant to the allegations contained herein, Seaside Pediatrics of Bluffton, P.C. and Maureen Berrigan, M.D., and their employees and/or agents, owed duties to A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S., and in general to all minors receiving care in their facilities and/or by their employees and/or agents.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

760.     Seaside Pediatrics of Bluffton, P.C. and Maureen Berrigan, M.D. undertook the duty to render medical care and/or professional family services care to A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. in accordance with the prevailing professional standards of care in the national community.

761.     Notwithstanding said undertakings, and while A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. were under the care of Seaside Pediatrics of Bluffton, P.C. and Maureen Berrigan, M.D. and/or their nurses, counselors, agents, and/or employees, etc., said Defendants and/or their nurses, counselors, agents, and/or employees, etc. departed from prevailing and acceptable professional standards of care and treatment and were thereby negligent, grossly negligent, reckless and in violation of the duties owed to A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. and are liable for one or more of the following acts of omission or commission, any or all of which are departures from the prevailing and acceptable professional standards of care:

    a.   In failing to properly recognize and/or timely respond to, treat, and/or properly monitor A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.;

    b.   In failing to properly communicate the decompensation of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. to appropriate persons or entities;

    c.   In failing to stop or mitigate the abuse, torture and harm to the children;

    d.   In failing to properly notify law enforcement or any other state agency about the abuse, torture and harm to A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.;

    e.   In failing to obtain appropriate consults from specialists able to properly diagnose and treat A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.;

    f.   In failing to document issues related to the patient continuing failure to gain weight and/or grow;

    g.   In failing to recognize torture and abuse on sibling of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. to help prevent further and abuse to the minor;

    h.   In failing to recognize signs and symptoms consistent with failing to thrive;

    i.   In failing to properly train and educate employees and/or agents, or if properly trained and educated, their failure to act appropriately under the circumstances;

    j.   In Defendant's employees failure to exercise independent judgment and skill and act to the protect A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. and her siblings;

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

k. In failing to have proper policies and procedures in place, or if they did have policies and procedures applicable, the failure of Defendants to follow such policies and procedures;

l. In such other particulars as may be ascertained through discovery undertaken pursuant to the South Carolina Rules of Civil Procedure.

762.    As a direct and proximate result of the negligence, gross negligence, recklessness, and willful and wanton departure from proper medical care by Seaside Pediatrics of Bluffton, P.C. and Maureen Berrigan, M.D., agents, and/or employees as noted above, A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. suffered from severe and debilitating injuries which resulted terrible injuries and harm.

763.    Plaintiffs seeks damages, punitive damages, and costs.

### Twenty-First Cause of Action
### General Negligence
### (Seaside Pediatrics of Bluffton, P.C. and Maureen Berrigan, M.D.)

764.    Plaintiffs incorporate paragraphs 1-763 as if incorporated herein verbatim.

765.    Upon information and belief, Seaside Pediatrics of Bluffton, P.C. and Maureen Berrigan, M.D. have the right or power to direct and control the manner in which its employees and/or agents provide care and operate the business of delivering routine, administrative, ministerial and/or non-medical care.

766.    Upon information and belief, Seaside Pediatrics of Bluffton, P.C. and Maureen Berrigan, M.D. have a non-delegable duty to provide physicians, counselors, nurses and other staff adequately trained and able to provide routine, administrative, ministerial and/or non-medical care to patients.

767.    Seaside Pediatrics of Bluffton, P.C. and Maureen Berrigan, M.D. and their physicians, nurses, agents, and/or employees, undertook the duty to render routine, administrative, ministerial and/or non-medical care to A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

768.     Notwithstanding said undertaking, and while A.M.L., J.J.L., R.D.M., J.J.G., and

S.T.S. were under the care of Seaside Pediatrics of Bluffton, P.C. and Maureen Berrigan, M.D.,

and their nurses, counselors, agents, and/or employees, said Defendants, and their nurses,

counselors, agents and/or employees departed from prevailing and acceptable standards of

routine, administrative, ministerial or non-medical care and treatment and were thereby

negligent, careless, grossly negligent, reckless and in violation of the duties owed to A.M.L.,

J.J.L., R.D.M., J.J.G., and S.T.S. and are therefore liable for one or more of the following acts of

omission or commission:

     a.  In failing to communicate their findings to specific medical personnel that could address the findings;
     b.  In acting or failing to act in a way that would be appropriate to a member of the public;
     c.  In failing to render proper routine care;
     d.  In failing to render proper ministerial care;
     e.  In failing to render proper administrative care in hiring, training, supervising and discipline decisions;
     f.  In failing to create a culture of safety;
     g.  In failing to do a proper analysis of abuse and neglect cases which predated the situation with A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.;
     h.  In failing to render proper non-medical care;
     i.  In failing to staff their respective facilities appropriately;
     j.  In failing to train their employees, nurses, physicians, and/or agents in an appropriate manner;
     k.  In continuing to employ certain employees when Defendants knew or should have known that doing so would result in a patient's harm;
     l.  In such other particulars as may be ascertained through discovery undertaken pursuant to the South Carolina Rules of Civil Procedure.

769.     As a direct and proximate result of the negligence, gross negligence, recklessness,

and willful and wanton departure from proper routine, administrative, ministerial, or non-medical

care by Seaside Pediatrics of Bluffton, P.C. and Maureen Berrigan, M.D., and its agents, and/or

employees as noted above, A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. suffered from severe and

debilitating injuries which resulted in terrible injuries and harm.

770.    Plaintiffs seek damages, punitive damages, and costs.

## I.    Palmetto Pediatrics Defendants.

771.    Plaintiffs incorporate paragraphs 1-770 as if incorporated herein verbatim.

772.    Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe knew that troubling behavior of one child in a home could be indicative of signs of abuse of neglect to all children.

773.    Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe were aware of troubling behaviors of A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.

774.    Palmetto Pediatrics of the Low Country, LLC, and Dr. Lowe provided services to Plaintiffs A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. from 2008 through 2011.

775.    The Palmetto Pediatrics Defendants were singularly responsible for ensuring operations at the pediatric clinic provided safe and competent care to their minor patients, including those who were being, or had been, starved, tortured and abused like A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.

776.    At all relevant times, the Palmetto Pediatrics Defendants held themselves out as a modern competent medical facility that included trained and skilled physicians.

777.    The Palmetto Pediatrics Defendants had the right or power to direct and control the way its employees and/or agents provide care and operate the business of delivering medical and non-medical care for a fee through its facilities.

778.    The Palmetto Pediatrics Defendants should have noticed that the children were being starved and abused.

779.    The Palmetto Pediatrics Defendants had the right or power to direct and control the way its employees and/or agents hire, retain, supervise, and train staff under its employment or agency.

780.    The Palmetto Pediatrics Defendants had non-delegable duties to provide staff with adequate knowledge and training to be able to provide necessary and reasonable medical and non-medical care to patients at its facilities in different Counties in the Low Country of South Carolina.

781.    The Palmetto Pediatrics Defendants had medical and/or non-medical staff who are its agents, servants, and employees, and all acts or omissions complained of herein, performed by said agents, servants, and employees occurred during the course and scope of such agency and/or employment and are therefore imputed to the Palmetto Pediatrics Defendants.

782.    The negligent, grossly negligent, reckless, willful or wanton acts, omissions, and liability of Defendants includes that of their agents, principals, employees, and/or servants, both directly and vicariously, pursuant to principals of non-delegable duty, corporate liability, apparent authority, agency, ostensible agency, and/or *respondeat superior*.

783.    The Palmetto Pediatrics Defendants had an obligation and duty to provide a continuum of care to A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.

784.    The Palmetto Pediatrics Defendants had an obligation and duty to protect A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.

785.    It was obvious from medical, educational, and case management documentation to the Palmetto Pediatrics Defendants that A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. were not gaining weight and not growing in a normal fashion.

786.    There is no documentation for any attempts by the Palmetto Pediatrics Defendants to determine the cause of this troubling situation.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

787.    The Palmetto Pediatrics Defendants were in the best position to be able to prevent or mitigate the abuse and starvation foisted on children.

788.    The Palmetto Pediatrics Defendants knew by seeing ALL of these children that obvious abuse and neglect was ongoing, yet they did not do anything to protect these children.

789.    South Carolina has mandatory reporting laws.

790.    Specifically, S.C. Code Ann. §63-7-310 provides, in pertinent part:

(B) A physician…shall report in accordance with this section when in the person's professional capacity, the person has received information which gives the person reason to believe that a child's physical and mental health or welfare has been or may be adversely affected by abuse or neglect.
…

(D) Reports of child abuse or neglect may be made orally by telephone or otherwise to the county department of social services or to a law enforcement agency in the county where the child resides or is found.

791.    These reporting laws require someone who learns of emotional abuse, sexual abuse, physical abuse, or acts perpetrated on a minor that puts them in danger or potential danger, to report this act or persons committing the acts to the proper authorities.

792.    This mandatory reporting does not include a private right of action for negligence per se as enunciated in *Doe v. Marion*, 645 S.E.2d 245, 373 S.C. 390 (2007).

793.    Though there is no private right of action under thew mandatory reporting statute, failure to report abuse, torture and neglect is an industry standard subject to the common law of negligence.

794.    Failure to protect a child with obvious signs of abuse and/or neglect is also reckless and grossly negligent and not subject to caps.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

795.    Even if someone were to suggest that the Palmetto Pediatrics Defendants were not subject to mandatory reporting, their failure to protect A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. was a breach of medical and non-medical standards of care.

796.    The Palmetto Pediatrics Defendants failed to take reasonable steps and/or failed to implement reasonable safeguards to protect A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.

797.    Furthermore, at no point during the periods of time alleged, did Defendants have in place an adequate system or procedures to supervise and/or monitor employees, representatives, or agents to ensure they protected at-risk children.

798.    Having been in the Palmetto Pediatrics Defendants care, which should have provided A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. normal opportunities for protection, the Palmetto Pediatrics Defendants owed a duty to inform someone or take whatever steps were necessary to protect A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. from further starvation, torture and/or abuse.

799.    The Palmetto Pediatrics Defendants' knowing acquiescence and silence with respect to the known, or reasonably knowable, activities of child abusers, constituted a course of conduct through which acts of abuse and neglect were condoned, approved, and effectively authorized.

800.    Through their failure to timely respond to and attempt to stop or mitigate the acts referenced herein, and for all of the other reasons set forth in this Complaint including, without limitation, their failure to take the steps necessary to prevent the occurrence of such reprehensible acts, the Palmetto Pediatrics Defendants ratified said actions.

801.    But for the Palmetto Pediatrics Defendants' actions and failures to act, A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. would not have sustained injuries and damages.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

802.    Affidavits from qualified medical professionals specifying at least one breach of the standard of care on behalf of each Palmetto Pediatrics Defendants are attached hereto as Exhibit C.

### Twenty-Second Cause of Action
**Medical and Professional Negligence**
**(Palmetto Pediatrics of the Low Country, L.L.C. and Lance Lowe, M.D.)**

803.    Plaintiffs incorporate paragraphs 1-802 as if incorporated herein verbatim.

804.    At all times relevant to the allegations contained herein, Palmetto Pediatrics of the Low Country, L.L.C. and Lance Lowe, M.D., and their employees and/or agents, owed duties to A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S., and in general to all minors receiving care in their facilities and/or by their employees and/or agents.

805.    Palmetto Pediatrics of the Low Country, L.L.C. and Lance Lowe, M.D., undertook the duty to render medical care and/or professional family services care to A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. in accordance with the prevailing professional standards of care in the national community.

806.    Notwithstanding said undertakings, and while A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. were under the care of Palmetto Pediatrics of the Low Country, L.L.C. and Lance Lowe, M.D. and/or their nurses, counselors, agents, and/or employees, etc., said Defendants and/or their nurses, counselors, agents, and/or employees, etc. departed from prevailing and acceptable professional standards of care and treatment and were thereby negligent, grossly negligent, reckless and in violation of the duties owed to A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. and are liable for one or more of the following acts of omission or commission, any or all of which are departures from the prevailing and acceptable professional standards of care:

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

a. In failing to properly recognize and/or timely respond to, treat, and/or properly monitor A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.;

b. In failing to properly communicate the decompensation of A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. to appropriate persons or entities;

c. In failing to stop or mitigate the abuse, torture and harm to the children;

d. In failing to properly notify law enforcement or any other state agency about the abuse, torture and harm to A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.;

e. In failing to obtain appropriate consults from specialists able to properly diagnose and treat A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.;

f. In failing to document issues related to the patient continuing failure to gain weight and/or grow;

g. In failing to recognize torture and abuse on sibling of A.M.L., J.J.L., R.D.M., E.R.L., J.J.G., and S.T.S. to help prevent further and abuse to the minor;

h. In failing to recognize signs and symptoms consistent with failing to thrive;

i. In failing to properly train and educate employees and/or agents, or if properly trained and educated, their failure to act appropriately under the circumstances;

j. In Defendant's employees failure to exercise independent judgment and skill and act to the protect A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. and her siblings;

k. In failing to have proper policies and procedures in place, or if they did have policies and procedures applicable, the failure of Defendants to follow such policies and procedures;

l. In such other particulars as may be ascertained through discovery undertaken pursuant to the South Carolina Rules of Civil Procedure.

807.    As a direct and proximate result of the negligence, gross negligence, recklessness, and willful and wanton departure from proper medical care by Palmetto Pediatrics of the Low Country, L.L.C. and Lance Lowe, M.D., agents, and/or employees as noted above, A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. suffered from severe and debilitating injuries which resulted terrible injuries and harm.

808.    Plaintiffs seek damages, punitive damages, and costs.

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

### Twenty-Third Cause of Action
### General Negligence
### (Palmetto Pediatrics of the Low Country, L.L.C. and Lance Lowe, M.D.)

809.    Plaintiffs incorporate paragraphs 1-808 as if incorporated herein verbatim.

810.    Upon information and belief, Palmetto Pediatrics of the Low Country, L.L.C. and Lance Lowe, M.D. have the right or power to direct and control the manner in which its employees and/or agents provide care and operate the business of delivering routine, administrative, ministerial and/or non-medical care.

811.    Upon information and belief, Palmetto Pediatrics of the Low Country, L.L.C. and Lance Lowe, M.D. have a non-delegable duty to provide physicians, counselors, nurses and other staff adequately trained and able to provide routine, administrative, ministerial and/or non-medical care to patients.

812.    Palmetto Pediatrics of the Low Country, L.L.C. and Lance Lowe, M.D. and their physicians, nurses, agents, and/or employees, undertook the duty to render routine, administrative, ministerial and/or non-medical care to A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.

813.    Notwithstanding said undertaking, and while A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. were under the care of Palmetto Pediatrics of the Low Country, L.L.C. and Lance Lowe, M.D., and their nurses, counselors, agents, and/or employees, said Defendants, and their nurses, counselors, agents and/or employees departed from prevailing and acceptable standards of routine, administrative, ministerial or non-medical care and treatment and were thereby negligent, careless, grossly negligent, reckless and in violation of the duties owed to A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. and are therefore liable for one or more of the following acts of omission or commission:

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

    a.   In failing to communicate their findings to specific medical personnel that could address the findings;

    b.   In acting or failing to act in a way that would be appropriate to a member of the public;

    c.   In failing to render proper routine care;

    d.   In failing to render proper ministerial care;

    e.   In failing to render proper administrative care in hiring, training, supervising and discipline decisions;

    f.   In failing to create a culture of safety;

    g.   In failing to do a proper analysis of abuse and neglect cases which predated the situation with A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S.;

    h.   In failing to render proper non-medical care;

    i.   In failing to staff their respective facilities appropriately;

    j.   In failing to train their employees, nurses, physicians, and/or agents in an appropriate manner;

    k.   In continuing to employ certain employees when Defendants knew or should have known that doing so would result in a patient's harm;

    l.   In such other particulars as may be ascertained through discovery undertaken pursuant to the South Carolina Rules of Civil Procedure.

814.    As a direct and proximate result of the negligence, gross negligence, recklessness, and willful and wanton departure from proper routine, administrative, ministerial, or non-medical care by Palmetto Pediatrics of the Low Country, L.L.C. and Lance Lowe, M.D., and its agents, and/or employees as noted above, A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. suffered from severe and debilitating injuries which resulted in terrible injuries and harm.

815.    Plaintiffs seek damages, punitive damages, and costs.

**J.  All Defendants.**

**Twenty-Fourth Cause of Action**
**Necessaries Claim**
**(All Defendants)**

816.    Plaintiffs incorporate paragraphs 1-815 as if incorporated herein verbatim

817.    John Doe and Jane Snow hereby incorporate by reference and reallege every allegation above as if fully set forth herein verbatim.

818.    John Doe and Jane Snow will be responsible for reimbursing Medicaid for all necessities that have been paid for through the Children's health insurance. In addition, J.J.G. and S.T.S., who are over the age of eighteen (18), seek to recover past expenses for necessities in order to reimburse Medicaid.

819.    John Doe is responsible for A.M.L.'s, J.J.L.'s, and E.R.L.'s medical bills, medical care, and overall care until they turn eighteen (18). Since A.M.L., J.J.L., and E.R.L. are under a disability, John Doe will be required to provide this care for an undetermined length of time after Minor Child reaches the age of eighteen (18).

820.    Jane Snow is responsible for R.D.M.'s medical bills, medical care, and overall care until he turns eighteen (18).

821.    John Doe and Jane Snow will suffer economic damages, including but not limited to, the provision of medical care, life care expense, psychiatric expenses, lost wages, counseling services, and special programs for abused children due to the actions and/or inactions of Defendants as delineated in all paragraphs above.

822.    As a direct and proximate result of the multiple acts and/or omissions as herein alleged on the part of Defendants in all paragraphs above, the Minor Child has suffered the following damages, including, but not limited to:

      a. Substantial medical expenses that are reasonably certain to occur for the remainder of her life;
      b. Substantial life care expenses that are reasonably certain to occur for the remainder of her life;
      c. Substantial loss of earnings and impairment of earning capacity that are reasonably certain to occur for the remainder of her life;
      d. Disability that is likely to occur for the remainder of her life, including the necessity of psychiatric care;

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

e.  Substantial injury to her psyche and emotional state; and,

f.  Substantial loss of enjoyment of life.

823.    As a direct and proximate result of the multiple acts and/or omissions as herein alleged on the part of Defendants in all paragraphs above, John Doe and Jane Snow will suffer the following damages, including, but not limited to:

a.  Substantial medical expenses for his daughter that are reasonably certain to occur before he reaches the age of 18;

b.  Substantial life care expenses for his daughter son that are reasonably certain to occur before the age of 18;

c.  Care related to his daughter's disability that is likely to occur before the age of 18, including the necessity of psychiatric care;

d.  Provision of extraordinary medical care for his daughter;

e.  Expenditure of economic resources to provide for his daughter before the age of 18, including, but not limited to, special education, assistance, or appropriate therapies such as art therapy, equine therapy, or any other type of treatment which may alleviate some of the Minor Child's suffering due to Defendants' actions and/or inactions

f.  Substantial injury to their psyche and emotional state;

g.  Loss of society, companionship, and consortium with their son; and,

h.  Lost wages from having to take time off to manage their son, the investigation, and doctors' visits, among other things.

824.    John Doe, Jane Snow, J.J.G., and S.T.S. should be awarded any and all damages flowing from any necessaries claim or any other damages they may suffer because of Defendants' (and their employees') multiple actions and/or inactions.

825.    All damages should be in an amount determined by a jury at trial.

WHEREFORE, Plaintiffs requests the Court enter judgment in her favor for:

A.  Damages and special damages in the appropriate amount;

B.  Punitive damages as are appropriate and when allowed by statute or the common law;

C.  Necessities;

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208

D.  Attorneys' fees, costs, expenses, and disbursements of this action when allowed by

statute or the common law;

E.  Interest; and

F.  Such other and further relief as is just and proper.

Respectfully Submitted,

s//Reobert J. Butcher
Robert J. Butcher
Federal Bar No. 9767
Deborah J. Butcher
Federal Bar No. 10731
The Foster Care Abuse Law Firm, PA
507 Walnut Street
Camden, South Carolina 29020
P.O. Box 610
Camden, South Carolina 29021
Telephone: (803) 432-7599
Facsimile: (803) 432-7499
Email: rbutcher@camdensc-law.com
Email: dbutcher@camdensc-law.com

Camden, South Carolina
May 8, 2022

ELECTRONICALLY FILED - 2022 May 09 11:42 PM - JASPER - COMMON PLEAS - CASE#2022CP2700208