# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| A.M.L., J.J.L., E.R.L., by and through their Next of Friend, John Doe, R.D.M., by and through his Next of Friend, Jane Snow, J.J.G., and S.T.S., <br><br>                     Plaintiffs, <br><br> v. <br><br> South Carolina Department of Social Services, SCDSS Case Worker #1, SCDSS Case Worker #2, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #1, SCDSS Case Worker Supervisor #2, Magnelia Washington Cottrell, Charles Brown, Franklin County Children Services, FCCS Case Worker #1, FCCS Case Worker #2, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #1, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes, <br><br>                     Defendants. | C/A 9:22-CV-01874 <br> (Consolidated with 9:21-cv-00479-RMG) <br><br> **FOURTH AMENDED COMPLAINT** <br> (***Jury Trial Demanded***) |

The Plaintiffs, complaining of the Defendants, would respectfully amend their Third Amended Complaint and show this Court the following:

## I.       The Parties.

### A.  Plaintiffs.

1.       Plaintiff **A.M.L.** was born in Ohio in 2004. A.M.L. is currently a citizen and resident of the County of Dorchester in the State of South Carolina.

2.       Plaintiff **J.J.L.** was born in Ohio in 2005. J.J.L. is currently a citizen and resident of the County of Dorchester in the State of South Carolina.

3.      Plaintiff **E.R.L.** was born in Ohio in 2011. E.R.L. is currently a citizen and resident of the County of Dorchester in the State of South Carolina.

4.      As J.J.L. and E.R.L. are minor children, this action is brought on their behalf by their next of Friend, **John Doe**. John Doe is the adoptive father of A.M.L., J.J.L., and E.R.L. and a citizen and resident of the County of Dorchester in the State of South Carolina.

5.      Plaintiff **R.D.M.** was born in Ohio in 2006. R.D.M. is currently a citizen and resident of the County of Charleston in the State of South Carolina.

6.      As R.D.M. is a minor child, this action is brought on his behalf by his next of Friend, **Jane Snow**. Jane Snow is the adoptive mother of R.D.M. and a citizen and resident of the County of Charleston in the State of South Carolina.

7.      Plaintiff **J.J.G.** was born in Ohio in 2003. J.J.G. is currently a citizen and resident of the County of Berkeley in the State of South Carolina.

8.      Plaintiff **S.T.S.** was born in South Carolina in 2003. S.T.S. is currently a citizen and resident of the County of Beaufort in the State of South Carolina.

9.      Plaintiffs A.M.L., J.J.G. and S.T.S. proceed under pseudonyms to protect the anonymity of their three other minor siblings. In addition, the family of their abusers have threatened to harm some of the Plaintiffs.

**B. South Carolina Department of Social Services Defendants.**

10.     **Defendant South Carolina Department of Social Services (SCDSS)** is an agency of the State of South Carolina created by the General Assembly of the State of South Carolina. SCDSS is responsible for ensuring that the children in its custody are safe and are receiving adequate care and treatment in accordance with applicable legal standards. S.C. Code Ann. § 43-1-10 (1993); S.C. Code Ann. § 63-7-10(A)(5). It is also responsible for investigating allegations of child abuse and neglect in South Carolina.

11.     Defendants **SCDSS Case Worker #1, SCDSS Case Worker #2, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #1**, and **SCDSS Case Worker Supervisor #2,** are unknown employees of the South Carolina Department of Social Services. It is believed they are citizens and residents of the Counties of Jasper or Beaufort in the State of South Carolina.

12.     Defendant **Magnelia Washington Cottrell** is a citizen and resident of the County of Beaufort in the State of South Carolina. From March 11, 2010, through June 6, 2010, she was employed by the South Carolina Department of Social Services. Magnelia Washington Cottrell is sued in her individual capacity.

13.     Defendant **Charles Brown** is a is a citizen and resident of the County of Beaufort in the State of South Carolina. From March 11, 2010, through June 6, 2010, she was employed by the South Carolina Department of Social Services. Charles Brown is sued in his individual capacity.

### C.  Franklin County Children Services Defendants.

14.     Defendant **Franklin County Children Services** (FCCS) is a "public children services agency" and has assumed the powers and duties of the children services function for Franklin County, Ohio. Ohio Rev. Code §§5153.01 & 5153.02. *See also*, Ohio Rev. Code § 307.981. In 2015 FCCS had 4,225 children in its custody, among them, A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G.[1] FCCS is sued pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) and in tort.

15.     Defendants **FCCS Case Worker #1, FCCS Case Worker #2, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #1, FCCS Case Worker Supervisor #2** are unknown employees of Defendant FCCS. It is believed they are citizens and residents of the County of Franklin in the State of Ohio.

---

[1] FCA Bates No, 011193, 004737, 007729, 008230.

**D. Adoption Advocacy Defendants.**

16.     **Adoption Advocacy, Inc.** is a private adoption agency registered with the Secretary of State for the State of South Carolina as a nonprofit corporation. The corporation's registered agent is June S. Bond, and her address is 1712 Waterway Court, Spartanburg, South Carolina 29301. Adoption Advocacy, Inc. is located in the County of Spartanburg, State of South Carolina.

17.     **June Bond** is an employee of Adoption Advocacy, Inc., a citizen and resident of the County of Spartanburg in the State of South Carolina, and was responsible for the investigation, placement, and monitoring of the placement, supervision, and safety of A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G.

18.     **Joseph Haynes** is an employee of Adoption Advocacy, Inc., a citizen and resident of the County of Spartanburg in the State of South Carolina, and was responsible for the investigation, placement, and monitoring of the placement, supervision, and safety of A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G.

## II.     Jurisdiction and Venue.

19.     Plaintiffs incorporate paragraphs 1-18 as if restated herein verbatim.

20.     This Court has subject matter jurisdiction over this action pursuant to 42 U.S.C. §1983, *Martinez v. California*, 444 U.S. 277 (1980), 18 U.S.C. §1964(c), *Tafflin v. Levitt*, 493 U.S. 455 (1990), S.C. Code Ann. § 15-78-100(b), and S.C. Code Ann. §36-2-803 and has personal jurisdiction over the parties.

21.     Venue lies in County of Beaufort, State of South Carolina pursuant to S.C. Code Ann. §§ 15-7-30 and 15-78-100(b).

## III.     Child Services Agencies.

22.  Plaintiffs incorporate paragraphs 1-21 as if restated herein verbatim.

23. Child welfare agencies are "responsible for ensuring that children who have been found to be victims of abuse or neglect are protected from further harm. Whether the child is placed in out-of-home care or maintained in the home, the child welfare agency's first concern must be to ensure the safety of the child." U.S. Department of Health and Human Services Administration of Children and Families, Children's Bureau, *Child Welfare Outcomes Report 2016 Report to Congress*, *16.

24. A "foster home" means a private residence in which children are received apart from their parents, guardian, or legal custodian, by an individual reimbursed for providing the children nonsecure care, supervision, or training twenty-four hours a day. "Foster home" does not include care provided for a child in the home of a person other than the child's parent, guardian, or legal custodian while the parent, guardian, or legal custodian is temporarily away. Family foster homes and specialized foster homes are types of foster homes. Ohio Rev. Code §5103.02(D).

**A. Franklin County Children Services.**

25. Franklin County Children Services is a "public children services agency" and has assumed the powers and duties of the children services function for Franklin County, Ohio. Ohio Rev. Code §§5153.01 & 5153.02. *See also*, Ohio Rev. Code § 307.981. A.M.L., E.R.L., J.J.L., R.D.M., and J.J.G. were foster children in the custody of FCCS and placed in foster care, congregate care, residential treatment facilities, and kinship care. Ohio law limits children services "…with respect to the care of children, needing or likely to need public care or services, shall be vested in a single agency of county government…" Ohio Rev. Code §5153.16.

26. The provision of foster care and adoption services is highly regulated in the state of Ohio by each public children services agency and the Ohio Department of Job and Family Services. See Title 51, Chapters 5101, 5103, 5153; Title 21, Chapter 2151; Title 31, Chapter 3107 of the Ohio Revised Code and Title 5101:2, Chapters 5101-2-1, 5101-2-7, 5101-2-9, 5101-2-13, 5101-2-14, 5101-2-34, 5101-2-36 through 5101-2-40, 5101-2-42, 5101-2-44, 5101-2-47 through 5101-2-49,

5101-2-51, 5101-2-52, 5101-2-57. The placement of children outside the state of Ohio is also highly regulated and requires assessment, investigation, and monitoring of the child and the out-of-state home. See Title 51, Chapter 5103, Sections 5103.20 through 5103.28.

27.     Standardized policies and procedures are promulgated by the Ohio Department of Job and Family Services and adopted by each county public children services agency, to include FCCS. *See* https://emanuals.jfs.ohio.gov/FamChild/, last accessed May 3, 2021.

28.     FCCS "…provides case management, protective and supportive services, as well as purchased services from community agencies within a case plan agreed to by the family and Children Services casework staff."[2]

29.     As A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G. were wards of the state of Ohio, foster children in custody of FCCS, and their parents' rights were terminated, the Agency was required to protect the health and safety of these children while in the Agency's care.

30.     FCCS retained a non-delegable constitutional duty to ensure that children in the Agency's custody were safe and receiving adequate care. *Meador v. Cabinet for Human Resources*, 902 F.2d 474, 476 (6th Cir. 1990) (We hold that due process extends the right to be free from the infliction of unnecessary harm to children in state-regulated foster homes.). *See also*, *Doe ex rel. Johnson v. S.C. Dep't of Soc. Svcs.*, 597 F.3d 163, 175 (4th Cir. 2010).

31.     FCCS is a signatory and administrator for the Interstate Compact on the Placement of Children (ICPC). Ohio Rev. Code §§ 5103.20 through 2103.237; Ohio Admin. Code §§5101:2-52-02 through 5101:2-52-10.

32.     As a signatory of the ICPC, FCCS retained jurisdiction over A.M.L., J.J.L., E.R.L., R.D.M., and J.J.G. from the time they were placed in South Carolina until the day they were adopted. S.C. Code Ann. §63-9-2200(5)(a); Ohio Rev. Code §5103.20(IV).

---

[2] FCA Bates No. 011193.

**B. South Carolina Department of Social Services.**

33.     All intervention by the State has as its primary goal the welfare and safety of the child. S.C. Code Ann. § 63-7-10(A)(5).

34.     The South Carolina Children's Code aims to establish an effective system of protection of children from injury and harm while living in public and private residential agencies and institutions meant to serve them. S.C. Code Ann. § 63-7-10(B)(5).

35.     When children must be placed in care away from their homes, the State shall insure that they are protected against any harmful effects resulting from the temporary or permanent inability of parents to provide care and protection for their children. S.C. Code Ann. § 63-7-20(D).

36.     SCDSS administers the provisions of S.C. Code Ann. §63-11-10, *et seq*., and regulations regarding private agencies, such as Adoption Advocacy, Inc. SCDSS also regulates, licenses, and monitors Child Placing Agencies, such as Adoption Advocacy, Inc., and certified adoption investigators. S.C. Code of Regs. §114-4910, et seq., S.C. Code Reg. §114-4370.

37.     The provision of foster care and adoption services is highly regulated in the state of South Carolina by SCDSS. *See* Title 63, Chapters 1, 7, 9, 11 of the South Carolina Code of Laws and Chapter 114, Articles 1, 5, 43, and 49 of the South Carolina Regulations.

38.     SCDSS is part of the ICPC. S.C. Code Ann. §§63-9-2000 through 63-9-2290.

**C. Adoption Advocacy, Inc.**

39.     Adoption Advocacy, Inc. is a "child placing agency" as it "facilitates the placement of children for the purpose of adoption" and it is an "…entity who offers services for compensation where the intent of those services is to arrange or secure adoptions…" S.C. Code Ann. §63-9-30; S.C. Code Reg. §114-4910. As a "child placing agency", Adoption Advocacy, Inc. is subject to regulations, licensure scheme, and monitoring by SCDSS. S.C. Code of Regs. §114-4910, et seq.

40.     When a ward of the State is placed in a foster home pending adoption, Adoption Advocacy, Inc. assumes the constitutional duties and responsibility for the safety and well-being of

the minor child. Adoption Advocacy, Inc. is required to assess and monitor the home for the safety

and well-being of the minor child in accordance with generally accepted social work standards.

41.    Failure to follow generally accepted social work practices can result in a disruption in

the adoption, or even worse, physical or mental harm to the child and sometimes death.

42.    Adoption Advocacy, Inc.'s employees, June Bond, and Joe Hanyes are "certified

adoption investigators", licensed, regulated, and monitored by SCDSS. S.C. Code Reg. §114-4370.

**D.  Contracts between Franklin County Children Services and Adoption Advocacy, Inc.**

43.    Upon the placement of A.M.L., E.R.L., J.J.L., J.J.G., and R.D.M. into South

Carolina, the following facts relate to each child's status:

a.  A.M.L., E.R.L., J.J.L., J.J.G., and R.D.M. were minor children, incompetents and unable to protect themselves or make their own decisions.
b.  Each child was a permanent ward of the State of Ohio.
c.  As permanent wards of the State of Ohio, each child was a foster child.
d.  Ohio received permission from South Carolina to place each child in South Carolina pursuant to the Interstate Compact for the Placement of Children.
e.  Franklin County Children Services contracted with Adoption Advocacy, Inc., to place, assess, and monitor each child's placement in the Mitchell home.
f.  Short of the initial seizure of a foster child or the termination of her parent's rights, there is no more significant or permanent state action than a state's placement of its ward for adoption in a private home.

44.    On March 16, 2010, Defendant Joe Haynes, Director of Adoption Advocacy, Inc.,

signed an "Adoption Services Agreement" with FCCS for the foster care placement and adoption of

A.M.L., J.J.L., R.D.M., and J.J.G. in the Mitchell Home.[3]

45.    On June 26, 2015, Defendant Joe Haynes, Director of Adoption Advocacy, Inc.,

signed an "Adoption Services Agreement" with FCCS for the foster care placement and adoption of

E.R.L. in the Mitchell Home.[4]

---

[3] FCA Bates No. 029645-029650.
[4] FCA Bates No. 029651-029656.

46.     In the agreements, Adoption Advocacy, Inc. was listed as the "Provider" and FCCS was listed as "Children Services".[5]

47.     Under "Purpose" the Adoption Services Agreement states:

Provider shall assist in preparing identified children and prospective adoptive families for adoption. This shall include, but is not limited to, writing pre-adoptive summaries, making Model Approach to Partnership in Parenting (MAPP) classes available for adoptive applicants, implementing Federal Bureau of Identification clearance checks on any prospective adoptive parents who are not Ohio residents, submitting completed family assessments, arranging for linkage of the adoptive child to resources identified by Children Services or Provider that are needed prior to placement, providing child specific training to the adoptive family, providing adoption placement services and supervision to the families, maintaining contact with appropriate Children Services staff, and providing post adoptive services to the child and family as needed.[6]

48.     Adoption Advocacy, Inc., was paid up to $23,500.00 for providing adoption services for A.M.L., J.J.L., R.D.M., and J.J.G, to include $3,000 per child for legalization of the adoption.[7]

Adoption Advocacy was paid $6,750.00 for providing adoption services for E.R.L., to include $5,000 for legalization of the adoption.[8]

49.     Adoption Advocacy, Inc. was required to submit monthly reports to FCCS:

[f]rom the time of placement until legalization of the adoption…to include, but not limited to, a description of services delivered to the child and adoptive family, the number of contacts, who was present during the contacts, topics covered in each contact, a report on the health of the child, and copies of medical, school or counseling, etc. reports, or if no report is available that month, a narrative summary. The report should provide a general summary of the placement, describing concerns and progress.[9]

50.     FCCS required Adoption Advocacy, Inc. to report all critical incidents.[10]

---

[5] FCA Bates No. 029645; 029651.
[6] FCA Bates No. 029645; 029651.
[7] FCA Bates No. 029645-029646.
[8] FCA Bates No. 029652.
[9] FCA Bates No. 029647; 029653.
[10] FCA Bates No. 029647; 029653.

51.     Adoption Advocacy, Inc.'s employees, June Bond and Joe Haynes, owed a professional duty, legal duty, and constitutional duty to A.M.L., E.R.L., J.J.L., R.D.M., and J.J.G. to place them in a safe foster care placement, free from abuse, neglect, and starvation.

52.     Adoption Advocacy, Inc.'s employees, June Bond and Joe Haynes, owed a professional duty, legal duty, and constitutional duty to provide A.M.L., E.R.L., J.J.L., R.D.M., and J.J.G. with medical care and mental health care when they learned they were abused by the Mitchells.

53.     The Courts hold that when a private agency steps into the shoes of the state in performing acts that implicate substantive due process protections, they become state actors. In *E.R.L. v. Adoption Advocacy*, 2023 U.S. App. LEXIS 3485, 2023 WL 1990300 (4th Cir. 2023), the Fourth Circuit ruled that, "in certain circumstances, a private party that assumes a state's affirmative constitutional obligations may act under color of law for purposes of 42 U.S.C. § 1983. *Id.*, at 1-2 (Citing *West v. Atkins*, 487 U.S. 42, 56, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)). *See also*, *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 200 fn. 8 (1980) ("Of course, the protections of the Due Process Clause, both substantive and procedural, *may be triggered when the State, by the affirmative acts of its agents, subjects an involuntarily confined individual to deprivations of liberty which are not among those generally authorized by his confinement* (Emphasis added)).

### IV.     General allegations applicable to all claims.

54.     Plaintiffs incorporate paragraphs 1-53 as if restated herein verbatim.

55.     Sometime in the late 1990s, Yulanda Mitchell "broke a child's arm while potty training" the child.[11]

---

[11] FCA Bates No. 028710.

56.     A.M.L., J.J.G., J.J.L., and R.D.M. share a biological mother. Although they have no biological link to E.R.L., they, along with S.T.S., are siblings, as the children lived in the same adoptive home, were raised as siblings, and suffered together the worst abuses imaginable. In the aftermath of their ordeal, they are now spread among four adopted families across the low country.

57.     Around July 2003, S.T.S. was placed in the Mitchell home.

58.     A.M.L. and J.J.G. were taken into the custody of the State of Ohio in May 2005.[12]

59.     In June 2005, J.J.L. was born and upon her discharge from the hospital, she was placed in the custody of the State of Ohio.[13] R.D.M. was born in August 2006 and he was placed in foster care with J.J.L after release from the hospital.[14]

60.     Sometime before 2005, an adoptive placement for another child was disrupted after Yulanda Mitchell physically abused the child. The Beaufort County Family Court made a finding of abuse and neglect and placed Yulanda Mitchell's name on the SCDSS's Registry of Abuse and Neglect for physically abusing a foster child that was placed in her home.

61.     On June 11, 2005, Beaufort County Sheriff's Office responded to a complaint of child abuse perpetrated by Yulanda Mitchell. The complaint was forwarded by Corporal K. Denham of the Beaufort County Sheriff's Office to Caseworker Lee at Beaufort County SCDSS.[15]

62.     SCDSS failed to remove S.T.S. from the Mitchell home even though the Mitchells did not have custody of S.T.S. and SCDSS and the Family Court had determined Yulanda Mitchell had physically abused another foster child.

63.     S.T.S. would be starved and beaten by the Mitchells until 2016 and this abuse was documented in his medical, school, and therapeutic records.

---

[12] FCA Bates No. 004786, 004737, 007729.
[13] FCA Bates No. 004369, 004646-004647, 004659-004661, 004369.
[14] FCA Bates No. 000015, 008231.
[15] FCA Bates No. 028709-028710.

64.    On January 26, 2009, A.M.L., J.J.L., J.J.G., and R.D.M. were placed in the permanent custody of the State of Ohio.[16] The Ohio Family Court placed the children in the permanent custody of FCCS.[17]

65.    Herbert and Yulanda Mitchell adopted S.T.S. on September 18, 2009.[18]

66.    On January 25, 2010, A.M.L. weighed 45.63 lbs.[19] On October 26, 2009, J.J.L. was 39 and ¼ inches tall and weighed 36.4 lbs.[20] and R.D.M. was 37 inches tall and weighed 35.7 lbs.[21] On December 18, 2009, J.J.G. weighed 49 lbs. 4. oz.[22]

67.    On March 11, 2010, FCCS placed A.M.L., J.J.L., J.J.G., and R.D.M., in Bluffton, South Carolina through the ICPC with SCDSS.[23] SCDSS, Magnelia Washington Cotttrell, Charles Brown, SCDSS Case Worker #1, SCDSS Case Worker #2, and SCDSS Case Worker Supervisor #1 conducted the placement, assessment, and monitoring of the children in the home on behalf of SCDSS. Adoption Advocacy, Inc., June Bond, and Joe Haynes contracted with FCCS to conduct the placement, assessment, and monitoring of the children in the home. FCCS, FCCS Case Worker #1, FCCS Case Worker #2, and FCCS Case Worker Supervisor #1 were responsible for approving and monitoring the placement of A.M.L., J.J.L., J.J.G., and R.D.M.

68.    The children were placed in the home of Yulanda Mitchell and Herbert Bernard Mitchell, Sr. at 86 Pine Forest Drive, Bluffton, South Carolina. Yulanda Mitchell and Herbert Mitchell lived in the three-bedroom home of 1,639 square feet. Their two adult sons lived in the home along with S.T.S.[24] The home lacked the necessary space for five children and four adults.

---

[16] FCA Bates No. 000015, 008145.
[17] FCA Bates No. 000016.
[18] FCA Bates No. 008145-008146.
[19] FCA Bates No. 004893, 004897.
[20] FCA Bates No. 004483-004484, 004487.
[21] FCA Bates No. 008677, 008684.
[22] FCA Bates No. 008018, 008021.
[23] FCA Bates No. 008145.
[24] FCA Bates No. 011781.

69.     A.M.L., J.J.L., J.J.G., and R.D.M. would be starved and beaten by the Mitchells until 2016 and this abuse was documented in their medical, school, and therapeutic records.

70.     Public records demonstrate that prior to and during the adoption, Yulanda Mitchell and Herbert Bernard Mitchell, Sr. had been sued by several payday loan vendors and their home was in foreclosure during the time the Children were placed in the home for adoption. The Mitchells' financial problems should have made them ineligible for adoption.

71.     The Beaufort County Family Court finding of abuse and neglect and placement of Yulanda Mitchell's name on the SCDSS's Registry of Abuse and Neglect should have disqualified the Mitchells from adoption.

72.     The Defendants knew or should have known Yulanda Mitchell's name was on the SCDSS's Registry of Abuse and Neglect for physically abusing a foster child. The Defendants knew or should have known that placing A.M.L., J.J.L., J.J.G., and R.D.M. in the home endangered the children.

73.     Yulanda Mitchell, Herbert Mitchell, and the Defendants defrauded the Beaufort County Family Court and committed perjury by concealing the fact that Yulanda Mitchell was on SCDSS's Registry of Abuse and Neglect.

74.     When Child Placing Agencies place children in a pre-adoptive home, the Agencies are required to investigate a person's criminal record and abuse history, the family's financial circumstances, the composition of the family, to include all adults and children living in the home and assess the home itself to determine whether it is suitable for all of the children.

75.     On March 23, 2010, A.M.L. was 5 years and 8 months of age, 43 inches tall and weighed 45 lbs., 8 oz.[25] On March 29, 2010, J.J.L. was 4 years and 9 months of age, 42 inches tall,

---

[25] FCA Bates No. 000139.

and weighed 37 lbs.[26] On March 29, 2010, R.D.M. was three years and 7 months of age, 40 inches

tall, and weighed 37 lbs.[27] On March 30, 2010, J.J.G. was 6 years and 10 months of age, 47 inches

tall, and weighed 48 lbs. and 5 oz.[28]

76.     When A.M.L., J.J.L., J.J.G., and R.D.M. were placed in the Mitchell home, FCCS

and the state of Ohio maintained legal custody of the Children until the day they were adopted. S.C.

Code Ann. §63-9-510; S.C. Code Ann. §63-9-2200(5)(a); Ohio Rev. Code §5103.20(IV).

77.     On June 6, 2010, A.M.L., J.J.L., J.J.G., and R.D.M. were adopted by Yulanda

Mitchell and Herbert Mitchell through a decree by the Beaufort County Family Court.

78.     By July 30, 2010, A.M.L. weighed 40 lbs., 8 oz, having lost 5 lbs. since the March

11, 2010, placement.[29] On July 30, 2010, J.J.L. weighed 33 and ½ lbs., having lost 4 lbs. since the

March 2010 placement.[30] By August 5, 2010, R.D.M. weighed 32 lbs. 8 oz, having lost 4 and ½ lbs.[31]

By August 5, 2010, J.J.G. weighed 44 lbs. and 12 oz, having lost 3 and ½ lbs.[32]

79.     From March 11, 2010, until June 6, 2010, A.M.L., J.J.L., J.J.G., and R.D.M. were

beaten and starved by Yulanda Mitchell.

80.     The following height-weight chart tracks A.M.L.'s abuse during the time she was

placed with the Mitchells[33]:

---

[26] FCA Bates No. 001738, 001740, 001787, 001789.
[27] FCA Bates No. 008967.
[28] FCA Bates No. 008036.
[29] FCA Bates No 000136.
[30] FCA Bates No. 001736, 001737, 001785, 001786.
[31] FCA Bates No. 008965.
[32] FCA Bates No. 008034.
[33] FCA Bates No. 000001, 000029, 000032, 000039, 000047-000053, 000062, 000065, 000068, 000072, 000075, 000080-000081, 000084, 000087, 000090, 000093, 000096, 000125-000126, 000128-000130, 000132-000133, 000135-000139, 000183, 000196, 000208, 000246, 000298-000303, 000322, 000398, 000602, 000606, 000613, 000699, 000703, 000705, 000708, 000732, 000736, 000738, 000740, 000742, 000743, 000745, 000746, 000769, 000773, 000775, 000778, 000789, 000796, 000800, 000802, 000805, 000809, 000831, 000835, 000837, 000842, 000844, 000849, 001668, 004720, 004737, 004754, 004779, 004794, 004805, 004828, 004838, 004850, 004854, 004860, 004865, 004873, 004878, 004893, 004987, 004897.

| A.M.L. Growth from January 25, 2010 through June 14, 2017 | | | |
| Key: Yellow – Period in Mitchell Home; Blue: Post-removal | | | |
| Date | Age | Height (Inches) | Weight (Pounds) |
|---|---|---|---|
| 01/25/2010 | 5 yrs. 6 mos. | | 45.63 |
| 03/23/2010 | 5 yrs. 8 mos. | 43" | 45 lbs. 8 oz |
| 05/19/2010 | 5 yrs. 10 mos. | 44" | 45 lbs. 8 oz |
| 07/30/2010 | 6 yrs. 0 mos. | 43.2" | 40 lbs. 8 oz |
| 03/28/2011 | 6 yrs. 8 mos. | 45.9" | 46 lbs. 9 oz |
| 04/21/2011 | 6 yrs. 9 mos. | 45.5" | 44 lbs. 8 oz |
| 08/02/2011 | 7 yrs. 0 mos. | 45.5" | 42 lbs. 8 oz |
| 10/06/2011 | 7 yrs. 2 mos. | 45.5" | 44 lbs. |
| 12/27/2011 | 7 yrs. 5 mos. | 45.5" | 43 lbs |
| 01/25/2012 | 7 yrs. 6 mos. | 45" | 46 lbs. 8 oz |
| 03/30/2012 | 7 yrs. 8 mos. | 45" | 47 lbs. |
| 04/04/2012 | 7 yrs. 8 mos. | 45" | 46.4 lbs. |
| 05/09/2012 | 7 yrs. 10 mos. | 44.75" | 48 lbs. |
| 03/06/2013 | 8 yrs. 7 mos. | 45.5" | 50.6 lbs. |
| 09/25/2013 | 9 yrs. 2 mos. | 46" | 49 lbs. |
| 03/24/2014 | 9 yrs. 8 mos. | 47" | 52 lbs. |
| 07/23/2014 | 10 yrs. 0 mos. | 48" | 52 lbs. |
| 11/24/2014 | 10 yrs. 4 mos. | 48" | 52.2 lbs. |
| 04/17/2015 | 10 yrs. 9 mos. | 49" | 52 lbs. |
| 08/03/2015 | 11 yrs. 0 mos. | 50" | 50 lbs. |
| 01/05/2016 | 11 yrs. 5 mos. | 49.25" | 48 lbs. |
| 06/03/2016 | 11 yrs. 10 mos. | 49.25" | 58 lbs. |
| 08/08/2016 | 12 yrs. 1 mos. | 50" | 56 lbs. |
| 11/08/2016 | 12 yrs. 4 mos. | 51" | 65 lbs. |
| 11/23/2016 | 12 yrs. 4 mos. | 65" | 71 lbs. |
| 01/25/2017 | 12 yrs. 6 mos. | 51.26" | 73 lbs. 6.6 oz |
| 02/22/2017 | 12 yrs. 7 mos. | 51.97" | 78 lbs. 0.7 oz |
| 04/07/2017 | 12 yrs. 9 mos. | 52.64" | 78 lbs. 9.5 oz |
| 06/14/2017 | 12 yrs. 11 mos. | 53.62" | 86 lbs. 3.2 oz |

81.     The following height-weight chart tracks J.J.L.'s abuse during the time she was placed with the Mitchells [34]:

| J.J.L. Growth from January 25, 2010 through June 14, 2017 | | | |
|---|---|---|---|
| Key: Yellow – Period in Mitchell Home; Blue: Post-removal | | | |
| Date | Age | Height (Inches) | Weight (Pounds) |
| 10/26/2009 | 4 yrs. 4 mos. | 39.25" | 36.4 lbs. |
| 03/29/2010 | 4 yrs. 9 mos. | 42" | 37 lbs. |
| 05/19/2010 | 4 yrs. 11 mos. | 42" | 37 lbs. |
| 07/30/2010 | 5 yrs. 1 mos. | 41.1" | 33 lbs. 8 oz |
| 10/27/2010 | 5 yrs. 4 mos. | 42.1" | 39 lbs. 8 oz |
| 06/30/2011 | 6 yrs. 0 mos. | 41.6" | 36.6 lbs. |
| 08/02/2011 | 6 yrs. 1 mos. | 42.3" | 36 lbs. |
| 09/08/2011 | 6 yrs. 2 mos. | 43" | 39 lbs. 8 oz |
| 10/06/2011 | 6 yrs. 3 mos. | 43" | 39 lbs. 8 oz |
| 12/21/2011 | 6 yrs. 6 mos. | 43" | 36 lbs. |
| 03/30/2012 | 6 yrs. 9 mos. | 43.9" | 39 lbs. 8 oz |
| 05/18/2012 | 6 yrs. 11 mos. | 42.75" | 38 lbs. |
| 06/27/2012 | 7 yrs. 0 mos. | 43" | 37 lbs. |
| 03/06/2013 | 7 yrs. 8 mos. | 43" | 38.2 lbs. |
| 09/25/2013 | 8 yrs. 3 mos. | 43" | 39 lbs. |
| 03/24/2014 | 8 yrs. 9 mos. | 44" | 43 lbs. |
| 07/23/2014 | 9 yrs. 1 mos. | 44.5" | 43 lbs. |
| 11/24/2014 | 9 yrs. 5 mos. | 44.5" | 43.2 lbs. |
| 04/17/2015 | 9 yrs. 10 mos. | 45.75" | 43.8 lbs. |
| 08/03/2015 | 10 yrs. 1 mos. | 46" | 41 lbs. |
| 01/05/2016 | 10 yrs. 6 mos. | 46" | 40.5 lbs. |
| 06/03/2016 | 10 yrs. 11 mos. | 46" | 43.6 lbs. |
| 08/01/2016 | 11 yrs. 1 mos. | 46" | 40.6 lbs. |
| 11/01/2016 | 11 yrs. 4 mos. | 46.5" | 48 lbs. |
| 11/23/2016 | 11 yrs. 5 mos. | 46" | 55.5 lbs. |
| 12/01/2016 | 11 yrs. 5 mos. | 46" | 54 lbs. |
| 01/25/2017 | 11 yrs. 7 mos. | 47.24" | 54.9 lbs. |
| 04/07/2017 | 11 yrs. 9 mos. | 48.78" | 58 lbs. 10.3 oz |
| 06/14/2017 | 12 yrs. 0 mos. | 48.7" | 64 lbs. 0.7 oz |

---

[34] FCA Bates No. 000001, 000131, 000298-000303, 001619, 001625, 001627, 001632-001640, 001654, 001656, 001659, 001661, 001664, 001666, 001668, 001670, 001672, 001675, 001677, 001680, 001682, 001685, 001685, 0001687-001688, 001692, 001726, 001728-001731, 001734-001738, 001740, 001775, 001777-001779, 001780, 001783-001787, 001789, 0001977, 002008, 002107, 002126, 002127, 002131, 002158, 002161, 002163, 002165, 002198, 002204, 002206, 002244, 002247, 002286, 002307, 002478, 002481, 002502, 002506, 002509, 002513, 002528, 002533, 002535, 002579, 002583, 002585, 002590, 002610, 002614, 002616, 002618, 001922, 001935, 001936, 002692, 002696, 002699, 002702, 002705, 002721, 002724, 002728, 002732, 002734, 002742, 002776, 004462, 004469, 004473, 004476-004477, 004483-004484, 004487, 004490, 004494, 004500, 004506, 004517, 004526, 004537, 004543, 004572, 004584, 004599, 004608, 004627, 004630, 004636, 004638, 004640-004644, 004646, 004652-004658, 004659, 004690, 004696.

82.    The following height-weight chart tracks R.D.M.'s abuse during the time he was

placed with the Mitchells[35]:

| Date | Age | Height (Inches) | Weight (Pounds) |
|---|---|---|---|
| **R.D.M. Growth from January 25, 2010 through December 11, 2017** | | | |
| **Key: Yellow – Period in Mitchell Home; Blue: Post-removal** | | | |
| 10/26/2009 | 3 yrs. 2 mos. | 37" | 35.7 lbs. |
| 03/29/2010 | 3 yrs. 7 mos. | 42 | 37 lbs. |
| 08/05/2010 | 4 yrs. 0 mos. | 42 | 37 lbs. |
| 03/30/2011 | 4 yrs. 7 mos. | 41.1 | 33 lbs. 8 oz |
| 08/02/2011 | 4 yrs. 11 mos. | 42.3 | 36 lbs. |
| 08/10/2012 | 6 yrs. 0 mos. | 43 | 37 lbs. |
| 09/05/2012 | 6 yrs. 1 mos. | 43 | 38.2 lbs. |
| 08/14/2013 | 7 yrs. 0 mos. | 43 | 39 lbs. |
| 12/23/2013 | 7 yrs. 4 mos. | 44 | 43 lbs. |
| 09/22/2014 | 8 yrs. 1 mos. | | |
| 07/27/2015 | 8 yrs. 11 mos. | 45.75 | 43.8 lbs. |
| 09/02/2015 | 10 yrs. 1 mos. | 46 | 41 lbs. |
| 08/01/2016 | 9 yrs. 11 mos. | 46 | 40.6 lbs. |
| 11/01/2016 | 10 yrs. 2 mos. | 46.5 | 48 lbs. |
| 11/23/2016 | 10 yrs. 3 mos. | 46 | 55.5 lbs. |
| 12/01/2016 | 10 yrs. 3 mos. | 46 | 54 lbs. |
| 02/09/2017 | 10 yrs. 6 mos. | 47.24 | 54.9 lbs. |
| 04/03/2017 | 10 yrs. 7 mos. | 48.78 | 58 lbs. 10.3 oz |
| 05/15/2017 | 10 yrs. 9 mos. | 48.7 | 64 lbs. 0.7 oz |
| 12/11/2017 | 11 yrs. 4 mos. | | |

---

[35] FCA Bates No. 008207, 008209, 008231, 008230, 008233, 008234, 008696, 008697, 008235, 008236, 008701, 008704, 008713, 008721, 008722, 008728, 008730, 008733, 008625, 008736, 008737, 008740, 008742, 008744, 008752-008755, 008760, 008765, 008766, 008771, 008775, 008777, 008782, 008787, 008788, 008795, 008798, 008809, 008812, 008816, 008645, 008684, 008655, 008684, 008677, 008684, 008967, 008967, 008965, 008979, 008963, 008964, 008962, 008845, 008846, 008843, 011330, 008940, 011326, 011325, 008837, 011319, 011318, 008834, 008832, 011312, 008829, 008866-008875, 000298-000303, 011656, 011654, 011651, 011608, 008477, 008475, 008531, 011530, 008445, 008442, 011525, 011522, 011519, 011515.

83.    The following height-weight chart tracks J.J.G.'s abuse during the time he was placed with the Mitchells[36]:

| J.J.G. Growth from January 25, 2010 through August 28, 2017 | | | |
|---|---|---|---|
| Key: Yellow – Period in Mitchell Home; Blue: Post-removal | | | |
| **Date** | **Age** | **Height (Inches)** | **Weight (Pounds)** |
| 12/18/2009 | 6 yrs. 7 mos. | 39.25" | 36.4 lbs. |
| 03/30/2010 | 6 yrs. 10 mos. | 47" | 48 lbs. 5 oz |
| 05/19/2010 | 7 yrs. 0 mos. | 47" | 48 lbs. 8 oz |
| 08/05/2010 | 7 yrs. 2 mos. | 46.3" | 44 lbs. 12 oz |
| 03/28/2011 | 7 yrs. 10 mos. | 47.6" | 56 lbs. 11 oz |
| 08/01/2011 | 8 yrs. 2 mos. | 47.8" | 50 lbs. 8 oz |
| 10/06/2011 | 8 yrs. 4 mos. | 48" | 50 lbs. |
| 12/27/2011 | 8 yrs. 7 mos. | 48" | 51 lbs. |
| 01/25/2012 | 8 yrs. 8 mos. | 48" | 55 |
| 03/30/2012 | 6 yrs. 9 mos. | 48" | 55 lbs. 4 oz |
| 05/18/2012 | 9 yrs. 0 mos. | 48" | 55 lbs. |
| 06/27/2012 | 9 yrs. 1 mos. | 47.5" | 54 lbs. |
| 03/13/2013 | 9 yrs. 9 mos. | 49" | 57 lbs. |
| 08/12/2013 | 10 yrs. 2 mos. | 49" | 52 lbs. |
| 04/21/2014 | 10 yrs. 11 mos. | 50" | 58 lbs. |
| 06/18/2014 | 11 yrs. 1 mos. | 50" | 60 lbs. |
| 09/29/2014 | 11 yrs. 4 mos. | 51.75" | 62 lbs. |
| 01/14/2015 | 11 yrs. 7 mos. | 51.25" | 60 lbs. |
| 03/12/2015 | 11 yrs. 9 mos. | 51.25" | 63 |
| 03/20/2015 | 11 yrs. 10 mos. | 51" | 63 |
| 04/16/2015 | 11 yrs. 11 mos. | 52" | 62.2 lbs. |
| 07/27/2015 | 12 yrs. 2 mos. | 52" | 60.63 lbs. |
| 07/31/2015 | 12 yrs. 2 mos. | 52.5" | 58 lbs. |
| 02/15/2016 | 12 yrs. 9 mos. | 53 | 63.2 lbs. |
| 06/13/2016 | 13 yrs. 0 mos. | 53.5" | 65 lbs. |
| 08/08/2016 | 13 yrs. 2 mos. | 53.5" | 64 lbs. |
| 11/01/2016 | 13 yrs. 5 mos. | 54" | 69.5 lbs. |
| 11/23/2016 | 13 yrs. 6 mos. | 53.25" | 78.25 lbs. |
| 12/01/2016 | 13 yrs. 6 mos. | 53.5" | 77.5 lbs. |
| 02/09/2017 | 13 yrs. 8 mos. | 54.25" | 77.75 lbs. |
| 02/17/2017 | 13 yrs. 9 mos. | | 79.35 lbs. |
| 04/07/2017 | 13 yrs. 10 mos. | 55.28" | 83 lbs. 0.1 oz |
| 08/28/2017 | 14 yrs. 3 mos. | 57.56" | 94 lbs. 5.7 oz |

---

[36] 007773, 007775, 007781, 007775, 007603, 007737, 007954, 007960, 007965, 007970, 007978, 007983, 008021, 007986, 008021, 007995, 008021, 008004, 008021, 008014, 008021, 008021, 008018, 008021, 008036, 008035, 008034, 008033, 008031, 008030, 008028, 008027, 008025, 011438, 011435, 011427, 011422, 011412, 011410, 011404, 011401, 011668, 011399, 011394, 011390, 011389, 011385, 011379, 011375, 011372, 008167-008177, 000298-000303, 011665, 011504, 011501, 011499, 008116, 008121.

84.    The following height-weight chart tracks S.T.S.'s abuse during the time he was placed with the Mitchells[37]:

| S.T.S. Growth from April 13, 2009 through June 14, 2017 | | | |
|---|---|---|---|
| Key: Yellow – Period in Mitchell Home; Blue: Post-removal | | | |
| Date | Age | Height (Inches) | Weight (Pounds) |
| 04/13/2009 | 5 yrs. 11 mos. | 40" | 32 lbs. |
| 04/21/2009 | 5 yrs. 11 mos. | 40" | 33 lbs. |
| 05/06/2009 | 5 yrs. 11 mos. | | 33.95 lbs. |
| 08/05/2010 | 7 yrs. 2 mos. | 43.3" | 34 lbs. 12 oz |
| 08/01/2011 | 8 yrs. 2 mos. | 46" | 42 lbs. 8 oz |
| 08/10/2012 | 9 yrs. 3 mos. | 48" | 46 lbs. |
| 09/05/2012 | 9 yrs. 3 mos. | 48" | 48 lbs. |
| 08/14/2013 | 10 yrs. 3 mos. | 49" | 48 lbs. |
| 12/23/2013 | 10 yrs. 7 mos. | 50" | 54 lbs. |
| 06/18/2014 | 11 yrs. 1 mos. | 51" | 59 lbs. |
| 07/27/2015 | 12 yrs. 2 mos. | 55" | 62 lbs. |
| 07/25/2016 | 13 yrs. 2 mos. | 57.25" | 74 lbs. |
| 11/23/2016 | 13 yrs. 6 mos. | 58.25" | 86.25 lbs. |
| 12/01/2016 | 13 yrs. 6 mos. | 58.25" | 86.75 lbs. |
| 02/09/2017 | 13 yrs. 8 mos. | 59.75" | 89 lbs. |
| 04/07/2017 | 13 yrs. 10 mos. | 60.79" | 93 lbs. 0.6 oz |
| 10/23/2017 | 14 yrs. 5 mos. | 64" | 109 lbs. 16 oz |

85.    Over the nearly six and a half years these children were placed in the Mitchell hom:

   a.    A.M.L. gained less than 10 and ½ lbs. and only grew seven inches.

   b.    J.J.L. gained only 3 and ½ lbs. and only grew four inches.

   c.    R.D.M. gained only 3.6 lbs. and only grew four inches.

   d.    J.J.G. gained less than 16 lbs. and only grew six and a half inches.

86.    Over the nearly seven and a half years S.T.S. was placed in the Mitchell home, he gained only 42 lbs. and only grew seventeen inches.

---

[37] 011784, 011783, 011782, 011787, 011781, 011780, 011362-011363, 011361, 011357-011359, 011352-011353, 011348-011351, 0011668, 011343-011345, 011340-011342, 000298-000303, 011488-011489, 011486-011487, 011483-011484, 011870, 011452-011454, 011472-011475, 011446-011448, 011460-011463.

87.     By August 2010, SCDSS received a report indicating that a female minor child was beaten the previous night and left with severe bruising on the buttocks and the back of her thighs.[38] The Mitchells told SCDSS that J.J.L. had a rash on her buttocks from sitting in wet diapers because "she does not tell anyone she is wet/soiled."[39]

88.     In January 2011, a report was made to SCDSS that A.M.L. disclosed she was hit by a belt.[40]

89.     In April 2012, a report to SCDSS alleged R.D.M. had a bruise on his arm as a result of being hit with a shoe by his mother. It had also been alleged that the children were hoarding food.[41]

90.     On January 29, 2013, R.D.M. was referred to the Coastal Empire Mental Health by the Beaufort County School District for food stealing behaviors.[42]

91.     In September 2013 R.D.M. disclosed Yulanda Mitchell had picked him up over her head and dropped him to the floor 20 times because he had a bad day in school.[43] R.D.M. had a bump on his head and a temperature of 102 degrees with a bilateral ear infection.[44] R.D.M. stated his body ached and it sometimes hurt to breathe but he had no marks or other bruises on his body.[45] During an interview, R.D.M. stated that food was withheld from him as punishment in the home.[46] SCDSS closed its file on November 6, 2013.[47]

---

[38] FCA Bates No. 000017.
[39] FCA Bates No. 000017.
[40] FCA Bates No. 000017.
[41] FCA Bates No. 000017.
[42] FCA Bates No. 008850.
[43] FCA Bates No. 000017.
[44] FCA Bates No. 000017
[45] FCA Bates No. 000017.
[46] FCA Bates No. 000017.
[47] FCA Bates No. 000017.

92.     In January 2015, a report was made to SCDSS that the Children were being physically abused and the children were constantly stealing food at school.[48] The Children were forced to sleep on the floor and sometimes placed in a dark closet.[49] SCDSS closed the case in March 2015.[50]

93.     On February 17, 2015, Coleen Long from DSS requested the children's most recent weight/growth charts from Palmetto Pediatrics.[51]

94.     On February 17, 2015, S.T.S.'s, R.D.M.'s, J.J.G.'s, A.M.L.'s and J.J.L.'s pediatric records noted that their physician had received a release for the South Carolina Department of Social Services to obtain the children's growth chart.[52]

95.     Inexplicably, FCCS, SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes, placed E.R.L. into an adoptive placement at the Mitchell home in April 2015. These Defendants conducted the placement, assessment, and monitoring of the children in the home on behalf of SCDSS. Adoption Advocacy, Inc., June Bond, and Joe Haynes contracted with FCCS to conduct the placement, assessment, and monitoring of the children in the home. FCCS, FCCS Case Worker #3, FCCS Case Worker #4, and FCCS Case Worker Supervisor #4 were responsible for approving and monitoring the placement of E.R.L.

96.     From April 2015 until her adoption on October 15, 2015, E.R.L. remained both a citizen of Ohio and a ward of the state in the custody of the state of Ohio and was entitled to her constitutional right to a safe and secure placement free of abuse, neglect, and starvation.

---

[48] FCA Bates No. 000017.
[49] FCA Bates No. 000017.
[50] FCA Bates No. 000018.
[51] FCA Bates No. 000077.
[52] FCA Bates No. 011318, 011346, 011400, 001668.

97.    SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, FCCS, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #5, Adoption Advocacy, Inc., June Bond, and Joe Haynes defrauded the Beaufort County Family Court and committed perjury by concealing the fact that Yulanda Mitchell was on SCDSS's Registry of Abuse and Neglect.

98.    During E.R.L.'s placement at the Mitchell home, these Defendants returned to the Mitchell home in 2015, and since the adoption five years prior, A.M.L. had only gained only 6 ½ lbs., J.J.L. had only gained 6 ½ lbs., R.D.M. had only gained seven lbs., J.J.G. had only gained 20 lbs., and S.T.S. had only gained 28 lbs.

99.    SCDSS, SCDSS Case Worker #3, SCDSS Case Worker #4, SCDSS Case Worker Supervisor #2, FCCS, FCCS Case Worker #3, FCCS Case Worker #4, FCCS Case Worker Supervisor #2, Adoption Advocacy, Inc., June Bond, and Joe Haynes:

   a. Ignored the Mitchell's financial circumstances, the lack of suitability of the 1,639 square foot home to house four adults and five children in three bedrooms, and the chronic physical abuse and starvation of the children in the home.
   b. Ignored the troubling reports of abuse and neglect of E.R.L.'s siblings before her placement in the home.
   c. Ignored the fact that S.T.S. had been raised by the Mitchells since age two months and been diagnosed with failure to thrive.
   d. Ignored medical reports that showed the Mitchells were untruthful about who lived in the home.
   e. Ignored the fact that A.M.L., J.J.L., J.J.G., and R.D.M. were diagnosed with failure to thrive and there were concerns in the community that the children were being starved.
   f. Failed to investigate the children's educators and other service providers who had deep concerns that the Mitchells abused and starved the five children – where the children stole food at school, ate food out of the garbage cans, and were so deprived of water at times that they drank out of the toilets.
   g. Failed to investigate the children's mental health providers which would have shown the schools had referred the children to mental health services due to stealing food and adverse behaviors.

100.    E.R.L. was adopted by order of the Beaufort County Family Court on October 15, 2015, in the matter of *Mitchell v. Franklin County Ohio Children Services*, 2015-DR-07-01009

(Beaufort County Family Court October 15, 2015). From April 14, 2014, until the month after E.R.L. was adopted on October 15, 2015, she lost one and a half pounds.[53] This weight loss was caused by the Mitchells starving her.

    101.    During the pre-adoptive placement and after E.R.L.'s adoption, E.R.L. and her siblings were starved and beaten by the Mitchells.

    102.    The following height-weight chart tracks E.R.L.'s abuse during the time she was placed with the Mitchells[54]:

| E.R.L. Growth from April 13, 2009 through June 14, 2017 | | | |
|---|---|---|---|
| Key: Yellow – Period in Mitchell Home; Blue: Post-removal | | | |
| Date | Age | Height (Inches) | Weight (Pounds) |
| 03/10/2014 | 2 yrs. 3 mos. | 34" | 28.4 lbs. |
| 11/30/2015 | 3 yrs. 4 mos. | 39" | 27 lbs. |
| 12/07/2015 | 4 yrs. 0 mos. | 39" | 28 lbs. |
| 07/25/2016 | 4 yrs. 8 mos. | 39" | 26 lbs. |
| 10/31/2016 | 4 yrs. 11 mos. | 39" | 27.86 lbs. |
| 11/04/2016 | 4 yrs. 11 mos. | 38" | 30.4 lbs. |
| 11/08/2016 | 4 yrs. 11 mos. | 40" | 33 lbs. |
| 11/24/2016 | 5 yrs. 0 mos. | 39.25" | 35 lbs. |
| 01/12/2017 | 5 yrs. 1 mos. | 38.5" | 40 lbs. |
| 04/07/2017 | 5 yrs. 4 mos. | 41.58" | 43 lbs. 3.4 oz |
| 08/09/2017 | 5 yrs. 8 mos. | 43.3" | 46 lbs. 15.3 oz |
| 10/04/2017 | 5 yrs. 10 mos. | 44.88" | 49 lbs. 7.9 oz |

    103.    In March 2016, a report was made to SCDSS that R.D.M. disclosed that he has been eating food out of the garbage cans at school and that he only gets one meal at home as a consequence for stealing food.[55]

---

[53] FCA Bates No. 005597 and 001092.
[54] FCA Bates No. 005594, 005806, 005810, 005538, 005541, 005542, 005548, 005551, 005552-005553, 005583, 005589, 005554, 005583, 005589, 005558, 005583, 005589, 005563, 005583, 005589, 005565, 005583, 005589, 005572, 005583, 005589, 005203, 005576, 005583, 005589, 005597, 001668, 001092, 001091, 001087, 001085, 001099, 000298-000303, 001066-001073, 001061, 001097, 001139, 001156, 001169, 001182, 001246, 001274, 001278, 001282, 001301, 001305, 001310, 001328, 001332, 001335, 001337, 001364, 001368, 001370, 001374, 001376, 001389, 001393, 001395, 001398, 001407, 001414, 001418, 001420, 001423, 001425, 001441, 001445, 001448, 001450, 001453, 001501, 001505, 001508, 001512, 001516, 001539, 001543, 001544, 001547, 001549, 001552, 001585, 001590, 001593, 001598.
[55] FCA Bates No. 000018.

104.    Another report was made to SCDSS in April 2016 regarding S.T.S. stealing food.[56]

105.    On November 3, 2016 the Children entered foster care when they were placed in Emergency Protective Custody.[57] R.D.M. had written a note to his school teacher in October 2016 disclosing that he and his siblings were being beaten at home with a hanger, belt, and ruler.[58] He reported that the beatings left bruises on his legs and his adoptive mother would keep him home from school the next day or until the marks went away.[59] J.J.L. reported that one of her oldest adoptive brothers, who were biological children of the adoptive parents, would be told by the adoptive mother to beat J.J.L. because she stole food.[60] R.D.M. further disclosed feeling unsafe in the home, being constantly hungry due to food restrictions, and being forced to sleep on the floor without covers or pillows.[61]

106.    During the Mitchell's plea under *North Carolina v. Alford*, the Solicitor stated:

> Physical abuse: The children were made to stand against walls, popped with rulers, belt, or shoes; pulling of ears and hair; bending fingers back; mental abuse; locked in the bedroom while others were allowed to eat; made to sleep on the floor with no blanket; share cold bath water with siblings; food deprivation; the withholding of water and food as punishment; made to watch the other children eat.[62]

107.    All of the children were diagnosed with severe failure to thrive.[63]

108.    A Probable Cause Hearing was held by the Beaufort County Family Court on November 7, 2016, and the Court found probable cause for E.R.L., A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S. to remain in SCDSS's custody. The Court found probable cause based upon the following facts:

---

[56] FCA Bates No. 000018.
[57] FCA Bates No. 000298-000303.
[58] FCA Bates No. 000018.
[59] FCA Bates No. 000018.
[60] FCA Bates No. 000018.
[61] FCA Bates No. 000018.
[62] FCA Bates No. 007512.
[63] FCA Bates No. 011486, 011483, 011657, 011666.

There was probable cause for law enforcement to take emergency protective custody and for the South Carolina Department of Social Services (SCDSS) to assume legal custody of the children because SCDSS received a report on October 26, 2016 alleging that one of the minor children was caught stealing food at school for the second time in two days. The child reportedly has a history of stealing food from classmates and classrooms and taking food out of garbage cans. All of the minor children in the home were interviewed the following day. The children alleged that they are sent to their rooms and not allowed to eat dinner any time they get in trouble at home or school. The children also alleged they are hit with a belt, ruler, or hanger when they get in trouble. Three of the children had forensic medical examinations on November 1, 2016. These exams were conducted by Kristin Dalton, CPNP. Ms. Dalton reviewed records for five of the six children and discovered that the children's heights and weights fall far below the first percentile. Ms. Dalton also noted that two of the children examined have patterned scars on their bodies. SCDSS established a prima facie case based on the foregoing allegations.[64]

109.     On July 24, 2017, in the matter of *South Carolina Department of Social Services v. Yulanda Mitchell a/k/a Yolanda Mitchell and Herbert Mitchell*, Docket No. 2016-DR-07-01364, the Beaufort County Family Court made the following finding:

> …S.T.S., J.J.G., A.M.L., J.J.L., R.D.M., and E.R.L. were physically abused and willfully and recklessly neglected by Yulanda Mitchell a/k/a/ Yolanda Mitchell… S.T.S., J.J.G., A.M.L., J.J.L., R.D.M., and E.R.L. were willfully and recklessly neglected by Herbert Mitchell.[65]

110.     Between March 11, 2010, through November 3, 2016, teachers, nurses, guidance counselors, social workers, and principals at the Children's schools made numerous reports to SCDSS regarding the abuse, neglect, and starvation of A.M.L., J.J.L., R.D.M., J.J.G., and S.T.S.

111.     That as a direct and proximate result of the Defendants' acts and omissions, A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. suffered the following injuries: violation of their constitutional rights, great and permanent mental harm and injury, starvation, failure to thrive, physical pain from the battery, emotional distress, alteration of their lifestyles, psychological trauma, apprehension, anxiety, depression, embarrassment, shame, and a loss of enjoyment of life, all resulting from the abuse they suffered, which has and will in the future cause them to spend money for mental health treatment services and medical care.

---

[64] FCA Bates No. 000300.
[65] FCA Bates No. 003335.

## V.     Claims.

### A.  South Carolina Department of Social Services Defendants.

### First Cause of Action
**Violation of Fourteenth Amendment Right to a Safe & Secure Placement – 42 U.S.C. §1983
(Failure to Protect – Magnelia Washington Cottrell, Charles Brown, SCDSS Case Worker #1,
SCDSS Case Worker #2, and SCDSS Case Worker Supervisor #1)**

112.     Plaintiffs incorporate paragraphs 1-111 as if restated herein verbatim.

113.     From the time of the placement of A.M.L., J.J.L., R.D.M., and J.J.G., on March 11,

2010, until their adoption on June 6, 2010, these Children were wards of the state of Ohio, minor

children, and unable to protect themselves.

114.     As part of its agreement with the State of Ohio, under the ICPC, Magnelia

Washington Cottrell, Charles Brown, SCDSS Case Worker #1, SCDSS Case Worker #2, and SCDSS

Case Worker Supervisor #1 were required to assess, investigate, and monitor A.M.L., J.J.L., R.D.M.,

and J.J.G. in the Mitchell Foster home to ensure that these Children were safe and protected. The

placement of these Children in the foster home was at the behest of the State of Ohio and these

Children were entitled to their constitutional right to a safe and secure placement, free of abuse,

neglect, and starvation.

115.     The Fourteenth Amendment to the United States Constitution guarantees the right of

all children in custody to a safe and secure placement.

116.     Under 42 U.S.C. § 1983, persons acting under color of state law are liable for

violating constitutional rights.

117.     Magnelia Washington Cottrell, Charles Brown, SCDSS Case Worker #1, SCDSS

Case Worker #2, and SCDSS Case Worker Supervisor #1, acting in their individual capacities, under

color of law, were, from March 11, 2010, through the Children's adoption on June 6, 2010,

26

deliberately indifferent to the Children's constitutional right to a safe and secure foster care

placement. They had notice of the following dangers:

    a.      Failing to monitor the safety of the Children on a monthly basis pursuant to Ohio, South Carolina, and Federal law, and generally accepted social work standards.

    b.      Failing to monitor the safety of the Children on a monthly basis by speaking:

        1.    With each child, individually, in private, and outside of the presence of the Mitchells regarding their health and safety in the foster home.

        2.    With collateral sources such as day care providers, teachers, school officials, neighbors, mental health providers, and medical providers for the Children on a monthly basis regarding the care and safety of the Children.

    c.      Failing to investigate and assess the safety of the children in the home by:

        1.    Reviewing the medical and mental health records of the Children which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss.

        2.    Reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of children in the home.

        3.    Determining who lived in the home, to include the Mitchells' sons and their grandchildren.

    d.      Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

    e.      Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

    f.      Failing to observe the Children with Yulanda Mitchell, who showed they were visibly afraid of Yulanda Mitchell.

    g.      Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the South Carolina Department of Social Services' Registry of Abuse and Neglect.

118.    Magnelia Washington Cottrell, Charles Brown, SCDSS Case Worker #1, SCDSS

Case Worker #2, and SCDSS Case Worker Supervisor #1 ignored these dangers notwithstanding

their notice of them.

119.    Magnelia Washington Cottrell, Charles Brown, SCDSS Case Worker #1, SCDSS

Case Worker #2, and SCDSS Case Worker Supervisor #1 either misrepresented the safety of the

Children to the Beaufort County Family Court or they were willfully blind, or incompetent.

120.    A.M.L., J.J.L., R.D.M., and J.J.G. suffered the attacks and starvation and the injuries

set out above, which were the direct and proximate result of the constitutional violations by Magnelia

Washington Cottrell, Charles Brown, SCDSS Case Worker #1, SCDSS Case Worker #2, and SCDSS Case Worker Supervisor #1.

121.    A.M.L., J.J.L., R.D.M., and J.J.G. ask the Court to award damages, punitive damages, and attorneys' fees and cost.

## Second Cause of Action
### Gross Negligence under the South Carolina Tort Claims Act
### (South Carolina Department of Social Services)

122.    Plaintiffs incorporate paragraphs 1-121 as if restated herein verbatim.

123.    At all times during this matter A.M.L., J.J.L., R.D.M., and J.J.G. were clients of SCDSS.

124.    Under the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10 et seq. of the Code of Laws of South Carolina 1976, as amended, and the Common Law of South Carolina, Defendant SCDSS is liable for its tortious acts and the tortious acts of its employees and agents performed in the scope of their employment when it exercises its responsibility or duty in a grossly negligent manner as to the supervision, protection, control, confinement, or custody of any client. S.C. Code Ann. § 15-78-60(25).

125.    Defendant SCDSS owed a duty of care to A.M.L., J.J.L., R.D.M., and J.J.G. because it is statutorily charged by the General Assembly to investigate allegations of child abuse and neglect, assess and monitor placements of foster children under the ICPC, provide services to families in need, to do so in a manner that does not violate individuals' rights and liberties, and does not cause unnecessary harm to any child or family.

126.    From March 11, 2010, through June 6, 2010, SCDSS and its employees and agents, acting within the scope of their employment, were willful, wanton, careless, grossly negligent, and failed to exercise even slight care in exercising its duties and responsibilities of supervision, protection, control, confinement, and/or custody of the Plaintiffs in:

a.  Failing to monitor the safety of the Children on a monthly basis pursuant to Ohio, South Carolina, and Federal law, and generally accepted social work standards.

b.  Failing to monitor the safety of the Children on a monthly basis by speaking:

1.  With each child, individually, in private, and outside of the presence of the Mitchells regarding their health and safety in the foster home.

2.  With collateral sources such as day care providers, teachers, school officials, neighbors, mental health providers, and medical providers for the Children on a monthly basis regarding the care and safety of the Children.

c.  Failing to investigate and assess the safety of the children in the home by:

1.  Reviewing the medical and mental health records of the Children which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss.

2.  Reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of children in the home.

3.  Determining who lived in the home, to include the Mitchells' sons and their grandchildren.

d.  Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

e.  Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

f.  Failing to observe the Children with Yulanda Mitchell, who showed they were visibly afraid of Yulanda Mitchell.

g.  Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the South Carolina Department of Social Services' Registry of Abuse and Neglect.

127.  A.M.L., J.J.L., R.D.M., and J.J.G. suffered abuse, starvation, and injuries as set out in this Complaint which was the direct and proximate result of the acts and failures to act by SCDSS.

128.  A.M.L., J.J.L., R.D.M., and J.J.G. seek damages, special damages, and costs.

**Third Cause of Action**
**Gross Negligence under the South Carolina Tort Claims Act**
**(South Carolina Department of Social Services)**

129.  Plaintiffs incorporate paragraphs 1-128 as if restated herein verbatim.

130.  At all times during this matter the A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. were clients of SCDSS.

131.    Under the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10 et seq. of the Code of Laws of South Carolina 1976, as amended, and the Common Law of South Carolina, Defendant SCDSS is liable for its tortious acts and the tortious acts of its employees and agents performed in the scope of their employment when it exercises its responsibility or duty in a grossly negligent manner as to the supervision, protection, control, confinement, or custody of any client. S.C. Code Ann. § 15-78-60(25).

132.    Defendant SCDSS owed a duty of care to the Children because it is statutorily charged by the General Assembly to investigate allegations of child abuse and neglect, assess and monitor placements of abused and neglected children, provide services to families in need, to do so in a manner that does not violate individuals' rights and liberties, and does not cause unnecessary harm to any child or family.

133.    Beginning in July 2003, (for S.T.S., later dates for the other Children) through November 3, 2016, SCDSS received numerous reports of abuse and neglect from teachers, social workers, nurses, principals, neighbors, and others in the Bluffton Community and it failed to properly investigate the complaints.

134.    From July 2003 through November 3, 2016, SCDSS and its employees and agents, acting within the scope of their employment, were willful, wanton, careless, grossly negligent, and failed to exercise even slight care in exercising its duties and responsibilities investigate, assess, monitor, and protect the Children in:

    a.    Failing to monitor the safety of the Children pursuant to South Carolina and Federal law and generally accepted social work standards.

    b.    Failing to investigate and assess the safety of the children in the home by:

        1.    Speaking with each child, individually, in private, and outside of the presence of the Mitchells regarding their health and safety in the home.

        2.    Speaking with collateral sources such as day care providers, teachers, school officials, neighbors, mental health providers, and medical providers for the Children on a monthly basis regarding the care and safety of the Children.

        3.    Reviewing the medical and mental health records of the Children which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of

garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss.

    4.    Reviewing previous SCDSS records regarding the numerous documented complaints of abuse and neglect of children in the home.

c.    Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

d.    Failing to observe the Children with Yulanda Mitchell, who showed they were visibly afraid of Yulanda Mitchell.

e.    Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the South Carolina Department of Social Services' Registry of Abuse and Neglect.

135.    The Children suffered abuse, starvation, and injuries as set out in this Complaint as the direct and proximate result of the acts and failures to act by SCDSS.

136.    The following provides a list of occurrences for each child by date:

a.    A.M.L.:
- i.    August 5, 2010
- ii.    January 2011
- iii.    March 2011
- iv.    August 2011
- v.    April 2012
- vi.    January 29, 2013
- vii.    September 2013
- viii.    November 2013
- ix.    February 2015
- x.    September 2015
- xi.    March 2016

b.    J.J.L.:
- i.    August 5, 2010
- ii.    January 2011
- iii.    March 2011
- iv.    August 2011
- v.    April 2012
- vi.    January 29, 2013
- vii.    September 2013
- viii.    November 2013
- ix.    February 2015
- x.    September 2015
- xi.    March 2016

c.    E.R.L.:
- i.    September 2015
- ii.    March 2016

d.    R.D.M.:
- i.    August 5, 2010
- ii.    January 2011
- iii.    March 2011

        iv.        August 2011
        v.        April 2012
        vi.        January 29, 2013
        vii.        September 2013
        viii.        November 2013
        ix.        February 2015
        x.        September 2015
        xi.        March 2016

e.     J.J.G.:

        i.        August 5, 2010
        ii.        January 2011
        iii.        March 2011
        iv.        August 2011
        v.        April 2012
        vi.        January 29, 2013
        vii.        September 2013
        viii.        November 2013
        ix.        February 2015
        x.        September 2015
        xi.        March 2016

f.     S.T.S.:

        i.        June 2005
        ii.        July 2005 through May 10, 2010.
        iii.        May 11, 2010 through June 10, 2010.
        iv.        August 5, 2010
        v.        January 2011
        vi.        March 2011
        vii.        August 2011
        viii.        April 2012
        ix.        January 29, 2013
        x.        September 2013
        xi.        November 2013
        xii.        February 2015
        xiii.        September 2015
        xiv.        March 2016

137.    A.M.L., J.J.L., E.R.L., R.D.M., J.J.G., and S.T.S. seek damages, special damages,

and costs for each occurrence.

**<u>Fourth Cause of Action</u>**
**Violation of Fourteenth Amendment Right to a Safe & Secure Placement – 42 U.S.C. §1983**
**(Failure to Protect – SCDSS Case Worker #3, SCDSS Case Worker #4, and SCDSS Case**
**Worker Supervisor #2)**

138.    Plaintiffs incorporate paragraphs 1-137 as if restated herein verbatim.

139.    From the time of her placement in April 2015 until her adoption on October 15, 2015, E.R.L. was a ward of the state of Ohio, a minor child, and unable to protect herself.

140.    As part of its agreement with the State of Ohio under the ICPC, SCDSS Case Worker #3, SCDSS Case Worker #4, and SCDSS Case Worker Supervisor #2 were required to assess, investigate, and monitor E.R.L. in the Mitchell Foster home to ensure that E.R.L. was safe and protected. The placement of E.R.L. in the foster home was at the behest of the State of Ohio and E.R.L. was entitled to their constitutional right to a safe and secure placement, free of abuse, neglect, and starvation.

141.    The Fourteenth Amendment to the United States Constitution guarantees the right of all children in custody to a safe and secure placement.

142.    Under 42 U.S.C. § 1983, persons acting under color of state law are liable for violating constitutional rights.

143.    SCDSS Case Worker #3, SCDSS Case Worker #4, and SCDSS Case Worker Supervisor #2, acting in their individual capacities, under color of law, were, from April 2015 through E.R.L.'s adoption on October 15, 2015, deliberately indifferent to E.R.L.'s constitutional right to a safe and secure foster care placement. They had notice of the following dangers:

    a.    Failing to monitor the safety of the Children on a monthly basis pursuant to Ohio, South Carolina, and Federal law, and generally accepted social work standards.

    b.    Failing to monitor the safety of the Children on a monthly basis by speaking:

        1.    With each child, individually, in private, and outside of the presence of the Mitchells regarding their health and safety in the foster home.

        2.    With collateral sources such as day care providers, teachers, school officials, neighbors, mental health providers, and medical providers for the Children on a monthly basis regarding the care and safety of the Children.

    c.    Failing to investigate and assess the safety of the children in the home by:

        1.    Reviewing the medical and mental health records of the Children which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss.

        2.    Reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of children in the home.

      3.    Determining who lived in the home, to include the Mitchells' sons and their grandchildren.

d.    Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

e.    Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

f.    Failing to observe the Children with Yulanda Mitchell, who showed they were visibly afraid of Yulanda Mitchell.

g.    Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the South Carolina Department of Social Services' Registry of Abuse and Neglect.

144.    SCDSS Case Worker #3, SCDSS Case Worker #4, and SCDSS Case Worker Supervisor #2 ignored these dangers notwithstanding their notice of them.

145.    SCDSS Case Worker #3, SCDSS Case Worker #4, and SCDSS Case Worker Supervisor #2 either misrepresented the safety of E.R.L. to the Beaufort County Family Court or they were willfully blind, or incompetent.

146.    E.R.L. suffered the attacks and starvation and the injuries set out above, which was the direct and proximate result of the constitutional violations by SCDSS Case Worker #3, SCDSS Case Worker #4, and SCDSS Case Worker Supervisor #2.

147.    E.R.L. asks the Court to award damages, punitive damages, and attorneys' fees and cost.

### Fifth Cause of Action
**Gross Negligence under the South Carolina Tort Claims Act**
**(South Carolina Department of Social Services)**

148.    Plaintiffs incorporate paragraphs 1-147 as if restated herein verbatim.

149.    At all times during this matter the E.R.L. was a client of SCDSS.

150.    Under the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10 et seq. of the Code of Laws of South Carolina 1976, as amended, and the Common Law of South Carolina, Defendant SCDSS is liable for its tortious acts and the tortious acts of its employees and agents performed in the scope of their employment when it exercises its responsibility or duty in a grossly

negligent manner as to the supervision, protection, control, confinement, or custody of any client.

S.C. Code Ann. § 15-78-60(25).

151.    Defendant SCDSS owed a duty of care to E.R.L. because it is statutorily charged by the General Assembly to investigate allegations of child abuse and neglect, assess and monitor placements of foster children under the ICPC, provide services to families in need, to do so in a manner that does not violate individuals' rights and liberties, and does not cause unnecessary harm to any child or family.

152.    From April 2015 through October 15, 2015, SCDSS and its employees and agents, acting within the scope of their employment, were willful, wanton, careless, grossly negligent, and failed to exercise even slight care in exercising its duties and responsibilities of supervision, protection, control, confinement, and/or custody of E.R.L. in:

a.    Failing to monitor the safety of the Children on a monthly basis pursuant to Ohio, South Carolina, and Federal law, and generally accepted social work standards.

b.    Failing to monitor the safety of the Children on a monthly basis by speaking:
1.    with each child, individually, in private, and outside of the presence of the Mitchells regarding their health and safety in the foster home.
2.    with collateral sources such as day care providers, teachers, school officials, neighbors, mental health providers, and medical providers for the Children on a monthly basis regarding the care and safety of the Children.

c.    Failing to investigate and assess the safety of the children in the home by:
1.    reviewing the medical and mental health records of the Children which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss.
2.    reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of children in the home.
3.    determining who lived in the home, to include the Mitchells' sons and their grandchildren.

d.    Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

e.    Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

f.    Failing to observe the Children with Yulanda Mitchell, who showed they were visibly afraid of Yulanda Mitchell.

g.    Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the South Carolina Department of Social Services' Registry of Abuse and Neglect.

153.    E.R.L. suffered abuse, starvation, and injuries as set out in this Complaint which was the direct and proximate result of the acts and failures to act by SCDSS.

154.    E.R.L. seeks damages, special damages, and costs.

**B. Franklin County Children Services Defendants.**

### Sixth Cause of Action
**Violation of Fourteenth Amendment Right to a Safe & Secure Placement – 42 U.S.C. §1983 (Failure to Protect – Franklin County Children Services, FCCS Case Worker #1, FCCS Case Worker #2, and FCCS Case Worker Supervisor #1)**

155.    Plaintiffs incorporate paragraphs 1-154 as if restated herein verbatim.

156.    From the time of the placement of A.M.L., J.J.L., R.D.M., and J.J.G., on March 11, 2010, until their adoption on June 6, 2010, these Children were wards of the state of Ohio, minor children, and unable to protect themselves.

157.    As part of its agreement with the State of South Carolina, under the ICPC, FCCS, FCCS Case Worker #1, FCCS Case Worker #2, and FCCS Case Worker Supervisor #1 were required to assess, investigate, and monitor the Children in the Mitchell Foster home to ensure that the Children were safe and protected. The placement the Children in the foster home was at the behest of the State of Ohio and the Children were entitled to their constitutional right to a safe and secure placement, free of abuse, neglect, and starvation.

158.    The Fourteenth Amendment to the United States Constitution guarantees the right of all children in custody to a safe and secure placement.

159.    Under 42 U.S.C. § 1983, persons acting under color of state law are liable for violating constitutional rights.

160.    FCCS, FCCS Case Worker #1, FCCS Case Worker #2, and FCCS Case Worker Supervisor #1, acting in their individual capacities or under *Monell*, and under color of law, were,

from March 11, 2010 through the Children's adoption on June 6, 2010, deliberately indifferent to the

Children's constitutional right to a safe and secure foster care placement. They had notice of the

following dangers:

 a. Failing to monitor the safety of the Children on a monthly basis pursuant to Ohio, South Carolina, and Federal law, and generally accepted social work standards.

 b. Failing to monitor the safety of the Children on a monthly basis by speaking:

  1. with each child, individually, in private, and outside of the presence of the Mitchells regarding their health and safety in the foster home.

  2. with collateral sources such as day care providers, teachers, school officials, neighbors, mental health providers, and medical providers for the Children on a monthly basis regarding the care and safety of the Children.

 c. Failing to investigate and assess the safety of the children in the home by:

  1. reviewing the medical and mental health records of the Children which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss.

  2. reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of children in the home.

  3. determining who lived in the home, to include the Mitchells' sons and their grandchildren.

 d. Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

 e. Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

 f. Failing to observe the Children with Yulanda Mitchell, who showed they were visibly afraid of Yulanda Mitchell.

 g. Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the South Carolina Department of Social Services' Registry of Abuse and Neglect.

 161. These constitutional responsibilities are nondelegable duties.

 162. FCCS, FCCS Case Worker #1, FCCS Case Worker #2, and FCCS Case Worker

Supervisor #1 ignored these dangers notwithstanding their notice of them.

 163. FCCS created and established unconstitutional policies and procedures that directly

led to the harms endured by the Children and they are listed below:

  1. Failing to properly vet and investigate adoption placement contractors such as Adoption Advocacy, Inc., June Bond, and Joe Haynes.

  2. Failing to monitor adoption placement contractors such as Adoption Advocacy, Inc., June Bond, and Joe Haynes.

3.      Failing to monitor the safety of an out of state foster home of a foster child in the custody of the state of Ohio on a monthly basis pursuant to Ohio law, South Carolina law, and Federal law and generally accepted social work standards.

4.      Failing to monitor the safety of the Children in the home by speaking with each child, individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the foster home in accordance with generally accepted social work standards.

5.      Failing to monitor the safety of the Children by speaking with collateral sources, such as day care providers, teachers, and service on a monthly basis regarding the care and safety of the children.

6.      Failing to investigate and assess the safety of the children in the home by reviewing the medical records of the Children which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss over a two month period.

7.      Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors, administrators, and educators regarding the treatment of the children.

8.      Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers regarding the treatment of the children.

9.      Failing to investigate and assess the safety of the children in the home by reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of S.T.S. and another foster child.

10.     Failing to investigate and assess the safety of the children in the home by determining who lived in the home, to include the Mitchells' sons and their grandchildren.

11.     Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

12.     Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

13.     Failing to investigate by observing that S.T.S. failed to grow during the time since SCDSS placed S.T.S. with the Mitchells observe that he looked emaciated.

14.     Failing to observe the Children with Yulanda Mitchell, who visibly showed they were afraid of Yulanda Mitchell.

15.     Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.

164.    FCCS, FCCS Case Worker #1, FCCS Case Worker #2, and FCCS Case Worker Supervisor #1 either misrepresented the safety of the Children to the Beaufort County Family Court or they were willfully blind, or incompetent.

165.    A.M.L., J.J.L., R.D.M., and J.J.G. suffered the attacks and starvation and the injuries set out above, were the direct and proximate result of the constitutional violations by Franklin County Children Services, FCCS Case Worker #1, FCCS Case Worker #2, and FCCS Case Worker Supervisor #1.

166.    A.M.L., J.J.L., R.D.M., and J.J.G. asks the Court to award damages, punitive damages, and attorneys' fees and cost.

### Seventh Cause of Action

**Violation of Fourteenth Amendment Right to a Safe & Secure Placement – 42 U.S.C. §1983 (Failure to Protect – Franklin County Children Services, FCCS Case Worker #3, FCCS Case Worker #4, and FCCS Case Worker Supervisor #2)**

167.    Plaintiffs incorporate paragraphs 1-166 as if restated herein verbatim.

168.    From the time of her placement in April 2015 until her adoption on October 15, 2015, E.R.L. was a ward of the state of Ohio, a minor child, and unable to protect herself.

169.    As part of its agreement with the State of South Carolina under the ICPC, FCCS, FCCS Case Worker #3, FCCS Case Worker #4, and FCCS Case Worker Supervisor #2 were required to assess, investigate, and monitor E.R.L. in the Mitchell Foster home to ensure that E.R.L. was safe and protected. The placement of E.R.L. in the foster home was at the behest of the State of Ohio and E.R.L. was entitled to their constitutional right to a safe and secure placement, free of abuse, neglect, and starvation.

170.    The Fourteenth Amendment to the United States Constitution guarantees the right of all children in custody to a safe and secure placement.

171. Under 42 U.S.C. § 1983, persons acting under color of state law are liable for violating constitutional rights.

172. FCCS, FCCS Case Worker #3, FCCS Case Worker #4, and FCCS Case Worker Supervisor #2, acting in their individual capacities and under *Monell*, under color of South Carolina Law, were, from April 2015 through E.R.L.'s adoption on October 15, 2015, deliberately indifferent to E.R.L.'s constitutional right to a safe and secure foster care placement. They had notice of the following dangers:

    a.    Failing to monitor the safety of the Children on a monthly basis pursuant to Ohio, South Carolina, and Federal law, and generally accepted social work standards.

    b.    Failing to monitor the safety of the Children on a monthly basis by speaking:

        1.    with each child, individually, in private, and outside of the presence of the Mitchells regarding their health and safety in the foster home.

        2.    with collateral sources such as day care providers, teachers, school officials, neighbors, mental health providers, and medical providers for the Children on a monthly basis regarding the care and safety of the Children.

    c.    Failing to investigate and assess the safety of the children in the home by:

        1.    reviewing the medical and mental health records of the Children which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss.

        2.    reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of children in the home.

        3.    determining who lived in the home, to include the Mitchells' sons and their grandchildren.

    d.    Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

    e.    Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

    f.    Failing to observe the Children with Yulanda Mitchell, who showed they were visibly afraid of Yulanda Mitchell.

    g.    Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the South Carolina Department of Social Services' Registry of Abuse and Neglect.

173. These constitutional responsibilities are nondelegable duties.

174. FCCS, FCCS Case Worker #3, FCCS Case Worker #4, and FCCS Case Worker Supervisor #2 ignored these dangers notwithstanding their notice of them.

175.    FCCS created and established unconstitutional policies and procedures that directly led to the harms endured by the E.R.L. and they are listed below:

a.    Failing to properly vet and investigate adoption placement contractors such as Adoption Advocacy, Inc., June Bond, and Joe Haynes.

b.    Failing to monitor adoption placement contractors such as Adoption Advocacy, Inc., June Bond, and Joe Haynes.

c.    Failing to properly vet and investigate adoption placement contractors such as Adoption Advocacy, Inc., June Bond, and Joe Haynes.

d.    Failing to monitor adoption placement contractors such as Adoption Advocacy, Inc., June Bond, and Joe Haynes.

e.    Failing to monitor the safety of foster home of a foster child in the custody of the state of Ohio on a monthly basis pursuant to Ohio law, South Carolina law, and Federal law and generally accepted social work standards.

f.    Failing to monitor the safety of E.R.L. in the home by speaking with each child, individually, in private, and outside of the presence of the Mitchells on a monthly basis regarding their health and safety in the foster home in accordance with generally accepted social work standards.

g.    Failing to monitor the safety of E.R.L. by speaking with collateral sources, such as day care providers, teachers, and service providers for E.R.L. on a monthly basis regarding the care and safety of the children.

h.    Failing to investigate and assess the safety of the children in the home by reviewing the medical records of the Children, which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss over a two month period.

i.    Failing to investigate and assess the safety of the children in the home by speaking with the day care providers, schools, guidance counselors, administrators, and educators regarding the treatment of the children.

j.    Failing to investigate and assess the safety of the children in the home by speaking with neighbors, members of the community, counselors, therapists, medical providers, and other service providers for regarding the treatment of the children.

k.    Failing to investigate and assess the safety of the children in the home by reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of the Children.

l.    Failing to investigate and assess the safety of the children in the home by determining who lived in the home, to include the Mitchells' sons and their grandchildren.

m.    Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

n.    Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

o.    Failing to investigate by observing that the Children failed to grow during the time the children were placed with the Mitchells and failing to observe that the children looked emaciated.

p.      Failing to observe the Children with Yulanda Mitchell, as the children visibly showed they were afraid of Yulanda Mitchell.

q.      Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the information she provided on her application for screening for the South Carolina Department of Social Services' Registry of Abuse and Neglect.

176.    FCCS, FCCS Case Worker #3, FCCS Case Worker #4, and FCCS Case Worker Supervisor #2 either misrepresented the safety of E.R.L. to the Beaufort County Family Court or they were willfully blind, or incompetent.

177.    E.R.L. suffered the attacks and starvation and the injuries set out above, were the direct and proximate result of the constitutional violations by FCCS, FCCS Case Worker #3, FCCS Case Worker #4, and FCCS Case Worker Supervisor #2.

178.    E.R.L. asks the Court to award damages, punitive damages, and attorneys' fees and cost.

**Eighth Cause of Action**
**Negligence**
**(Franklin County Children Services)**

179.    Plaintiffs incorporate paragraphs 1-178 as if restated herein verbatim.

180.    FCCS is sued under the South Carolina Long Arm Statute, S.C. Code Ann. § 36-2-803.

181.    At all times during this matter the A.M.L., J.J.L., R.D.M., and J.J.G. were clients of the FCCS.

182.    FCCS is liable for its tortious acts and the tortious acts of its employees and agents performed in the scope of their employment when it exercises its responsibility or duty in a negligent manner as to the supervision, protection, control, confinement, or custody of any client.

183.    Defendant FCCS owed a duty of care to A.M.L., J.J.L., R.D.M., and J.J.G. because it is statutorily charged by the Ohio General Assembly to investigate allegations of child abuse and

neglect, assess and monitor placements of foster children under the ICPC, provide services to

families in need, to do so in a manner that does not violate individuals' rights and liberties, and does

not cause unnecessary harm to any child or family.

184.    These responsibilities are nondelegable duties.

185.    From March 11, 2010, through June 6, 2010, FCCS and its employees and agents,

acting within the scope of their employment, were negligent, willful, wanton, careless, grossly

negligent in exercising its duties and responsibilities of supervision, protection, control, confinement,

and/or custody of the Plaintiffs in:

a.    Failing to monitor the safety of the Children on a monthly basis pursuant to Ohio, South Carolina, and Federal law, and generally accepted social work standards.

b.    Failing to monitor the safety of the Children on a monthly basis by speaking:
   1.    with each child, individually, in private, and outside of the presence of the Mitchells regarding their health and safety in the foster home.
   2.    with collateral sources such as day care providers, teachers, school officials, neighbors, mental health providers, and medical providers for the Children on a monthly basis regarding the care and safety of the Children.

c.    Failing to investigate and assess the safety of the children in the home by:
   1.    reviewing the medical and mental health records of the Children which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss.
   2.    reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of children in the home.
   3.    determining who lived in the home, to include the Mitchells' sons and their grandchildren.

d.    Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

e.    Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

f.    Failing to observe the Children with Yulanda Mitchell, who showed they were visibly afraid of Yulanda Mitchell.

g.    Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the South Carolina Department of Social Services' Registry of Abuse and Neglect.

186.    A.M.L., J.J.L., R.D.M., and J.J.G. suffered abuse, starvation, and injuries as set out in

this Complaint as the direct and proximate result of the acts and failures to act by FCCS.

187.    A.M.L., J.J.L., R.D.M., and J.J.G. seek damages, punitive damages, special damages, and costs.

### Ninth Cause of Action
### Negligence
### (Franklin County Children Services)

188.    Plaintiffs incorporate paragraphs 1-187 as if restated herein verbatim.

189.    FCCS is sued under the South Carolina Long Arm Statute, S.C. Code Ann. § 36-2-803.

190.    At all times during this matter the E.R.L. was a client of FCCS.

191.    FCCS is liable for its tortious acts and the tortious acts of its employees and agents performed in the scope of their employment when it exercises its responsibility or duty in a negligent manner as to the supervision, protection, control, confinement, or custody of any client.

192.    FCCS owed a duty of care to E.R.L. because it is statutorily charged by the General Assembly to investigate allegations of child abuse and neglect, assess and monitor placements of foster children under the ICPC, provide services to families in need, to do so in a manner that does not violate individuals' rights and liberties, and does not cause unnecessary harm to any child or family.

193.    These responsibilities are nondelegable duties.

194.    From April 2015 through October 15, 2015, FCCS and its employees and agents, acting within the scope of their employment, were negligent, willful, wanton, careless, grossly negligent in exercising its duties and responsibilities of supervision, protection, control, confinement, and/or custody of E.R.L. in:

    a.    Failing to monitor the safety of the Children on a monthly basis pursuant to Ohio, South Carolina, and Federal law, and generally accepted social work standards.

    b.    Failing to monitor the safety of the Children on a monthly basis by speaking:

        1.    with each child, individually, in private, and outside of the presence of the Mitchells regarding their health and safety in the foster home.

      2.      with collateral sources such as day care providers, teachers, school officials, neighbors, mental health providers, and medical providers for the Children on a monthly basis regarding the care and safety of the Children.

  c.      Failing to investigate and assess the safety of the children in the home by:

      1.      reviewing the medical and mental health records of the Children which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss.

      2.      reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of children in the home.

      3.      determining who lived in the home, to include the Mitchells' sons and their grandchildren.

  d.      Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

  e.      Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

  f.      Failing to observe the Children with Yulanda Mitchell, who showed they were visibly afraid of Yulanda Mitchell.

  g.      Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the South Carolina Department of Social Services' Registry of Abuse and Neglect.

195.      E.R.L. suffered abuse, starvation, and injuries as set out in this Complaint as the direct and proximate result of the acts and failures to act by FCCS.

196.      E.R.L. seeks damages, punitive damages, special damages, and costs.

**C. Adoption Advocacy Defendants.**

### **Tenth Cause of Action**
**Violation of Fourteenth Amendment Right to a Safe & Secure Placement – 42 U.S.C. §1983**
**(Failure to Protect - Adoption Advocacy, Inc., June Bond, and Joe Haynes)**

197.      Plaintiffs incorporate paragraphs 1-196 as if it were restated herein verbatim.

198.      From the time of their placement on March 11, 2010, until their adoption on June 6, 2010, A.M.L., J.J.L., R.D.M., and J.J.G. were wards of the state of Ohio, minor children, and unable to protect themselves.

199.     Adoption Advocacy, Inc., June Bond, and Joe Haynes, were compensated by FCCS and the state of Ohio to assess, investigate, and monitor these Children in the Mitchell Foster home to ensure that the Children were safe and protected. The placement of the Children in the foster home was at the behest of the State of Ohio and they were entitled to their constitutional right to a safe and secure placement free of abuse, neglect, and starvation.

200.     The Fourteenth Amendment to the United States Constitution guarantees the right of all children in custody to a safe and secure placement.

201.     Under 42 U.S.C. § 1983, persons acting under color of state law are liable for violating constitutional rights.

202.     Adoption Advocacy, Inc., June Bond, and Joe Hayne became state actors when they stepped into the shoes of FCCS and assumed the duties of placing the children, investigating the Mitchell home, and monitoring the Mitchell home from March 11, 2010 through the adoption on June 6, 2010.

203.     Adoption Advocacy, Inc., June Bond, and Joe Hayne, acting in their individual capacities, under color of law, were, from March 11, 2010, until their adoption on June 6, 2010, deliberately indifferent to A.M.L.'s, J.J.L.'s, R.D.M.'s, and J.J.G.'s constitutional right to a safe and secure foster care placement. They had notice of the following dangers:

    a.    Failing to monitor the safety of the Children on a monthly basis pursuant to Ohio, South Carolina, and Federal law, and generally accepted social work standards.

    b.    Failing to monitor the safety of the Children on a monthly basis by speaking:

        1.    with each child, individually, in private, and outside of the presence of the Mitchells regarding their health and safety in the foster home.

        2.    with collateral sources such as day care providers, teachers, school officials, neighbors, mental health providers, and medical providers for the Children on a monthly basis regarding the care and safety of the Children.

    c.    Failing to investigate and assess the safety of the children in the home by:

        1.    reviewing the medical and mental health records of the Children which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss.

        2.        reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of children in the home.

        3.        determining who lived in the home, to include the Mitchells' sons and their grandchildren.

d.      Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

e.      Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

f.      Failing to observe the Children with Yulanda Mitchell, who showed they were visibly afraid of Yulanda Mitchell.

g.      Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the South Carolina Department of Social Services' Registry of Abuse and Neglect.

204.      Adoption Advocacy, Inc., June Bond, and Joe Haynes ignored these dangers notwithstanding their notice of them.

205.      Adoption Advocacy, Inc., June Bond, and Joe Haynes either misrepresented the safety of A.M.L., J.J.L., R.D.M., and J.J.G. to SCDSS, FCCS, and the Beaufort County Family Court or they were willfully blind, or incompetent.

206.      A.M.L., J.J.L., R.D.M., and J.J.G. suffered the attacks and starvation and the injuries set out above as the direct and proximate result of the constitutional violations by Adoption Advocacy, Inc., June Bond, and Joe Haynes.

207.      A.M.L., J.J.L., R.D.M., and J.J.G. ask the Court to award damages, punitive damages, and attorneys' fees and cost.

### Eleventh Cause of Action
### Negligence, Recklessness, Willfulness or Gross Negligence as to Adoption Advocacy, Inc., June Bond, and Joe Haynes Under the South Carolina Solicitation of Charitable Funds Act

208.      Plaintiffs incorporate paragraphs 1-207 as if it were restated herein verbatim.

209.      Under the South Carolina Solicitation of Charitable Funds Act, § 33-56-10 *et seq.* of the Code of Law of South Carolina 1976, as amended, and the Common Law of South Carolina,

Adoption Advocacy, Inc. is liable for its tortious acts and the tortious acts of its employees acting in the scope of their employment.

210.    Adoption Advocacy, Inc.'s employees are also liable for their own tortious actions when, "the employee of the charitable organization whose act or omission gave rise to the claim unless it is alleged and proved in the action that the employee acted in a reckless, wilful, or grossly negligent manner." S.C. Code Ann. §33-56-180(A).

211.    Adoption Advocacy, Inc., June Bond, and Joe Haynes, from March 11, 2010 through the adoption on June 6, 2010, were, negligent, willful, wanton, reckless, careless, grossly negligent, and failed to exercise even slight care in having notice of the following dangers:

   a.    Failing to monitor the safety of the Children on a monthly basis pursuant to Ohio, South Carolina, and Federal law, and generally accepted social work standards.
   b.    Failing to monitor the safety of the Children on a monthly basis by speaking:
      1.    with each child, individually, in private, and outside of the presence of the Mitchells regarding their health and safety in the foster home.
      2.    with collateral sources such as day care providers, teachers, school officials, neighbors, mental health providers, and medical providers for the Children on a monthly basis regarding the care and safety of the Children.
   c.    Failing to investigate and assess the safety of the children in the home by:
      1.    reviewing the medical and mental health records of the Children which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss.
      2.    reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of children in the home.
      3.    determining who lived in the home, to include the Mitchells' sons and their grandchildren.
   d.    Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.
   e.    Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.
   f.    Failing to observe the Children with Yulanda Mitchell, who showed they were visibly afraid of Yulanda Mitchell.
   g.    Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the South Carolina Department of Social Services' Registry of Abuse and Neglect.

212.    A.M.L., J.J.L., R.D.M., and J.J.G. suffered abuse, starvation, and injuries as set out in this Complaint as the direct and proximate result of the acts and failures to act by Adoption Advocacy, Inc., June Bond, and Joe Haynes.

213.    A.M.L., J.J.L., R.D.M., and J.J.G. seek damages, punitive damages, and costs against Adoption Advocacy, Inc., June Bond, and Joe Haynes.

**Twelfth Cause of Action**
**Violation of Fourteenth Amendment Right to a Safe & Secure Placement – 42 U.S.C. §1983**
**(Failure to Protect - Adoption Advocacy, Inc., June Bond, and Joe Haynes)**

214.    Plaintiffs incorporate paragraphs 1-213 as if restated herein verbatim.

215.    From the time of her placement in April 2015 until her adoption on October 15, 2015, E.R.L. was a ward of the state of Ohio, a minor child, and unable to protect herself.

216.    Adoption Advocacy, Inc., June Bond, and Joe Haynes, were compensated by FCCS and the state of Ohio to assess, investigate, and monitor E.R.L. in the Mitchell Foster home to ensure that E.R.L. was safe and protected. The placement of E.R.L. in the foster home was at the behest of the State of Ohio and E.R.L. was entitled to her constitutional right to a safe and secure placement free of abuse, neglect, and starvation.

217.    The Fourteenth Amendment to the United States Constitution guarantees the right of all children in custody to a safe and secure placement.

218.    Under 42 U.S.C. § 1983, persons acting under color of state law are liable for violating constitutional rights.

219.    Adoption Advocacy, Inc., June Bond, and Joe Hayne became state actors when they stepped into the shoes of FCCS and assumed the duties of placing E.R.L., investigating the Mitchell home, and monitoring the Mitchell home from April 2015 through the adoption.

220.    Adoption Advocacy, Inc., June Bond, and Joe Hayne, acting in their individual capacities, under color of law, were, from April 2015, until E.R.L.'s adoption in October 2015, were deliberately indifferent to E.R.L.'s constitutional right to a safe and secure foster care placement. They had notice of the following dangers:

    a.    Failing to monitor the safety of the Children on a monthly basis pursuant to Ohio, South Carolina, and Federal law, and generally accepted social work standards.

    b.    Failing to monitor the safety of the Children on a monthly basis by speaking:

        1.    with each child, individually, in private, and outside of the presence of the Mitchells regarding their health and safety in the foster home.

        2.    with collateral sources such as day care providers, teachers, school officials, neighbors, mental health providers, and medical providers for the Children on a monthly basis regarding the care and safety of the Children.

    c.    Failing to investigate and assess the safety of the children in the home by:

        1.    reviewing the medical and mental health records of the Children which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss.

        2.    reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of children in the home.

        3.    determining who lived in the home, to include the Mitchells' sons and their grandchildren.

    d.    Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

    e.    Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

    f.    Failing to observe the Children with Yulanda Mitchell, who showed they were visibly afraid of Yulanda Mitchell.

    g.    Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the South Carolina Department of Social Services' Registry of Abuse and Neglect.

221.    Adoption Advocacy, Inc., June Bond, and Joe Haynes ignored these dangers notwithstanding their notice of them.

222.    Adoption Advocacy, Inc., June Bond, and Joe Haynes either misrepresented the safety of E.R.L. to SCDSS, FCCS, and the Beaufort County Family Court or they were willfully blind, or incompetent.

223.    E.R.L. suffered the attacks and starvation and the injuries set out above, were the direct and proximate result of the constitutional violations by Adoption Advocacy, Inc., June Bond, and Joe Haynes.

224.    E.R.L. asks the Court to award damages, punitive damages, and attorneys' fees and costs.

### Thirteenth Cause of Action
**Negligence, Recklessness, Willfulness or Gross Negligence as to Adoption Advocacy, Inc., June Bond, and Joe Haynes Under the South Carolina Solicitation of Charitable Funds Act**

225.    Plaintiffs incorporate paragraphs 1-222428 as if restated herein verbatim.

226.    Under the South Carolina Solicitation of Charitable Funds Act, § 33-56-10 *et seq.* of the Code of Law of South Carolina 1976, as amended, and the Common Law of South Carolina, Adoption Advocacy, Inc. is liable for its tortious acts and the tortious acts of its employees acting in the scope of their employment.

227.    Adoption Advocacy, Inc.'s employees are also liable for their own tortious actions when, "the employee of the charitable organization whose act or omission gave rise to the claim unless it is alleged and proved in the action that the employee acted in a reckless, wilful, or grossly negligent manner." S.C. Code Ann. §33-56-180(A).

228.    Adoption Advocacy, Inc., June Bond and Joe Haynes, from April 2015 through the adoption of E.R.L. in October 2015, were, negligent, willful, wanton, reckless, careless, grossly negligent, and failed to exercise even slight care in having notice of the following dangers:

a.    Failing to monitor the safety of the Children on a monthly basis pursuant to Ohio, South Carolina, and Federal law, and generally accepted social work standards.
b.    Failing to monitor the safety of the Children on a monthly basis by speaking:
   1.    with each child, individually, in private, and outside of the presence of the Mitchells regarding their health and safety in the foster home.
   2.    with collateral sources such as day care providers, teachers, school officials, neighbors, mental health providers, and medical providers for the Children on a monthly basis regarding the care and safety of the Children.
c.    Failing to investigate and assess the safety of the children in the home by:

1.     reviewing the medical and mental health records of the Children which showed complaints of neglect and food deprivation by schools and day care, a failure to thrive, food withholding, stealing food, hoarding food, eating out of garbage cans, drinking water from a toilet, failure to follow a pediatrician's instructions, and the children's chronic weight loss.

2.     reviewing SCDSS records regarding the numerous documented complaints of abuse and neglect of children in the home.

3.     determining who lived in the home, to include the Mitchells' sons and their grandchildren.

d.     Failing to investigate the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home.

e.     Failing to investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms.

f.     Failing to observe the Children with Yulanda Mitchell, who showed they were visibly afraid of Yulanda Mitchell.

g.     Failing to investigate by requiring a copy of Yulanda Mitchell's driver's license, social security card, and birth certificate and comparing that to the South Carolina Department of Social Services' Registry of Abuse and Neglect.

229.     E.R.L. suffered abuse, starvation, and injuries as set out in this Complaint as the direct and proximate result of the acts and failures to act by Adoption Advocacy, Inc., June Bond, and Joe Haynes.

230.     E.R.L. seeks damages, punitive damages, and costs against Adoption Advocacy, Inc., June Bond, and Joe Haynes.

WHEREFORE, Plaintiffs requests the Court enter judgment in her favor for:

A.     Damages and special damages in the appropriate amount;

B.     Punitive damages as are appropriate and when allowed by statute or the common law;

C.     Attorneys' fees, costs, expenses, and disbursements of this action when allowed by statute or the common law;

D.     Interest; and

E.     Such other and further relief as is just and proper.

Respectfully Submitted,

s//Robert J. Butcher
Robert J. Butcher
Federal Bar No. 9767
Deborah J. Butcher
Federal Bar No. 10731
The Foster Care Abuse Law Firm, PA
507 Walnut Street
Camden, South Carolina 29020
P.O. Box 610
Camden, South Carolina 29021
Telephone: (803) 432-7599
Facsimile: (803) 432-7499
Email: rbutcher@camdensc-law.com
Email: dbutcher@camdensc-law.com

Camden, South Carolina
March 15, 2023