THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| A.M.L., J.J.L., E.R.L., by and through their Next of Friend, John Doe, R.D.M., by and through his Next of Friend, Jane Snow, J.J.G., and S.T.S.,<br><br>              Plaintiffs,<br><br>v.<br><br>South Carolina Department of Social Services, *et al.*,<br><br>              Defendants. | C.A. No. 9:22-1874-RMG<br><br>**ORDER** |

       This matter comes before the Court on a motion for summary judgment brought by Defendants Franklin County Children Services ("FCCS") and various unnamed FCCS employees[1] sued in their individual capacities for alleged violations of the constitutional rights of Plaintiffs as well under a common law negligence claim. (Dkt. No. 162). Plaintiffs filed a memorandum in opposition to the motion for summary judgment and the FCCS related defendants filed a reply. (Dkt, Nos. 179, 184). The Court also considers in this order a closely related motion for summary judgment brought by a contractor of FCCS, Adoption Advocacy, Inc ("Adoption Advocacy"), and two named employees of Adoption Advocacy, June Bond and Joe Hayes, for alleged violations of

---

[1] Plaintiffs referenced FCCS individually sued employees in their Fourth Amended Complaint only by John Doe designations: FCCS Case Worker #1, FCCS Case Worker #2, FCCS case worker # 3, FCCS Case Worker # 4, FCCS Case Worker Supervisor # 1, and FCCS Case Worker Supervisor # 2. (Dkt. No. 103 at 1, 3-4). Since the filing of the Fourth Amended Complaint, Plaintiffs have not amended their complaint to actually identify any FCCS employee by name and set forth any allegations regarding such individually named employees specific alleged acts and/or omissions.

1

Plaintiffs constitutional rights as well as a claim under the South Carolina Solicitation of Charitable Funds Act. (Dkt. No. 165). Plaintiff filed a memorandum in opposition to the motion for summary judgment and the Adoption Advocacy related defendants filed a reply. (Dkt. Nos. 180, 185). For reasons set forth below, both motions for summary judgment are granted.[2]

## Legal Standard

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *See id.* Therefore, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).

---

[2] Defendants have strenuously objected to Plaintiffs attaching to their memoranda in opposition to the motions for summary judgment a document titled "Statement of Material Facts in Dispute," which is 148 pages in length and contains 471 paragraphs. (Dkt. No. 179-72). Defendants assert that this attachment was "clearly designed as an attempt to by-pass the page limitations" set in the Local Rule 7.05(B) of 35 pages. (Dkt. Nos. 184 at 5-6; 185 at 9). It is clear that Plaintiffs' attachment represents a flagrant violation of the Local Rules and placed the Defendants at a distinct disadvantage since they have honored the page limits set by court rules. This is not the first occasion in which the Court has been required to address excessive filings by Plaintiffs' counsel, Robert Butcher. Earlier in the case, the Court addressed Plaintiffs' Third Amended Complaint, which ran 332 pages and "contained numerous unrelated claims against twenty one named defendants and twenty 'John Doe' defendants that could not conceivably be tried in a single jury trial." (Dkt. No. 90 at 1). The Court, exercising its authority to sever claims under Fed. R. Civ. P. 21, split the case into five separate cases and then remanded all but one of casesto state court because of the lack of federal jurisdiction. The Court grants Defendants' motion to strike Plaintiffs' "Statement of Material Facts in Dispute" because its submission was plainly in violation of court rules and placed Defendants in an unfair disadvantage.

A fact is "material" only if "its existence might affect the outcome of the suit under governing law. Obviously, what facts are material will depend on the claims pleaded in the complaint . . . By framing the dispute, the pleadings affect the availability of summary judgment." Moore's Federal Practice, Vol. 11, § 56.05[1][a] (2024). A claim that is not raised in the last amended complaint and "first raised in response to a motion for summary judgment is not properly before the court and may be disregarded on that ground." *Id*. Further, a plaintiff may not amend his complaint through argument in a brief opposing summary judgment and "may not raise new claims after discovery has begun without amending his complaint." *Wahi v. Charleston Area Medical Center, Inc.*, 562 F.3d 599, 617 (4th Cir. 2009); *Barclay White Skanska, Inc. v. Battelle Memorial Institute*, 262 Fed. Appx. 556, 563 (4th Cir. 2008).

"In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The movant bears the initial burden of demonstrating that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has made this threshold demonstration, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue to survive the motion for summary judgment. *See id.* at 324. Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

It is well settled that in passing upon a motion for summary judgment, the claims pleaded in the last filed complaint frame the dispute, and a party cannot amend his complaint via arguments first raised in a response to a motion for summary judgment. *Wahi v. Charleston Area Medical*

*Center, Inc.*, 562 F.2d 599, 617 (4th Cir. 2009); *Barclay White Skanska, Inc. v. Battelle Memorial Institute*, 262 Fed. Appx. 556, 563 (4th Cir. 2008); Moore's Federal Practice, Vol. 11, §§ 56.05[1][a], 56.81[4]. Any claim raised for the first time in response to a motion for summary judgment is not properly before the court and should be disregarded. *Id.*

## Factual Background

It is important at the outset to place in the proper context the role of FCCS and Adoption Advocacy in regard to their relationship to the Plaintiffs and their claims in this action. In 2009, Plaintiffs A.M.L., J.J.L., J.J.G., and R.D.M. were minor siblings in the custody of FCCS, a county social service agency in Ohio. The children had been placed into the custody of FCCS after they were removed from the home of the biological mother due to abuse and neglect. After the biological mother's parental rights were terminated, FCCS sought an adoption placement for the four siblings that would keep the children together, a rather challenging undertaking. FCCS was advised by Adoption Advocacy, a Greenville, South Carolina nonprofit it had done work since the early 2000's, that it had identified a couple, Yulanda and Herbert Mitchell of Beaufort County, South Carolina, that was willing to adopt the four siblings.

Adoption Advocacy was a modest not for profit operation, with two employees, June Bond and Joe Hayes, who held certificates from the state of South Carolina as adoption investigators. (Dkt. No. 166-21 at 11-12). Adoption Advocacy was founded in 1999 and assisted out of state social service agencies which sought to make an adoption placement in South Carolina through the Interstate Compact on the Placement of Children ("ICPC"). Adoption Advocacy investigators Bond and Hayes performed contract work with social service agencies from 25 states and were subject to annual audits of their records by the South Carolina Department of Social Services ("SCDSS") in association with the renewal of their licenses. Adoption Advocacy never had any

issue with the license renewals of Bond and Hayes and had never been sued before this action. (*Id*. at 11-12, 14-15).

An interstate adoption of foster children is a highly formalized process under the ICPC. The "sending state," in this case Ohio, retains custody of the child throughout the adoption process and is responsible for conducting background checks, home visitations and supervision from the time of the placement in a home in the receiving state until the adoption process is completed. S.C. Code § 63-9-2200, Subsection 5(a). South Carolina has established detailed requirements for conducting background checks of the proposed adoptive parents. *See*, S.C. Code § 63-9-520; (Dkt. Nos. 180-2, 180-8, 180-9). These include requirements for a criminal background check, child abuse registry check, sex offender registry check, financial information review, physical examinations of the proposed adoptive parents and a whole host of other matters. (Dkt. No. 180-8 at 9). The sending state also was required to perform home visitations and to interview the prospective adoptive parents and (once placed) the proposed adopted children. (*Id*. at 2-4).

Under the normal processing of interstate adoptions, sending states routinely contract with a local adoption agency to assist in performing the required background checks, home assessments and home visits. In most instances, the local adoption agencies perform the background checks and the required home visitations on behalf of the sending state. FCCS, in addition to contracting with Adoption Advocacy to perform the required background checks and home visitations, sent staff from Ohio to conduct its own interviews with the Mitchells and the children, effectively double staffing the home visitation process. According to Defendant Hayes, FCCS was the only out of state social service agency in his experience which both contracted with a local agency to

conduct home interviews and conducted its own monthly home visits by bringing its own out of state staff to South Carolina. (Dkt. No. 166-21 at 47-48, 58).

In March 2010, FCCS entered into a contract with Adoption Advocacy to perform certain specified duties related to the proposed adoption of the four siblings. These included conducting the home study and performing home visitations and monthly reports. (Dkt. No. 166-16). Ms. Bond conducted the home visitations for Adoption Advocacy and as well as the background investigation. Her monthly reports were detailed and suggested no issues regarding the Mitchells' proposed adoption of the children. (Dkt. No. 191-5). FCCS staff, going beyond the requirements of the ICPC, conducted their own in person home visits with the Mitchells and the children in April and May 2010 and had no concerns regarding the proposed adoptions. (Dkt. No. 162-1 at 3-4). All of the background checks, including criminal history, sexual abuse history, and child abuse history, came back clear. (*Id*. at 3). Adoption Advocacy recommended the finalization of the adoption of the four children, and the Beaufort County Family Court entered an order on June 11, 2010 formally approving the adoptions of the four children by the Mitchells.

FCCS, Adoption Advocacy, and the Beaufort County Family Court all lacked critical disqualifying information regarding Yulanda Mitchell's child abuse history prior to the 2010 adoption of the four siblings. In July 1998, SCDSS was provided information about the suspected abuse of a child that had been privately placed into the custody of Ms. Mitchell. An investigation confirmed the child had suffered severe physical abuse at the hands of Ms. Mitchell and the child was removed from the Mitchell home. In January 1999, a Family Court hearing was conducted regarding the allegations of child abuse by Ms. Mitchell. After conducting a full hearing on the matter, Family Court Judge Gerald Smoak found that Ms. Mitchell "physically abused the child" and that she would "present significant risk of committing physical or sexual abuse or willful or

6

reckless neglect" if allowed to care for a child. (Dkt. No. 178-4 at 6). Judge Smoak ordered that Ms. Mitchell be placed on the Central Registry for Child Abuse and Neglect ("Child Abuse Registry") based upon his findings. (*Id.*).

At that time, a person determined to be a child abuser would be placed on the Child Abuse Registry for seven years. In 2002, South Carolina law was changed and persons listed on the Child Abuse Registry remained for life. This new rule was not made retroactive and eventually Ms. Mitchell's name was removed from the Child Abuse Registry. SCDSS was allowed, however, to retain information relating to any "indicated" case after the seven year period on the Child Abuse Registry had expired. S.C. Code § 63-7-1960. The catch was that Ms. Mitchell's child abuse history was not publicly available. When Adoption Advocacy made inquiry to SCDSS in 2010 whether Ms. Mitchell was on the Child Abuse Registry, it was told she was not, with no disclosure of her past child abuse history.[3]

Additionally, in June 2005, while Ms. Mitchell was still on the Child Abuse Registry, a family member reported to SCDSS suspected child abuse by Ms. Mitchell of another child she had privately obtained custody. The report identified potential witnesses to the abuse, including the family member reporter, her mother, her daughter, and Ms. Mitchell's mother. The report also disclosed that Ms. Mitchell "has been in trouble for child abuse in the past." (Dkt. No. 178-3). A Beaufort County Deputy Sheriff interviewed Ms. Mitchell, and she claimed that the child had suffered bruises when she fell getting out of an automobile. The deputy sheriff found no evidence "at this time" to indicate abuse but, out of an abundance of caution, contacted SCDSS and advised a staff member of the incident "due to the past history of the suspect." (*Id.*). There is no evidence

---

[3] The Child Abuse Registry as well as the SCDSS records of previously "founded" child abuse cases were under the exclusive control of SCDSS and not accessible to adoption investigators, out of state social service agencies, or the general public.

7

that the family members with personal knowledge of Ms. Mitchell's alleged abuse were interviewed by the law enforcement officer.

Despite the fact that state law required an "appropriate and thorough investigation" by SCDSS upon the receipt of a child abuse report, no child abuse investigation was initiated SCDSS. Two years later, Ms. Mitchell's name went off the Child Registry.[4] There is no evidence in the record that FCCS or Adoption Advocacy had any knowledge of the 1998 child abuse report, the removal of a child from the Mitchell home due to a child abuse report, the 2000 judicial finding of child abuse, or the 2005 family report of child abuse. Hayes made it clear that had Adoption Advocacy been aware of Ms. Mitchell's abuse history, the adoption process would have immediately terminated. (Dkt. No. 166-21 at 55).

After the adoption of the four siblings was finalized in 2010, SCDSS received reports of alleged child abuse regarding Ms. Mitchell in January 2011, April 2012, September 2013, January 2015, and April 2016. (Dkt. No. 158-17, 158-18, 158-19, 158-21, 158-23, 158-25, 158-26, 158-27, 158-28, 158-29, 158-30 158-31, 158-32, 158-33, 158-34, 158-36, 158-37, 158-40). A number of these reports came from school personnel. All of these reports were determined by SCDSS to be unfounded. The record indicates that none of the investigations included an examination of the past abuse records regarding Ms. Mitchell that were in the SCDSS files. Finally, following still another abuse report from school personnel in October 2016, the children were removed from the Mitchell home and determined to have suffered severe physical abuse and chronic withholding of food that had resulted in the four children being in the first percentile for growth for their ages. (Dkt. Nos. 158-63, 158-64, 158-65, 158-66, 158-67, 158-68, 158-69). The Mitchells were

---

[4] Based on this history and other information in the record, the Court, by separate order, denied SCDSS' motion for summary judgment in this action.

subsequently criminally prosecuted, and Yulanda Mitchell was sentenced to 10 years of incarceration.[5]

In 2015, Ms. Mitchell expressed an interest in adopting another child who was in the custody of FCCS, Plaintiff E.R.L. Adoption Advocacy was again contracted to conduct a background check and home visits. (Dkt. No. 166-17). FCCS staff also made several in person visits to the Mitchell home to interview the Mitchells and the children, again essentially double staffing the home visitation process. The background checks came back clean. (Dkt. No. 162-1 at 4). When an inquiry was made by Adoption Advocacy regarding whether Ms. Mitchell was on the Child Abuse Registry, SCDSS accurately reported she was not. SCDSS did not reveal to Adoption Advocacy, FCCS, or the Beaufort County Family Court that was handling the 2015 adoption Ms. Mitchell's past judicial finding of child abuse or the multiple child abuse reports that had been made since the adoption of the four siblings in 2010. The home visitations conducted by FCCS and Adoption Advocacy raised no red flags. The adoption of E.R.L. was approved by the Beaufort County Family Court on October 15, 2015. (Dkt. No. 166-13).

## Discussion

A. <u>FCCS, Adoption Advocacy and their staff members are entitled to summary judgment regarding Plaintiffs' § 1983 deliberate indifference claims</u>.

Plaintiffs assert § 1983 claims in the Sixth and Seventh Causes of Action against FCCS and various employees of FCCS for an alleged deliberate indifference in regard to the 2010 and 2015 adoptions. (Dkt. No. 103, ¶¶ 155-178). Plaintiffs assert nearly identical § 1983 claims against

---

[5] A complicating factor in the Mitchell child abuse investigations was that most of the Mitchell children denied any abuse or food deprivation. It was later learned that Ms. Mitchell had coached the children on what to say if questioned about possible abuse, which created confusion among SCDSS staff about the reliability of the reports. The failure of SCDSS staff to search the agency's own records regarding Ms. Mitchell's abuse history significantly contributed to the failure to act on the earlier reports of child abuse.

Adoption Advocacy and its staff members in the Tenth and Twelfth Causes of Action (*Id*. at ¶¶ 197-207, 214-224).[6]

Plaintiff's § 1983 causes of action against FCCS, Adoption Advocacy and their staff members vastly overstate the scope of a legally proper deliberate indifference claim. As the Fourth Circuit stated in *Doe v South Carolina Department of Social Services*, 597 F.3d 163, 175 (4th Cir. 2010), a child in the custody of a social service agency may have a claim of deliberate indifference where social workers "at a minimum . . . were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice."  On the other hand, a child in the custody of a social service agency after being removed from the parental home because of abuse and/or neglect has no valid deliberate indifference claim against social workers for injuries inflicted by foster parents where there was "unknown harm or dangers." *Id*.

Plaintiffs concede that Adoption Advocacy was "hamstrung by SCDSS's failure to conduct a Central Registry check." (Dkt. No. 179 at 3).  Nonetheless, Plaintiffs contend that had Adoption Advocacy conducted a "complete" investigation, it would have had "plenty of opportunity to discover" the dangers. (*Id*.). Plaintiffs' concession states the obvious—there is no evidence in this voluminous record before the Court which remotely suggests that FCCS, Adoption Advocacy or any of their staff had any knowledge of Yulanda Mitchell's child abuse history, the numerous reports of alleged child abuse by Ms. Mitchell that were deemed unfounded by SCDSS, or any other danger the children might have had by being in her custody. In the absence of information

---

[6] Adoption Advocacy and the Plaintiffs vigorously dispute whether Adoption Advocacy would be deemed acting under color of state law and thus liable under § 1983 for contract work it performed in support of FCCS's adoption processes regarding the Mitchell adoptions in 2010 and 2015. The Court assumes without deciding that in performing non-delegable duties for children in the custody of a state social service agency, Adoption Advocacy would be deemed a state actor. As noted above, this dispute is academic because under the facts presented in this action neither Adoption Advocacy nor FCCS have any § 1983 liability.

that "plainly placed" the Defendants "on notice of a danger" there can be no liability for a deliberate indifference claim. *Doe*, 597 F.3d at 175. Consequently, FCCS, Adoption Advocacy and their staffs are entitled to summary judgment regarding the Plaintiffs deliberate indifference claims under the Sixth, Seventh, Tenth and Twelfth Causes of Action.[7]

    B.  <u>FCCS is entitled to summary judgment on Plaintiffs' *Monell* claims</u>.

Plaintiffs contend that FCCS is liable for alleged adoption of "unconstitutional policies and procedures" under the Sixth and Seventh Causes of Action. (Dkt. No. 103 at ¶¶163, 175). It is well settled that a local governmental entity may be liable for a custom or policy only in four very specific ways: (1) through an express policy; (2) through a decision of a person with final policymaking authority; (3) through an omission, such as a failure to train officers that manifest a deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread that its custom has the force of law. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

In response to FCCS's motion for summary judgment on the *Monell* claims, Plaintiffs argued that FCCS "took absolutely no interest in the children it shunted off to private adoption agencies" based entirely on a statement of Adoption Advocacy's Hayes in his deposition that FCCS did not conduct reviews of Adoption Advocacy's adoption files. (Dkt. No. 179 at 8). Plaintiffs' argument ignores the fact that all of Adoption Advocacy's reports were submitted to FCCS under its contract as part of the adoption process and that FCCS staff conducted their own

---

[7] The individually named FCCS and Adoption Advocacy employees would also be entitled to qualified immunity because any liability for individual governmental employees for violation of a constitutional right must be "clearly established" and "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Doe* at 176. Where there was no clear notice of the presence of danger to the foster children, there was no clearly established constitutional right on a deliberate indifference claim.

home visits and interviews. In fact, according to Hayes, FCCS was the only out of state social service agency that actually sent staff to South Carolina to conduct their own interviews and assessments after contracting with Adoption Advocacy to handle the home assessment. (Dkt. No. 166-21 at 47-8, 58). This situation bears no resemblance to cases which have found that a failure to properly train staff can manifest a deliberate indifference to the rights of citizens. FCCS is entitled to summary judgment on Plaintiffs' *Monell* claims.

        C. <u>FCCS is entitled to summary judgment on Plaintiffs' negligence claims</u>.

Plaintiffs have asserted common law negligence claims against FCCS for its handling of the 2010 and 2015 adoptions of Plaintiffs under the Eighth and Ninth Causes of Action. (Dkt. No. 103 at ¶¶ 179-187, 188-196). FCCS asserts that it is entitled to immunity because under Ohio law, political subdivisions of the state are entitled to immunity under the facts presented in this action only if it can be shown that an "employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(a)(6)(b); (Dkt. No. 179 at 10-11).

In response to the Defendants' motion for summary judgment, Plaintiffs asserted their negligence claim was based on "recklessness" by unnamed FCCS staff members identified only as John Does. (Dkt. No. 179 at 11). The Ohio Supreme Court has defined "reckless conduct" as "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. Massillon*, 983 N.E.2d 266, 273 (Ohio 2012).

Plaintiffs' claim against FCCS based on the alleged gross negligence of individual staff members fails for a number of reasons. First, a legally valid claim of reckless conduct against an Ohio state employee must be targeted at the acts or omissions of a specifically identified public

12

employee. A reference to a John Doe defendant with no specification of an identifiable public employee and his or her specific acts of reckless conduct is insufficient to state a claim of reckless conduct under Ohio law. Second, "reckless conduct" requires "conscious disregard of or indifference to a known or obvious risk of harm." *Anderson*, 983 N.E. 2d at 273. Plaintiffs concede that FCCS and Adoption Advocacy employees were unaware of Ms. Mitchell's child abuse history and this lack of knowledge "hamstrung" them. (Dkt. No. 179 at 3). Without actual knowledge of a known or obvious risk, here Ms. Mitchell's child abuse history, there can be no reckless conduct under Ohio law that meets the requirements of § 2744.03(6)(b).

The South Carolina Supreme Court has enforced immunity laws of sister states as a matter of comity and public policy. *Newberry v. Georgia Department of Industry and Trade*, 336 S.E.2d 464, 465 (S.C. 1985). The South Carolina Court of Appeals has described the language of *Newberry* as "unequivocal." *Frady v. Student Loan Servicing Center*, 443S.E.2d 580, 581 (S.C. App. 1994). The statute authorizing a limited class of negligence actions against Ohio governmental entities is part of Ohio's partial waiver of sovereign immunity and is entitled to the respect under South Carolina law as a matter of comity and public policy.

Consequently, the Court grants summary judgment to FCCS on Plaintiffs' Eighth and Ninth Causes of Action.

> D. <u>Adoption Advocacy is entitled to summary judgment on Plaintiffs' negligence claims, and June Bond, and Joe Hayes are entitled to summary judgment on Plaintiffs' claims of reckless, willful or grossly negligent conduct</u>.

Under South Carolina law, a charitable organization, such as Adoption Advocacy, can be liable for common law negligence up to the statutory limits of the South Carolina Tort Claims Act, and employees of charitable organizations can be individually liable for "reckless, willful, or grossly negligent" acts or omissions. S.C. Code § 33-56-180. Grossly negligent conduct has been

13

defined to mean "the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not do. It is the failure to exercise slight care." *Pack v. Associated Marine Institutes, Inc.*, 698 S.E.2d 134, 138 (S.C. App. 2004). Reckless conduct has been defined as "the doing of a negligent act knowingly; it is a conscious failure to exercise due care." *Berberich v. Jack*, 709 S.E.2d 607, 612 (S.C. 2011).

To sustain a negligence action, a plaintiff must show that (a) the defendant owed a duty to plaintiff; (b) the defendant breached that duty by some negligent act or omission; (c) the plaintiff suffered injury or damages; and (d) the defendant's breach was the proximate cause of plaintiff's injury. *Steinke v. South Carolina Department of Labor, Licensing, and Regulation*, 520 S.E. 2d 142, 149 (1999). The plaintiff has the burden to establish that the defendant had a duty to the plaintiff.

Plaintiffs allege in the Eleventh and Thirteenth Causes of Action ten different alleged acts or omissions by Adoption Advocacy and its two employees, Bond and Hayes, arising out of the processing of the adoptions of the four siblings in 2010 and E.R.L. in 2015. (Dkt. No. 103 at ¶¶ 211 and 228). It is important to again note that Adoption Advocacy was a contractor with FCCS, which had custody of the children during the adoption processing. FCCS maintained an active role in the adoption processing, including multiple home visits by FCCS staff traveling from Ohio. Adoption Advocacy had specific tasks to perform set forth in its contract with FCCS. Consequently, Adoption Advocacy's duties were limited to those set in the contract with FCCS

and any requirements under SCDSS policies for the performance of those specifically designated by the contract.

The Court addresses each of these alleged acts or omissions of Adoption Advocacy, June Bond and Joe Hayes as follows:

1. "<u>Failing to monitor the safety of the children on a monthly basis.</u>" (Dkt. No. 103 at ¶¶ 211(a) and 228(a)): The record clearly establishes that Adoption Advocacy, pursuant to its contract with FCCS, conducted the required monthly meetings prior to adoption and as well as post placement assessments. (Dkt. Nos. 166 at 17; 166-4, 166-5, 166-11, 166-12, 166-16, 166-17). Plaintiffs do not contest in their response in opposition that Adoption Advocacy performed all of the required monthly meetings under its contract with FCCS. Adoption Advocacy is entitled to summary judgment on these allegations.

2. <u>Failing to monitor the safety of the child "by speaking with each child individually, in private, and outside the presence of the Mitchells regarding their health and safety in the foster home</u>." (Dkt. No. 103 at ¶¶ 211(b)(1), 228(b)(1)): Adoption Advocacy prepared detailed reports in 2010 and 2015 describing the attitude, bonding, family activities, school issues and other matters for each child. (Dkt. No. 166-5, 166-12). These reports reflect performance of the monthly visitations required under Adoption Advocacy's contract with FCCS. (Dkt. No. 166-16 at 2). Additionally, FCCS, as the custodian of the children, sent its own staff to South Carolina to effectively double staff the adoption processing. At oral argument, Plaintiffs argued that Adoption Advocacy was negligent in performing one of two required home visitations. This allegation was not asserted in the Complaint and Plaintiffs have provided no evidence that Plaintiffs suffered any injury from this alleged failure to make two home assessments. The missing piece of information here, that Ms. Mitchell was a judicially determined child abuser, was not the overlooked because

15

of the lack of an adequate number of home visits or assessments but from SCDSS' failure to search its own child abuse records when SCDSS received seven different reports of child abuse regarding Ms. Mitchell. Adoption Advocacy is entitled to summary judgment on these allegations.

    3.   <u>Failing to monitor the safety of the children by speaking with "collateral sources such as day care providers, teachers, school officials, neighbors, mental health providers, and medical providers.</u>" (Dkt. No. 103 at ¶¶ 211(b)(2), 228(b)(2)): Adoption Advocacy was an independent contractor with FCCS and was contracted to perform a set of specific duties regarding the adoption process. (Dkt. No. 166-16). The contract did not provide for Adoption Advocacy to communicate with "collateral sources." FCCS maintained custody of the children and made frequent visits to South Carolina regarding the processing of the adoption in its capacity as the custodian of the children. Plaintiffs contended at oral argument that SCDSS policy required the adoption investigator to interview collateral sources. The policy referenced actually provides that the adoption process "may" require contacting "associated persons" to gather evidence if necessary "concerning the character and integrity of the adoptive applicants." (Dkt. No. 180-9 at 2). The record is clear that Adoption Advocacy completed the mandatory checks on criminal history, child abuse registry, and sexual predator history. (Dkt. Nos. 180-8 at 9; 196 at 56-60). Furthermore, Plaintiffs offered no expert testimony that the standard of care required adoption investigators to communicate with collateral sources. Plaintiffs have not identified any legal duty that Adoption Advocacy had to communicate with "collateral sources." Adoption Advocacy is entitled to summary judgment on these allegations.

    4.   <u>Failing to review the "medical and mental health records of the children," which would have allegedly showed complaints of food deprivation by school officials and stealing and hoarding food.</u> (Dkt. No. 103 at ¶¶ 211(c)(1), 228(c)(1)): Adoption Advocacy's contract with

16

FCCS listed several distinct areas of responsibility, which did not include gathering the children's medical and mental health records. (Dkt. No. 166-16 at 2). Further, no SCDSS policy required an adoption investigator to gather medical and mental health records of the proposed adoptive children, and no expert testimony was offered to indicate that the standard of care required adoption investigators to gather these records. Additionally, the records regarding food deprivation to the four siblings arose in child abuse reports by school personnel years after the completion of the 2010 adoption process. (Dkt. Nos. 158-18, 158-30, 158-56). Adoption Advocacy is entitled to summary judgment on these allegations.

5. <u>Failing to review "SCDSS records regarding the numerous documented complaints of child abuse and neglect" regarding Ms. Mitchell</u>: (Dkt. No. 103, ¶¶ 211(c)(2), 228(c)(2)): Plaintiffs concede that Adoption Advocacy had no access to SCDSS child abuse records. Adoption Advocacy is entitled to summary judgment on these allegations.

6. <u>Failing to determine who lived in the Mitchell home</u> (Dkt. No. 103, ¶¶ 211(c)(3)): The 2010 home study specifically identified who was living in the Mitchell home. (Dkt. No. 199-1 at 6). Additionally, both Adoption Advocacy and FCCS staff had the opportunity to determine who was residing in the Mitchell home during their many home visits. Adoption Advocacy is entitled to summary judgment on these allegations.

7. <u>Failing to investigate "the Mitchells' financial circumstances and numerous lawsuits from payday lenders and the foreclosure of their home."</u> (Dkt. No. 103 at ¶¶ 211(d), 228(d)): SCDSS policy required "financial information" review including "W-2, tax return, or last three months pay stubs." (Dkt. No. 180-8 at 9). Adoption Advocacy completed the required financial review. SCDSS policy and Adoption Advocacy's contract with SCDSS did not require a search for prior lawsuits. Plaintiffs did not offer any expert testimony on standard of care which indicated

17

a need to check such records, and Adoption Advocacy's Joe Hayes stated he had never done this in conducting two decades of adoption processing in South Carolina. (Dkt. No. 166-21 at 30-31, 58, 76). Adoption Advocacy is entitled to summary judgment on these allegations.

8. <u>Failing to "investigate the Mitchells' home to include locks on the outside of the doors of the children's rooms</u>." (Dkt. No. 103, at ¶¶ 221(e), 228(e)): Adoption Advocacy conducted all of the home visitations required under its contract with FCCS. Adoption Advocacy staff, as well as FCCS staff, all documented positive relationships between the Mitchells and the children and indicated they were adjusting to their new home. Neither Adoption Advocacy's contract with FCCS nor SCDSS policies required checking the doors on the children's bedrooms for the placement of locks, and Plaintiffs offered no expert testimony to indicate such a check was required by the standards of care. Adoption Advocacy is entitled to summary judgment on these allegations.

9. <u>Failing to observe during home visits that the children "were visibly afraid of Yulanda Mitchell</u>." (Dkt. No. 103 at ¶¶ 221(f), 228(f)): The many home visits conducted by Adoption Advocacy and FCCS staff documented positive relationships between Ms. Mitchell and the children during the several months the adoptions were processed in 2010 and 2105. Adoption Advocacy is entitled to summary judgment on these allegations.

10. <u>Failing to compare Ms. Mitchell's driver's license and other identification information with the Department of Social Services' Registry of Child Abuse and Neglect</u> (Dkt. No. 103 at ¶¶ 221(g), 228(g)): The uncontested evidence in the record shows that Adoption Advocacy had no access to the SCDSS' Child Abuse Registry and made the required inquiry to SCDSS concerning whether either of the Mitchells were on the Child Abuse Registry. SCDSS

accurately reported Ms. Mitchell was not on the Child Abuse Registry at the time of the 2010 and 2015 adoption. Adoption Advocacy is entitled to summary judgment on these allegations.

Since there is no evidence that June Bond and Joe Hayes were negligent in the performance of their duties during the 2010 and 2015 adoptions, it is axiomatic that Plaintiffs have no valid claim against them for gross negligence. In sum, the record does not demonstrate any material factual dispute on Plaintiffs' claim of negligence against Adoption Advocacy or Plaintiffs' claims of gross negligence against June Bond, and Joe Hayes, and the Court finds that all are entitled to summary judgment on the negligence and gross negligence claims as a matter of law. The Court grants Adoption Advocacy, June Bond and Joe Hayes summary judgment on the negligence and gross negligence claims in the Eleventh and Thirteenth Causes of Action.

## Conclusion

Based on the foregoing, the Court finds that FCCS, its John Doe staff members, Adoption Advocacy, June Bond and Joe Hayes are entitled to summary judgment as a matter of law and grants their motions for summary judgment (Dkt. No. 162, 165).

**AND IT IS SO ORDERED**.

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

March 5, 2025
Charleston, South Carolina